# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RLI INSURANCE COMPANY,

     Plaintiff,

vs.                                                              Case No: 8:20-cv-02395
                                                                 **DISPOSITIVE MOTION**

OUTSIDEIN ARCHITECTURE, LLC,

     Defendant.

_____/

## RLI INSURANCE COMPANY'S MOTION FOR
## FINAL SUMMARY JUDGMENT

     RLI INSURANCE COMPANY ("RLI"), pursuant to Fed. R. Civ. P. 56, moves

for final summary judgment against OUTSIDEIN ARCHITECTURE, LLC ("OIA"):

Respectfully submitted,

/s/ MICHELE A. VARGAS
SINA BAHADORAN
Florida Bar No. 523364
Sina.Bahadoran@Clydeco.us
MICHELE A. VARGAS
Florida Bar No. 686395
Michele.Vargas@Clydeco.us
CLYDE & CO US LLP
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
T: 305.446.2646

Dated: April 8, 2022.

## TABLE OF CONTENTS

INTRODUCTION .................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 3

    A.  OIA was hired for architectural services
        for a project in Puerto Rico. ............................................................ 3

    B.  OIA became aware of issues with
        demolition work at the Project. ........................................................ 3

    C.  The first claim against OIA. ............................................................. 4

    D.  OIA reported the claim to its prior insurer, AIG. ........................................... 4

    E.  OIA learned a demolition worker died
        in an accident at the Project. .......................................................... 5

    F.  Marrero's Lawyer sends a Litigation Notice to OIA. .................................... 6

    G.  After receiving the counsel's Litigation Notice,
        OIA conducted its own investigation. ................................................. 8

    H.  OIA applied for a new policy with RLI,
        but did not disclose the worker's death at the Project. ............................... 8

    I.  Relying on OIA's answers in the Application,
        RLI issued the policy. ................................................................. 10

    J.  As threatened in the Litigation Notice, OIA was sued for
        causing Marrero's death. ............................................................. 12

    K.  OIA convinced the Puerto Rico trial court to disqualify
        Marrero's counsel based on the Litigation Notice. ................................... 13

    L.  OIA reported the wrongful death claim to RLI. ......................................... 14

    M.  The Declaratory Judgment Action ..................................................... 14

ARGUMENT AND CITATION OF AUTHORITY ..................................................... 15

    I.   THE PRIOR KNOWLEDGE PROVISION BARS COVERAGE............... 16

    II.  RESCISSION UNDER THE APPLICATION. ........................................... 27

    III. THE RELATED CLAIMS PROVISION APPLIES. .................................... 29

    IV. THE PRIOR NOTICE EXCLUSION ELIMINATES COVERAGE. ......... 32

    V.  OIA'S AFFIRMATIVE DEFENSES ARE MERITLESS.............................. 34

CONCLUSION ......................................................................................................... 35

CERTIFICATE OF SERVICE................................................................................... 35

## INTRODUCTION

At issue here is whether RLI owes coverage when OIA plainly knew of and could reasonably anticipate a claim before its new policy with RLI incepted on **March 18, 2020**. More specifically, on **June 10, 2019**, OIA knew a demolition worker at its project fell through the thirteenth floor and died. OIA was the "chief architect and manager" of the Project. In the months leading up to the accident, OIA knew demolition work was being performed *without* a permit. In fact, on the day of the accident, OIA's consultant threatened to expose OIA's "serious ethical violations." And on **June 21, 2019**, a lawyer for the decedent's Estate sent OIA a legal hold and evidence preservation letter ("Litigation Notice"). The Litigation Notice was blunt: "*You are all involved in a matter that may involve litigation regarding Rise Village at Carolina Puerto Rico. This litigation stems from the death of Raul E. Garcia….*"

Despite knowing about the death, the Litigation Notice, and even a potential whistleblower claim, OIA applied for a new insurance policy with RLI and did not disclose any of this information.

The Insuring Agreement includes a **Prior Knowledge provision**, which precludes coverage because OIA knew and could reasonably foresee a claim before the policy incepted. *See Berkley Assur. Co. v. Expert Group, Int'l*, 779 Fed. App'x. 604 (11th Cir. 2019).

RLI also does not owe coverage because the Insuring Agreement includes a **claims-made and reported provision**, which limits coverage to "claims" first made and reported during the policy period. The wrongful death claim against OIA is deemed "first made" before the policy incepted because it relates to the June 10, 2019 claim. Both claims share "a logical or causal connection" of common facts, situation, events, transactions, or projects, which means that they qualify as "related claims" under the Multiple/Related Claims Condition 5. *See Zodiac Group, Inc. v. Axis Surplus Ins. Co.*, 542 Fed. App'x 844 (11th Cir. 2013).

Moreover, the policy includes a **Prior Notice Exclusion** that bars coverage for any claim *based upon or arising out of any fact, situation, event, wrongful act* that was the subject of any notice given by OIA under any prior policy. OIA reported the June 10, 2019 claim to its prior insurer, AIG. That claim threatened to expose OIA's "serious ethical violations," including knowledge of illegal demolition work without a permit. *See Nova S.E. Univ. v. Cont'l Cas. Co.*, No. 18civ61842, 2019 WL 7820594 (S.D. Fla. Dec. 27, 2019).

The policy is void under the policy's Representations Condition 14 and Fla. Stat. § 627.409 based on OIA's material misrepresentations in the **Application**. *See Miguel v. Metro. Life Ins. Co.*, 200 Fed. App'x. 961 (11th Cir. 2006).

RLI respectfully submits it is entitled to summary judgment in its favor as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. *OIA was hired for architectural services for a project in Puerto Rico.*

1.  OIA's principal, Darren Azdell, is a licensed architect in Florida. (*See 04/13/2020 Application*, Ex. 1, Pg. 2.)

2.  On June 25, 2018, Tower Acquisition Group, LLC ("Tower") hired OIA as the architect for a project known as Rise Village in Carolina, Puerto Rico ("Project"). (*See* D.E. 1-2, ¶¶ 7, 10, 16; *Supp. Expert Rep.*, Ex. 2, Pg. 3.) OIA then hired InterGroup, LLC ("IG") as its architectural consultant for the Project. (*Id.*, Pg. 3.)

### B. *OIA became aware of issues with demolition work at the Project.*

3.  The Project did not go smoothly. In **February 2019**, OIA sent an email to other design professionals in the Project expressing particular concern "about cracks in the cantilever corners…." (*See Email dated 02/18/2019*, Ex. 3.)

4.  On **March 1, 2019**, the principal of IG, Mario Corsino, warned OIA that "the project may get in trouble easily" because there was no demolition permit but demolition was nonetheless underway. (*See IG Email dated 03/01/2019*, Ex. 4.)

5.  IG reiterated on **March 4, 2019** that there was no "demolition permit active now or evidence of such." for the Project. (*See IG Correspondence*, Ex. 5.) Mr. Corsino was adamant: "[s]topping the demolition until the Permit is completed is the correct way to go. That will assure all parties no legal consequences and again, there is no permit to Demolish to date." (*Id.*, Pg. 5.)

6.     Things escalated when in an email dated **March 4, 2019**, IG warned OIA it would "not permit [OIA's] actions [to] tarnish [IG's] good name and professional standing" and it needed to resolve the permitting problem.[1] (*See IG Email #2*, Ex. 6.)

7.     On **April 11, 2019**, a fire broke out during demolition work on the 11th floor. (*See Bird Report*, Ex. 7.)

8.     OIA defaulted on its prime contract. On **May 20, 2019**, OIA confessed to IG "[OIA is] in default of our prime agreement [with Tower] and [it] ha[d] limited time to correct the deficiencies in the construction documents and properly update the consultants." (*See OIA Email #2*, Ex. 8.)

**C. The first claim against OIA.**

9.     Tension between OIA and IG escalated. On **June 10, 2019**, IG made a claim against OIA for payment for its work on the Project. (*See IG claim*, Ex. 9.) IG threatened to expose OIA's "serious ethical violations" at the Project, which could "affect" OIA's license. (*Id.*, Pg. 2.)

**D. OIA reported the claim to its prior insurer, AIG.**

10.     OIA was insured by New Hampshire Insurance Company ("AIG") under a claims-made and reported liability policy. (*See AIG Policy*, Ex. 10.)[2]

---

[1] The demolition permit was not issued until March 7, 2019.

[2] The insuring agreement of the AIG policy includes a prior knowledge and claims provisions. (*Id.*, Pg. 1-2.) It also includes a circumstance reporting so if OIA would've reported the death claim, coverage would have been accepted.

11.     On **June 17, 2019**, OIA's insurance broker, Tammy Johnson of Florida Design Insurance, LLC, advised OIA to report IG's claim to AIG. (*See Voicemail Tr.*, Ex. 11.) That same day OIA reported the claim, explaining it "received a demand letter… for payment of services…." (*See OIA's Claim Reporting*, Ex. 12.)

12.     OIA responded to IG that their contract required mediation as "a condition precedent to any litigation." (*See Response*, Ex. 13.)

13.     AIG acknowledged the claim (*Claim Acknowledgement*, Ex. 14), and then disclaimed coverage. (*See AIG's Email Denial*, Ex. 15.)

14.     OIA eventually withdrew its tender to AIG. (*See Email to AIG*, Ex. 16.)

### E.  OIA learned a demolition worker died in an accident at the Project.

15.     On **June 10, 2019**, Raul E. Garcia Marrero, an employee of the demolition subcontractor, Demex Environmental Group, LLC ("Demex"), was using a Bobcat to clean debris on the 13th floor. (*See* D.E. 1-1, ¶ 21-22.) The 13th floor collapsed; Mr. Marrero fell and died on impact. (*Id.*)

16.     OIA learned of Mr. Marrero's death the same day, on **June 10, 2019**. (*See OIA Tr.* , Ex. 17, Pg. 70:7-10.)

17.     On **June 14, 2019**, OIA wrote to the structural engineer, Jose Morla, indicating OIA would independently evaluate the cause of the collapse. (*See OIA Email 06/14/2019*, Ex. 18.)

### F. *Marrero's Lawyer sends a Litigation Notice to OIA.*

18.     On **June 21, 2019**, an attorney for the Garcia family, Alcides A. Reyes-Gilestra, sent OIA and other culpable parties a legal hold and notice of claim letter ("Litigation Notice"). He served it via "certified mail and personal delivery" on OIA's principal, and also on OIA's registered agent in Puerto Rico. (*See Litigation Notice*, Ex. 19.)

19.     Mr. Gilestra's "modus operandi" in "all litigations and other matters in Puerto Rico" is "personal delivery" through "a courier or a messenger or a process server to deliver the letter" and service through "certified mail…." (*See Gilestra Tr.*, Ex. 20, Pg. 28:18-25; 29:12.)

20.     Mr. Gilestra's former law firm received "invoicing on all services provided," including for serving the Litigation Notice on OIA. (*Id.*, Pg. 31:3-10.) On December 3, 2019, Mr. Gilestra's former firm sent him and his clients a letter "that all costs incurred through [December 2019] were due," including the cost of personal serving OIA with the Litigation Notice. (*Id.*, Pg. 32:1-8; *See BTA letter*, Ex. 21.)

21.     Gilestra's other client, Mr. Corsino, spoke to OIA's registered agent, Raul Santiago Perez. Mr. Perez confirmed he received the Litigation Notice and "he had forwarded it to Mr. Azdell." (*See*, Ex. 20, Pg. 35:19-25; 36:23-25; 37:1-3.)

22.     The Litigation Notice was clear:

> "You are all involved in a matter that **may involve litigation** regarding Rise Village at Carolina Puerto Rico. **This litigation** stems from the death of Raul E. Garcia at the worksite where Bird Group, LLC is the general contractor. I have been engaged as legal counsel by the Garcia family **to seek redress** in light of the negligence of one or more parties…."

(*Id.*, Pg. 2) (emphasis added).

23.     Mr. Gilestra testified he believed OIA was responsible because "there were some issues also involving the permitting process, Mr. Garcia died in the demolition phase of the project. So I did believe that OIA was potentially involved as a – could have responsibility in what happened… as the chief architect." (*Id.*, Pg. 34:9-25.) Further, "Mr. Corsino, the principal of IG… had several months before, raised issued of the permitting process, specifically the demolition permitting process." (*Id.*, Pg. 35:2-6.)

24.     In an email dated **June 28, 2019,** OIA wrote to his attorney, Sergio Criado, indicating that BTA, a law firm owned by Mr. Gilestra, "just tried to serve me a certified letter. No one was here. **Accident attorney? Maybe from the construction accident?**" (*See OIA Email re Lit. Notice*, Ex. 22, Pg. 3) (emphasis added).

25.     Mr. Criado responded the Litigation Notice "is the same letter that [OIA] already ha[s]…." (*Id.*, Pg. 1.)

26.     That **same day**, Mr. Criado emailed Mr. Gilestra about the certified Litigation Notice that BTA sent "directly to [his] client Outsidein Architecture, LLC." (*See Gilestra Email*, Ex. 36.) Mr. Gilestra responded to Mr. Criado that the letter he referenced in his email is "the same letter" he, as "principal of BTA" sent to OIA, *i.e.*, the Litigation Notice. (*Id.*, Pg. 3.)

### G. *After receiving the counsel's Litigation Notice, OIA conducted its own investigation.*

27.     On **July 12, 2019**, OIA's structural engineer, Jose Morla, agreed with a report finding the concrete is structurally deficient and the weight is not enough to resist the weight of the bobcat. (*See Email*, Ex. 23.)

### H. *OIA applied for a new policy with RLI, but did not disclose the worker's death at the Project.*

28.     Due to OIA's reporting of the IG claim, AIG chose not to renew OIA's policy. (*See 01/21/2020 Nonrenewal Email*, Ex. 24.)

29.      On January 3, 2020, OIA applied for new insurance using the application provided by its broker. (*See Tammy Email*, Ex. 25 and *App.*, Ex. 1.)

30.     The Application included these questions, which OIA falsely answered:

> Section 1.B. Short Form Eligibility (All Questions in This Section Are Mandatory)

> 8.     After inquiry, is the Applicant, any predecessors in business, or any other person for whom coverage is requested aware of any act, error, omission, or circumstance which may result in a claim being made

against them but which has not yet been reported to a professional liability carrier? (If yes, please attach a full statement)
**Answer: No**

Section 2.I. Claims History

3.　　After inquiry, is the Applicant, any predecessors in business, or any other person for whom coverage is requested <u>aware of any act, error, omission, or circumstance which may possibly result in a claim being made against them</u> but which has not yet been reported to a professional liability carrier?
**Answer: No**

4.　　Has the <u>Applicant</u>, any Predecessors in business or any other person form whom coverage is requested <u>ever reported a potential claim, circumstance to a professional liability carrier</u>?
**Answer: No.** (*See* D.E. 1-2, Pg. 2, 8) (italics added).

31.　　The first paragraph of the Application contains this definition of the term claim: "**claim means any demand for money or services**…." (Ex. 1, Pg. 1.)

32.　　OIA's broker submitted the Application to RLI for a Quote for a new insurance policy. (*See 02/21/2020 Tammy Email*, Ex. 26.)

33.　　On 02/26/2020, OIA's broker requested RLI bind coverage, and RLI issued the Binder. (*See 02/26/2020 Email*, Ex. 27; *Binder*, Ex. 28.)

34.　　OIA re-signed the Application on 04/13/2020, and it was re-submitted to RLI on 04/20/2020. (*See* Ex. 1; *04/20/2020 Tammy Email*, Ex. 29.)

35.　　OIA's broker testified she relied on OIA's answers in the Application, which she referred to as "**kind of a normal application**," before sending it out to the available insurance market for a quote. (*See Tammy Tr.*, Ex. 30, Pg. 18:2-3; 21:1-6, 23-24; 22:1-2; 36:24-25; 37:1.)

36.     Ms. Johnson also testified that she "understood" the questions in the application. (*Id.*, Pg. 26:15-22.) Ms. Johnson agreed that Question 8 of the Application required the applicant [OIA] to disclose "any act, error or omission, or circumstance which may result in a claim being made against them, regardless of whether the applicant believes they have liability." (*Id.*, Pg. 74:6-17.)

37.     Ms. Johnson also testified OIA never informed her about the death at the Project before she sent the Application to RLI for a Quote. (*Id.*, Pg. 39:7-13.)

38.     Had OIA notified her about the death, she would've "absolutely" recommended that OIA disclose that event in the application. (*Id.*, Pg. 39:14-22.)

39.     OIA also failed to inform Ms. Johnson of the Litigation Notice which, had she known, she "**absolutely**" would've recommended OIA disclose it in its Application. (*Id.*, Pg. 45:1-20; 54:6-18.) She also would have recommended reporting the Litigation Notice to AIG. (*Id.*, Pg. 44:14-16.)

40.     In fact, OIA did not inform Ms. Johnson about the demolition death at the Project until September 10, 2020, which was 15 months later. (*Id.*, Pg. 65:1-6.) Ms. Johnson testified she should've been notified when OIA learned of the incident back in June 2019. (*Id.*, Pg. 66:8-25; 67:1-9; 68:23-25; 69:1-6.)

## I.   *Relying on OIA's answers in the Application, RLI issued the policy.*

41.     In reliance on OIA's warranties and representations in the Application, RLI issued a claims made and reported Professional Liability policy,

No. RDP0038983, effective 03/18/2020 to 03/18/2022. (*See* D.E. 1-2.)

42.     Under Insuring Agreement 1 a., RLI has a duty to pay on behalf of OIA, **Claim Expenses** and **Damages** incurred by OIA as a result of a **Claim** for a **Wrongful Act** to which this insurance applies…. (*Id.*, Pg. 5.)

43.     The Insuring Agreement includes two additional provisions for coverage to apply. Under the Claims Made Provision 1(b)(i), the claim must be first made and reported during the Policy Period. (*Id.*) Under the Prior Knowledge Provision 1(b)(iii), "none of the **Insured's** directors, officers, principals, partners or insurance managers knew or could have reasonably expected that the **Wrongful Act**… might give rise to a **Claim**… prior to the inception date of this Policy…." (*Id.*)

44.     The policy also includes a Prior Notice Exclusion Q, which provides:

This Policy does not apply to any **Claim(s)**…

Based upon or arising out of: (i) any fact, situation, event, **Wrongful Act**… which was the subject of any notice given under any prior policy for Design Professional Liability.. prior to the effect date of this Policy; or (ii) any other **Wrongful Act**… whenever occurring, which is logically or causally connected by common facts, situations or events, regardless of the number of contracts or the types of **Professional Services** rendered, to the **Wrongful Act…** specified in q. (i) immediately above. (*Id.*, Pg., 12-13.)

45.     The Policy includes Multiple/Related Claim(s) Condition 5(d), which provides in part: "**Related Claims** will be treated as a single **Claim,** regardless of when the earliest **Claim** was made against an **Insured**. This Policy applies only if

the earliest **Claim** is first made against an **Insured** during a **Policy Year** within the

**Policy Period**…." (*Id.*, Pg. 13.)

### J. *As threatened in the Litigation Notice, OIA was sued for causing Marrero's death.*

46.     On July 15, 2020, the Estate of Mr. Garcia sued OIA and the other

design professionals on the Project ("Underlying Action"). (*See* D.E. 1, ¶ 8.)

47.     The complaint alleges OIA was the "chief architect" in charge of the

design and management of the Project. (*See* D.E. 1-1, ¶ 7, 10, 16.) OIA was also

"serving as a compliance officer, to ensure compliance with all of the standards,

laws, and regulations applicable to construction projects, which also includes the

government permit component." (*Id.*)

48.     OIA allegedly committed willful, intentional, reckless, quasi-criminal

and grossly negligent acts by failing to ensure compliance with the safety

standards established by the OSHA for construction and demolition sites. (*Id.*, ¶

10.) For example, construction began before the construction and demolition

permit was issued. OIA allegedly "had to order that the work be halted for several

days when one of the consultants alerted the head of OSHA about instances of

noncompliance with OSHA standards at the site." (*Id.*, ¶ 17.)

49.     OIA allegedly "continued with construction, despite being aware of

reports made about OSHA and permitting process violations at the construction

site." (*Id.*, ¶ 10.) OIA's alleged violations of OSHA were "the direct cause" of

Marrero's death on June 10, 2019, while working at the project. (*Id.*) Last, OIA allegedly "failed to exercise its duty to oversee the demolition work done by Bird and Demex and it failed to ensure compliance with the laws and regulations applicable to construction and demolition sites…." (*Id.*)

### K. OIA convinced the Puerto Rico trial court to disqualify Marrero's counsel based on the Litigation Notice.

50.     On March 12, 2021, OIA moved to disqualify attorney Gilestra in the Underlying Action based on an alleged conflict of interest. (*See Mot.*, Ex. 31.)

51.     According to OIA, Mr. Gilestra served OIA with the IG Claim on June 10, 2019, threatening to expose serious ethical violations at the Project. That same day, Mr. Marrero suffered the work-related death. Eleven days later, on June 29, 2019, Mr. Gilestra served OIA with the Litigation Notice. (*Id.*, Pg. 2-3.)

52.     Mr. Gilestra opposed the motion arguing OIA knew he was counsel for IG and the underlying claimants **since June 2019**.[3] (*See Resp.*, Ex. 32, Pg. 10.) In footnote 1, Mr. Gilestra argued that on 06/21/2019 he served the Litigation Notice on all defendants, including OIA. (*Id.*, Pg. 1.)

53.     On 02/15/2022, OIA prevailed on its motion; the Puerto Rico trial court disqualified Mr. Gilestra because he represented IG and also Marrero.[4]

---

[3] In paragraph 4, attorney Gilestra argues "[s]ince the beginning of 2019" IG notified OIA "about non-compliance… in areas such as occupational safety and the commencement of demolition of the site without the required permit." (*Id.*, Pg. 2-3.)

[4] Mr. Gilestra moved for reconsideration. (*See Mot.*, Ex. 34.) Of interest, he argues that despite having served OIA with the IG claim and the Litigation Notice, OIA committed "a fraudulent

**L. *OIA reported the wrongful death claim to RLI.***

54.     OIA reported the Underlying Action to RLI.

55.     On October 9, 2020, RLI agreed to defend OIA under a complete reservation of rights. (*See ROR*, Ex. 33.)

**M. *The Declaratory Judgment Action***

56.     RLI filed this action for a declaration that it does not owe defense or indemnity to OIA and that the policy is void. (*See* D.E. 1.) OIA filed an answer, affirmative defenses, and a counterclaim for breach of contract. (*See* D.E. 12.)[5] OIA dropped its fifth and sixth affirmative defenses. (*See* D.E. 30.)

57.     RLI's expert, Benjamin Bedard, opined that based on his experience and all the evidence he reviewed, before the RLI policy incepted, that OIA knew (actual knowledge) and also could reasonably foresee (objective/subjective test) that the death at the Project might result in a Claim against OIA. (*See* Ex. 2.)

58.     OIA did not hire an expert to rebut Mr. Bedard's opinions.

59.     OIA contends it did not receive the Litigation Notice until it moved to disqualify Mr. Gilestra. (*See Ans. To IROGs*, Ex. 35, Pg. 5.)

60.     In fact, Mr. Gilestra testified that OIA's position "is totally not credible and untrue" because since **July 2019**, OIA knew he was representing the wrongful

---

and deceptive act" in its application for insurance to RLI by alleged "it was unaware of the contingency in the instant case…." (*Id.*, Pg. 3.)

[5] RLI filed its answer and affirmative defenses to the counterclaim. (*See* D.E. 16.)

death claimants. (*See* Ex. 20, Pg. 51:21-25; 52:1-2; 54:4-19.) Moreover, his other client

(IG) told him in **July 2019** that OIA's registered agent, Santiago Perez, received

the Litigation Notice. (*Id.*, Pg. 57:1-4.; 64-21-25; 65:22-25; 66:1-14; *Tr. Vol II*, Pg.

106:5-8.)

61.     Mr. Gilestra testified he received the signed receipt indicating the

Litigation Notice was delivered by the U.S.P.S. via certified mail. (*Id.*, Pg. 76:5-11.)

62.     He also testified that the Litigation Notice to OIA "was the demand

letter, in essence. So, I mean, we don't need to send a demand letter after that."

(*Id.*, Pg. 113:9-17.)

63.     As for OIA's purported lack of knowledge that it would get sued,

attorney Gilestra testified that position was "actually unfathomable that OIA

would claim that they had total lack of knowledge of the potential lawsuit or the

legal hold letter. I can't fathom it." (*Id.*, Pg. 114:1-6.)

## ARGUMENT AND CITATION OF AUTHORITY

**Choice of Law and Policy Interpretation**

The duty to defend is generally based on the allegations of the underlying

complaint, *Empire Fire & Marine Ins. v. Span*, No. 19-61102, 2021 WL 2255127, at *6

(S.D. Fla. June 3, 2021), but there is an exception when the "duty to defend is based

on factual issues that would not normally be alleged in the underlying complaint,"

such as prior knowledge. *Id.* at *7 (citing *Diamond State Ins. Co. v. Boys' Home Ass'n,

Inc.*, 172 F. Supp. 3d 1326, 1340 (M.D. Fla. 2016) ("It appears that application of a

prior knowledge exclusion may constitute a circumstance where consideration of extrinsic evidence is appropriate.")).

## I.    THE PRIOR KNOWLEDGE PROVISION BARS COVERAGE.

The Prior Knowledge provision eliminates coverage if before **March 18, 2020** OIA "knew or could have reasonably expected that the Wrongful Act... might give rise to a Claim." (D.E. 1-2, Pg. 5.) Because it is part of the Insuring Agreement, OIA alone has the burden of proof. *See United Specialty Ins. v. Tzadik Acquisitions, LLC*, 488 F. Supp. 3d 1196, 1201 (M.D. Fla. 2020) ("the insured has the burden of proving that a claim against it is covered by the insurance policy.").

Florida courts apply a two-part test to determine if a prior knowledge provision applies. *See Feldman v. Imperium Ins. Co.*, No. 8:14-cv-1637, 2015 WL 584153, at *6 (M.D. Fla. Oct. 5, 2015). Part 1 involves actual knowledge of a wrongful act that could give rise to a claim before the policy incepts, while Part 2 involves whether the potential claim was reasonably foreseeable. If either prong is satisfied, there is no coverage. *See Fid. Nat'l Title Ins. Co. v. Houston Cas. Co.*, No. 6:11-cv-1438, 2012 WL 4523666, at *5 (M.D. Fla. Sept. 30, 2012).[6]

Courts consider extrinsic evidence. For example, in *Acosta, Inc. v. Nat'l Union Fire Ins.*, 39 So. 3d 565 (Fla. 1st DCA 2010), the court considered a pleading that

---

[6] Part 2 "is an objective inquiry, but it must be based on the facts subjectively known by the insured." *Id.*; *see also Eddy v. Cont'l Cas.*, 784 F. Supp. 2d 1331, 1342 (M.D. Fla. 2011) (finding objective test was met and prior knowledge provision barred coverage).

was filed in another lawsuit to apply the prior knowledge exclusion. *Accord Span*, 2021 WL 2255127, at *4 (Altman, J.) ("courts may look to extrinsic evidence when for example at issue is "whether the defendant had knowledge of a claim against it *before* it bought coverage.") (italics in original).

The evidence here is staggering. At the time of the Application, OIA was aware of the following information, which it failed to disclose:

(1) **02/2019** OIA was concerned about the cracks in the cantilever corners. (Ex. 3);

(2) **03/01/2019** IG warned OIA that "the project may get in trouble easily" because there was no demolition permit. (Ex. 4);

(3) **03/04/2019** IG reiterates to OIA that a demolition permit has not been issued, but demolition work continues. (Ex. 5);

(4) **05/20/2019** OIA admitted in writing it was in breach of the prime contract. (Ex. 8);

(5) **06/10/2019** the IG claim threatening to expose OIA's "serious ethical violations" at the Project, which included demolition work without supervision or a permit in place. (Ex. 9, 4-6);

(7) **06/10/2019** the accident and death of a demolition subcontractor following the collapse of an entire floor. (D.E. 1-1);

(8) **06/2019** OIA decides to investigate the cause of the collapse. (Ex. 18);

(9) **06/21/2019** the Litigation Notice was served on OIA's then registered agent. (Ex. 19);

(10) **06/28/2019** OIA's principal received notice that attorney Gilestra sent him certified mail in June 2019, which he believed was related to the death at the Project. Later, OIA's attorney confirmed receipt (Ex. 22, 36);

(11) **07/12/2019** OIA's structural engineer agrees with the report finding the concrete was structurally deficient. (Ex. 23), and

(12)  the death at the Project was widely reported in Puerto Rico's media. (*See* Ex. 17, Vol. 1, Pg. 71:5-6.)

A similar prior knowledge provision was enforced in a construction claim that is instructive here. *See Nova Se. Univ., Inc. v. Cont'l Cas. Co.*, No. 18cv-61842, 2019 WL 7820594, at *8 (S.D. Fla. Dec. 27, 2019). There, the insured structural engineer was hired to design ice tanks that would be used to cool a university in a more energy efficient manner. The project had problems from the start. In January 2009, the insured learned the ice tanks were leaking and cracking. It was later confirmed that the ice tanks were defectively designed. The insured tried to fire the employee responsible for the error, but he quit. The insured reported the issue to Evanston in January 2009.  The insured then drafted remedial designs, but those ended up being wrong as well. One of the tanks began leaking and showing corrosion in October 2009.

The university sued the insured on 12/26/2012 for professional negligence. The insured assigned its rights under two Continental professional liability policies issued 1/11/2012 through 1/11/2013. The policies included a prior knowledge provision in the insuring agreement, where Continental would pay but only if prior to 01/11/2012 the insured did not know "of any act, error, omission, or event that could reasonably be expected to become the basis of that claim." *Id.* at *3. Continental denied coverage.

In the coverage action, the district court granted Continental's motion for summary judgment reasoning that the prior knowledge provision barred coverage. First, while the university discovered three errors by the insured at different times, they were all "related" as they shared common facts and circumstances that were logically and causally connected. *Id.* at *6. "[F]or claims or acts to be "logically connected," all that is required is some factual nexus." *Id.* Second, the insured knew or should have reasonably expected that a claim would be made against it related to the negligent design dating back to January 2009. *Id.* at *7 "Florida courts routinely affirm the denial of coverage where an insurance policy contains an unambiguous prior knowledge provision and where an insured has knowledge prior to the effective date of the policy, of acts or omissions that might reasonably provide a basis for a claim." *Id.* (citing *Eddy*, 784 F. Supp. 2d 1331, 1337 (M.D. Fla. 2011)). The court determined that "a reasonable insured could have foreseen that a claim might result," and no coverage was owed. *Id.*

The Eleventh Circuit has upheld a similar prior knowledge provision. In *Berkley Assurance Co. v. Expert Group, Int'l*, 779 Fed. Appx. 604 (11th Cir. 2019), at issue was whether an insurer owed coverage for a related lawsuit first reported to a prior insurer. An Au Pair program allowed foreign nationals to work in the U.S. as childcare workers. On 11/13/2014, the insured and other sponsors were sued in a federal class action lawsuit for illegal price fixing. The complaint alleged

violations of the Sherman Act and wage related counts against the other defendants. The complaint was later amended in March 2015, adding a count for negligent misrepresentation and accused some sponsors—but not the insured-- of engaging in price fixing. A second amended complaint was filed in October 2016 that included a negligent misrepresentation claim against the insured. Then, a second lawsuit was filed against the insured in October 2016 by a former au pair client for negligent misrepresentation. At issue was coverage for the second lawsuit.

The insured reported the first lawsuit to its prior insurer, Colony, on 02/02/2015. Two days later the insured applied to Berkley for insurance and the Berkley policy was issued effective 02/14/2015 to 02/14/2016 and renewed through 02/14/2017. Berkley denied coverage for the second lawsuit on the Prior Knowledge provision reasoning the insured had knowledge of the grounds for the second lawsuit before the inception date of its policy. Since March 2015 the insured could foresee a claim for negligent misrepresentation because that is when the amended complaint in the first lawsuit asserted illegal price fixing by all sponsors. The district court agreed that since March 2015, the insured was on notice of allegations that all sponsors allegedly engaged in price fixing and that other lawsuits would soon follow. The district court also found the allegations gave the insured "sufficient prior knowledge of the grounds for [the subsequent] claims

that the prior-knowledge exclusion applied to bar coverage." *Id.* at 608. On appeal, the insured argued prior knowledge did not apply because the complaint in the first lawsuit alleged intentional conduct of price fixing, while the second amended complaint only alleged negligence.

The Eleventh Circuit affirmed. The word prior knowledge provision does not refer to a claim that is more likely than not going to be made. This is because the "might" "indicates a requirement for a lesser degree of certainty." The court reasonably explained: a prior knowledge provision "is not limited to claims that are imminent or certain to be made," which would defeat the purpose. *Id.* at 611. Rather, it is enough if the insured "could have reasonably foreseen that a claim might likely be made." *Id.* Once the amended complaint was filed in the first lawsuit, the insured was on notice of a potential negligent misrepresentation claim against it. The insured "had an objective basis to anticipate the specific negligence claim that was eventually filed against it—even if it had no reason to suspect that [the underlying plaintiff] in particular would be the one to bring the claim." *Id.* at 612. The test rightfully so is not whether "a claim [against the insured] would be likely to succeed." *Id.* at 612.

Here, Part 1 (actual knowledge) and/or Part 2 (objective/subjective test) under the Prior Knowledge provision are both satisfied. Before RLI's policy incepted on 03/18/2020, OIA knew and had an objective basis to know it would

be sued because a worker died at the Project in which it was the chief architect and manager. ((*See* Ex. 17, Pg. 70:7-10.) For example, on May 20, 2010, OIA admitted it was in default of the prime contract. (*See* Ex. 8.) On June 14, 2019, just four days after the death, OIA learned the concrete on the 13th floor was deficient and it could not bear the weight of a Bobcat. (Ex. 23.) In March 2019, IG had been complaining to OIA about demolition work proceeding without a permit or OIA's supervision. (Ex. 4-6.) Moreover, in June 2019 OIA received the Litigation Notice, which warned all design professionals of litigation, the duty to preserve evidence, and the estate seeking "redress."[7] (*See* Ex. 19.) According to Mr. Gilestra, the Litigation Notice "was the demand letter, in essence. So, I mean, we don't need to send a demand letter after that." (*Id.*, Pg. 113:9-17.) He even called OIA's position in this case "unfathomable." (*Id.*, Pg. 114:1-6.) And, on June 10, 2019, IG threatened OIA to whistle blow about OIA's "serious ethical violations" (Ex. 9.) There is no coverage.

OIA will likely argue it did not know and could not reasonably foresee a claim because it had no liability for the death. This argument is not only implausible but also contrary to the actual wording of RLI's Prior Knowledge provision – "*might give rise to a claim*." As the Eleventh Circuit Court in *Berkley Assurance* prudently observed, "[t]he question under the prior-knowledge

---

[7] "A litigation hold is a legal term of art describing a notice issued in anticipation of a lawsuit or investigation…." *Chemtreat, Inc.*, 488 F. Supp. 3d at 361.

exclusion in this case is whether [the insured] could have reasonably foreseen that a claim might likely be made, **not whether such a claim would be likely to succeed**." *Id.* at 612 (emphases added); *see also Coregis Ins. Co. v. McCollum*, 961 F. Supp. 1572, 1579 (M.D. Fla. 1997) ("In no way does the [prior knowledge] exclusion require that such a claim have merit or that the insured reasonably believed it to have merit."); *Accord Westport Ins. Corp. v. Goldberg & Dublin*, 255 Fed. App'x 593, 594 (2d Cir. 2007) (upholding prior knowledge exclusion because "even a low probability of suit would trigger [it]."); *Cohen-Esrey Real Estate Serv. V. Twin City Fire*, 636 F.3d 1300, 1305 (10th Cir. 2011) ("The threat of a claim, even an unfounded one, is relevant to the insurer's exposure, because defense costs, which can be quite substantial, are covered by the policy even when the claim against the insured proves unsuccessful. The reality of modern American litigation, which is what insurance policies are designed to protect against, is that persons must be prepared to defend against colorable albeit invalid claims.").

Any insured in OIA's position would have reasonably expected a claim based on the death at the Project. In 2020 alone, 161 lawsuits were filed against architects for bodily injury or death. (*See Westlaw docket search*, Ex. 37.) Moreover, RLI's expert's opined that all of the evidence establishes OIA should have been on notice of a potential claim given the death at the Project, IG's threats of

23

whistle blowing, and the Litigation Notice. (Ex. 2.) Mr. Bedard's testimony is uncontroverted.

Other courts have similarly enforced prior knowledge exclusions. *See e.g.*, *ChemTreat, Inc. v. Certain Underwriters at Lloyd's of London*, 488 F. Supp. 3d 343 (E.D. Va. 2020) (finding that prong 1 and 2 of prior knowledge provision were met because before policy incepted the insured knew the boiler system it provided water treatment services for exploded killing an employee, the claimant sent it a letter requesting the preservation of evidence, and the manufacturer of the boiler sent it a letter about potential subrogation claims); *Fid. Nat'l Title Ins. v. Houston Cas. Co.*, 2012 WL 4523666 (M.D. Fla. Sept. 30, 2012) (evidence established insured had knowledge of a wrongful act prior to the inception of the policy that could give rise to a claim, which triggered the prior knowledge provision); *David R. Farbstein, P.A. v. Westport Ins. Corp.*, No. 16-cv-62561, 2017 WL 3425327, at *9 (S.D. Fla. Aug. 9, 2017) (upholding the prior knowledge provision); *Houston Specialty Ins. v. Titleworks of the S.W.*, No. 2:15-cv-219 2018 WL 11354007 (M.D. Fla. Mar. 16, 2018) (prior knowledge provision barred coverage because insured knew it missed a lien on the title before the policy incepted); *Lawyers Prof. Liab. Ins. v. Dolam, Fertig & Cutis*, 524 So. 2d 677 (Fla. 4th DCA 1988) (finding prior knowledge exclusion applied because insured knew of error before policy incepted).

In *Axis Ins. Co. v. Farah & Farah, P.A.*, 503 Fed. Appx. 947 (11th Cir. 2013), at issue was whether an attorney at the insured firm had knowledge of a potential malpractice claim before the inception of the policy on 06/19/2009. On 01/28/2008, an appellate court vacated the insured's judgment finding the district court lacked jurisdiction because the lawsuit was filed prematurely so that the claim for consortium was forever barred. On 05/04/2009 the insured applied for a professional liability policy. Three months later, a legal malpractice lawsuit was filed against the insured based on the prematurely filed medical malpractice suit. Axis disclaimed based on the prior knowledge provision.

Even though the insured was first sued after the Axis policy was issued, the district court held the insured had a basis to believe there were acts or omissions that might reasonably be expected to be the basis of a claim. The court prudently concluded: "In this case, the prior knowledge provision essentially makes fortuity a condition of coverage. The … provision indicates in clear and unambiguous language [the insurance company's] unwillingness to cover liability arising from prior acts or omissions that any insured might reasonably be expected to result in a claim." *Id.* at *8.

Here, before RLI's policy incepted on 03/18/2020, OIA could reasonably foresee being blamed over Marrero's death at the Project. These are some of the key dates and events: **May 20, 2019**, OIA admits it is in default of the prime

contract; **March 2019**, IG repeatedly tells OIA demolition work should not proceed without a permit; **June 10, 2019**, when the death occurred, the IG claim is made and it threatens to disclose OIA's serious ethical violations; **June 14, 2019**, OIA learns the concrete in the 13th floor was structurally deficient; **June 2019**, OIA conducts its own investigation; **June 21, 2019**, Litigation Notice is served on OIA and others and OIA learns of the Notice. RLI's expert agreed the evidence proves Type 1 and 2 under the Prior Knowledge provision. "OIA's communication regarding the potential culpability and negligence of other parties and the retention of an expert by another party demonstrates an awareness that claims were expected to be brought with respect to the incident…." (Ex. 2, Pg. 10.)

Under the Insuring Agreement of the policy, OIA's lack of prior knowledge is a **condition precedent** to coverage. Because OIA cannot meet its burden of satisfying this condition precedent, the Court must enter final summary judgment for RLI. *See Bryan Bros. Inc. v. Cont'l Cas. Co.*, 660 F.3d 827, 831 (4th Cir. 2011) ("Because Whitworth had prior knowledge there has been a failure to fulfill a condition upon which Continental Casualty Company's obligation is dependent.").[8]

---

[8] The defenses raised by RLI are independently dispositive. Accordingly, if the Court agrees with RLI on this defense, it need not address the others.

## II. RESCISSION UNDER THE APPLICATION.

Condition 14 of RLI's policy known as "Representation" provides that OIA:

> Represent and acknowledge that the statements and information contained in the Application **are true, accurate**, and are the basis of this Policy and are incorporated into and constitute a part of this Policy; and **shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy**." (D.E. 1-2, Pg. 15.) (Emphasis added).

The Application OIA signed and submitted to RLI also contains a representation and warranty provision:

> The applicant warrants and represents that the information that is set forth in this Application is **true, accurate and complete**. The Applicant acknowledges and understands that this Application and all information that is provided by the Applicant or any representative of the Applicant to supplement this Application will, if a policy of insurance is issued, be incorporated in such policy and be made part of such policy by reference. (*Id.*, Pg. 10) (emphasis added).

OIA's answers to Question 8 in Section B, and Questions 3 and 4 in Section I of the Application were not true, accurate, or complete. Specifically, at the time of the Application, OIA was aware of an act, error, omission or circumstance which may result in a claim against it, *i.e.*, the death at the Project. (Ex. 17, Pg. 70:7-10.) OIA had also reported "a potential claim, circumstance" to AIG, which was IG's claim. Again, this claim threatened to expose OIA's violations at the Project. (Ex. 9; Ex. 12.) Accordingly, OIA's categoric "No" answers to these questions were material misrepresentations/incorrect statements which void the policy. There is no coverage under Condition 14 and the representations and warranty of the Application. *See State Farm Mut. Auto. Ins. v. Cockram*, No. 2:11-cv-161, 2012 WL

4903271, at *3 (M.D. Fla. Oct. 16, 2012) ("a material misrepresentation renders the policy null and void from the date of inception.").

The RLI policy is also void under Fla. Stat. § 627.409(1) because (1) OIA's application contained misrepresentations, (2) they were material, and (3) caused RLI to detrimentally rely on the incorrect statements and issue the policy. *Cockram*, at *4 (discussing elements for statutory rescission). Indeed, RLI's representative testified that if OIA had truthfully and correctly answered Questions, 8, 3, and 4, RLI would not have issued the policy, or would have issued it with an endorsement excluding coverage for the death, the Project, the contracts, the claimants, or any work at the Project. (*See RLI Tr.*, Ex. 38, Pg. 89:2-11; 92:12-25.) "RLI would not have issued the policy in this case. It involved a death, and it involved allegations of ethical violations." (*Id.*, Pg. 89:15-19.) Further, RLI detrimentally relied on these answers because "prior claim history is a factor that is evaluated in underwriting." (*Id.*, Pg. 88:16-18; *See also RLI Decl.*, Ex. 39.) RLI's testimony is uncontradicted and OIA did not hire an underwriting expert to dispute RLI's underwriting position.

In *Cockram*, the district court held that a misrepresentation does not need to be intentional for the policy to be voided. *Id.* at *5 (citing *Miguel*, 200 Fed. App'x at 965)). Further, materiality is established "if the insurer would have altered the terms of the policy had the true facts been known, or if the true facts would have

served as a basis for denying the policy." *Id.* at *6 (citations omitted). Additionally, "an insurer is entitled, as a matter of law, to rely upon the accuracy of the information contained in the application **and has no duty to make additional inquiry**." *Miguel v. Metro Life Ins. Co.*, 200 Fed. App'x 961, 969 (11th Cir. 2006) (citations omitted). Here, not only did OIA fail to disclose the IG claim in the application and the death at the Project, but OIA did not tell its insurance broker about the death until 15 months later. (Ex. 30, Pg. 65:1-6.) Ms. Johnson testified that if she would have known of the death or the Litigation Notice she would have recommended OIA report it to AIG per that policy (Ex. 10, Pg. 11) or to disclose it in the application. (*Id.*, Pg. 44:14-16; 45:1-20; 54:6-18.) Pursuant to *Cockram* and *Miguel*, the Court should find the policy is void pursuant to the policy, the application, and  § 627.409(1).[9]

### III. THE RELATED CLAIMS PROVISION APPLIES.

The RLI policy includes a so-called "relatedness" provision that compresses all factually related claims back in time to when the first claim was made. (*See* D.E. 1-2, Pg. 13.) The RLI policy specifically provides: "**Related Claims** will be treated as a single **Claim,** regardless of when the earliest **Claim** was made against an **Insured**. This Policy applies only if the earliest **Claim** is first made against an **Insured** during a **Policy Year** within the **Policy Period**…." (*Id.*) This

---

[9] If the Court agrees with RLI on this alternative defense, it need not address the other defenses.

is a common feature in claims-made policies that are routinely enforced. *See, e.g.,* *Health First v. Capitol Specialty Ins.*, 230 F. Supp. 3d 1285, 1289 (M.D. Fla. 2017), *aff'd*, 747 Fed. App'x 744 (11th Cir. 2018).

There is undeniable overlap between the **Claim** by IG over OIA's unethical practices allowing demolition without a permit and the lawsuit over the death of demolition employee Marrero. Both **Claims** involve the same Project, the same design professionals, the same construction contracts, the same allegations of OIA's "serious ethical violations" and "negligence" in allowing demolition work without a permit, and both claims were being made by the same plaintiff's counsel, Mr. Gilestra. (*See* D.E. 1, Ex. 9, Ex. 19.)

Indeed, OIA was worried that Mr. Gilestra would use his knowledge on behalf of IG in support of his claim on behalf of Marrero. OIA even went so far as getting Mr. Gilestra disqualified, arguing he had an unfair advantage because he could use the same evidence to support both claims. (Ex. 31, Pg. 1-3, 6-8.) It was because the claims were related that OIA was successful in disqualifying him. OIA should accordingly be estopped from now arguing that the claims are unrelated. *See James River Ins. Co. v. Fortress Sys.*, 899 F. Supp. 2d 1331, 1334 (S.D. Fla. 2012) (applying judicial estoppel against insured for taking one position in underlying action and another in the ensuing coverage action).

Florida federal courts and the Eleventh Circuit have uniformly excluded coverage for later claims that share a "factual nexus" with earlier claims. *See, e.g., Datamaxx Applied Tech., Inc. v. Chubb Custom Ins. Co.*, No. 6:20-cv-291, 2021 WL 4166740 (M.D. Fla. Sept. 13, 2021); *Vozzcom, Inc. v. Great Am. Ins. Co.*, 666 F. Supp. 2d 1332, 1337 (S.D. Fla. 2009), *aff'd*, 374 F. App'x 906 (11th Cir. 2010); *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000); *Zodiac Group, Inc. v. Axis Surplus Ins. Co.*, 542 Fed. App'x 844 (11th Cir. 2013); *Health First,* 747 Fed. App'x 744 (11th Cir. 2018); *RSUI Indem. Co. v. Attorney's Title Ins. Fund, Inc.*, No. 2:13-cv670, 2016 WL 7042960 (M.D. Fla. June 16, 2016); *Fed. Ins. Co. v. Surujon*, No. 07-22819, 2008 WL 2949438 (S.D. Fla. July 29, 2008).

Courts have held that relatedness provisions "[are] very broad and to require only that the claims indirectly arise out of related circumstances… the Eleventh Circuit has adopted the position that the claims need only have a logical or causal connection… Indeed, for claims to be related there need not be exact factual overlap, or even identical legal causes of action." *Healthfirst* at 1300 (Underscore added); *see also RSUI Indem.*, 2016 WL 7042960, at * 4 ("Every claim asserted against ATIF in the underlying state court litigation shares the same factual basis as the 2008 counterclaim, which was first made before the respective policy periods began. As such, there is no coverage…."). Like in *Health First,*

*Datamaxx*, *RSUI Indem.*, *Zodiac*, *Vozzcom*, *Wendt*, and *Surujon*, the Court should enter final summary judgment in favor of RLI.

### IV. THE PRIOR NOTICE EXCLUSION ELIMINATES COVERAGE.

The Prior Notice Exclusion bars coverage if notice was provided to a prior insurer. The language of the exclusion broadly contemplates any overlap:

> based upon or arising out of (i) *any* fact, situation, event, **Wrongful Act**… which was the subject of *any* notice given under any prior policy for Design Professional Liability… prior to the effective date of this Policy; *or* (ii) *any other* **Wrongful Act**… whenever occurring, which is *logically or causally connected* by *common facts, situations or events*, *regardless of* the number of contracts or the types of **Professional Services** rendered, to the **Wrongful Act**… specified in q. (i) immediately above.

(D.E. 1-2, Pg. 13) (italics and underscore added).

It is undisputed that on June 17, 2019, OIA notified AIG of the IG **Claim**. This "**Claim**" alleged a fact, situation, event, or wrongful act by OIA.[10] (Ex. 12.) IG was clear that if OIA did not pay it the money owed under the contract, it would blow the whistle on OIA's "serious ethical violations" at the Project. (*Id.*) IG's attorney testified the violations included allowing demolition work before the demolition permit was issued and also for failing to supervise the work. (Ex. 20, Pg. 19:3-22.)

---

[10] RLI's policy defines "**Claim**" as "a written demand for monetary, non-monetary or injunctive relief against any insured…." (D.E. 1-2, Pg. 6). AIG's policy defines "claim" as "any demand received by an Insured seeking Damages and alleging liability or responsibility on the part of the Insured…." (Ex. 10, Pg. 7.)

OIA cannot credibly argue that it did not notify AIG or that the IG claim is not based upon or arising out of "any fact, situation, event, Wrongful Act" that is at issue in the Marrero claim. The alleged "wrongful act" that OIA reported to AIG is IG's allegation of OIA's "serious ethical violations" involving demolition work. This allegation is undeniably "logically or causally connected by common facts, situations or events" to the allegations in the wrongful death claim. *See Health First*, 747 Fed. App'x at 751 ("relatedness" only requires a tenuous connection between claims).

In *Vozzcom*, the district court held that claims are related when parties are the same, the claims arise from the same transactions, and the wrongful acts are contemporaneous. 666 F. Supp. 2d at 1338. For example, the underlying complaint alleges OIA is liable for the death of Mr. Marrero because OIA allowed demolition work at the Project before a permit was issued, it failed to implement safety measures, failed to supervise certain work, and failed to review the as-built drawings showing the hole in the 13th floor. (D.E. 1-1.) These allegations overlap with the allegations in the IG claim, as exemplified by the disqualification of Mr. Gilestra.

Florida courts have upheld similar Prior Notice Exclusions. *See e.g.*, *Reuter v. Lancet Indem. Risk*, 262 F. Supp. 3d 1341, 1343 (S.D. Fla. 2017) ("Plaintiff's transmission of the DOH documents gave notice to his prior carrier of an

"occurrence" that triggered the Prior Notice Exclusion…."); *Nova*, 2019 WL 7820594, at *8 (prior notice exclusion applied because the insured reported a "wrongful act" to prior insurer, which has a connection with a "wrongful act" under the current policy); *Vozzcom*, 666 F. Supp. 2d at 1340 (Prior Notice Exclusion only required a "tenuous connection" between new claim and earlier claim reported to prior insurer for exclusion to apply). RLI's Prior Notice Exclusion is even broader. That is, even if the Court were to find the IG claim and the death claim do not share wrongful acts that are logically or causally connected, OIA's reporting of "*any* fact, situation, event, or wrongful act" to AIG triggers the Exclusion.

## V.  OIA'S AFFIRMATIVE DEFENSES ARE MERITLESS.

OIA will argue Questions 8, 3-4 in the application **it submitted to RLI** were ambiguous because (a) of a formatting error, (b) it did not know what a "claim" is even though it is defined on the Application, and (c) it believed it only had to disclose an act, error, omission or circumstance (like a death) only if it is liable. The ambiguity defense is putting it lightly, junk. As the above authority provides, an applicant's liability is irrelevant. All that matters is whether OIA failed to disclose any potential claim against it because of the death. There is nothing ambiguous about Questions 8 or 4. The evidence shows OIA provided incorrect answers and Mr. Azdell <u>never</u> asked Ms. Johnson to clarify what questions 8, 3, or 4 meant. As

a matter of law, the ambiguity defense fails. *See Mercury Ins. Co. v. Markham*, 36 So. 3d 730 (Fla. 1st DCA 2010) (reversing trial court and entering judgment for insurer).

**<u>CONCLUSION</u>**

For all of these reasons, RLI requests that the Court enter final summary judgment in its favor.

**<u>CERTIFICATE OF SERVICE</u>**

I CERTIFY that on April 8, 2022, I e-filed this document using the CM/ECF system. I further certify that I am not aware of any non CM/ECF participants.

/s/MICHELE A. VARGAS
MICHELE A. VARGAS