# EXHIBIT "38"

```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3                      CASE NO.:  8:20-cv-02395-CEH-AEP

 4

 5   RLI INSURANCE COMPANY,

 6           Plaintiff,

 7       vs.

 8   OUTSIDEIN ARCHITECTURE, LLC,

 9           Defendant.

10   _____

11           Deposition of CORY FIGIEL, as corporate

12   representative, taken on behalf of defendant herein,

13   pursuant to Notice of Taking Deposition, via Zoom, on

14   January 25, 2022, at 10:00 a.m., before Terry T. Hurley,

15   Registered Professional Reporter, and Notary Public in

16   and for the State of Florida at Large.

17

18

19                      - - -

20

21

22

23

24

25
```

A P P E A R A N C E S

SINA BAHADORAN, ESQUIRE
Clyde & Company
1221 Brickell Avenue, Suite 1600
Miami, Florida  33131

Attorneys for Plaintiff


AUSTIN B. CALHOUN, ESQUIRE
Jimerson Birr, P.A.
One Independent Drive, Suite 1400
Jacksonville, Florida  32202

Attorneys for Defendant


- - -

1        I N D E X

2

3   Witness:  CORY FIGIEL

4

                              Page

5   DIRECT EXAMINATION

6       By Mr. Calhoun------------------004

7

8           E X H I B I T S

9

   For Identification

10

      No. 1--------------------------016
11      No. 2--------------------------027
      No. 3--------------------------029
12      No. 4--------------------------030
      No. 5--------------------------030
13      No. 6--------------------------039
      No. 7--------------------------084
14      No. 8--------------------------108

15

16

17

18

                    - - -

19

20

21

22

23

24

25

```
 1                        CORY FIGIEL,
 2   having been produced and first duly sworn as a witness,
 3   testified as follows:
 4                      DIRECT EXAMINATION
 5   BY MR. CALHOUN:
 6       Q    Good morning, Cory.  My name is Austin Calhoun.
 7   I'm the attorney representing Outsidein Architecture.
 8            Please state your full name for the record.
 9       A    Cory Michelle Figiel.
10       Q    And you're here as the corporate representative
11   for RLI Insurance?
12       A    Correct.
13       Q    And in that role you understand that the
14   questions I'm asking you today will not be you
15   personally, but what RLI knows and what RLI's testimony
16   is; understood?
17       A    I understand.
18       Q    Have you been deposed before?
19       A    No.
20       Q    You've never been deposed before?
21       A    No.
22       Q    You've never acted as RLI's corporate
23   representative in any matter before?
24       A    Not as a witness like this.
25       Q    In what respect?
```

1    A    Well, I don't understand your question.  I

2  mean, you're asking if I've been deposed as a corporate

3  rep.  No.

4    Q    Okay.  Let's discuss some of the ground rules

5  for today and for depositions in general.

6          You're under oath, so you're testifying today

7  just as if you would be testifying in court.  Do you

8  understand that?

9    A    Yes.

10   Q    And I ask that you give your best answers.  So

11 if you don't understand any of my questions, please feel

12 free to ask me to rephrase them.

13          Will you do that?

14   A    Yes.

15   Q    Your attorney does have a right to object to

16 certain questions, but even when your attorney objects

17 you're still obligated to answer unless your attorney

18 specifically tells you not to answer that question.

19          Do you understand?

20   A    Yes.

21   Q    And so that we have a clear record, please

22 allow me to complete my questions before you answer.

23 And the transcript doesn't pick up body gestures, so

24 nodding your head, moving your hands, you need to -- you

25 can do that, but you also need to verbalize your answer.

1    Understand?

2        A    I understand.

3        Q    Is there any reason that you can think of as to

4    why you cannot give your best testimony today?

5        A    No.

6        Q    What did Outsidein -- well, let me take a step

7    back.

8            Outsidein Architecture is a mouthful.  So if I

9    just say Outsidein will you understand I'm referring to

10   Outsidein Architecture?

11       A    Yes.

12       Q    What did Outsidein do to cause the death of

13   Garcia Marrero?

14       A    I guess I don't understand the question.

15       Q    What part of the question don't you understand?

16       A    Well, are you asking me what is being alleged?

17       Q    Does RLI believe that Outsidein did anything to

18   cause the death of the Garcia Marrero?

19       A    What do you mean by "cause the death"?

20       Q    You don't understand what "cause" means?

21       A    Well, I don't understand what you mean by

22   "cause the death".

23       Q    So you don't understand.  That's RLI's -- RLI's

24   statement is that RLI does not understand the term

25   "cause the death"?

1    A    Well --

2         MR. BAHADORAN:  (Inaudible.)

3         THE REPORTER:  I cannot hear him at all.

4         MR. BAHADORAN:  Can you hear me now?

5         THE REPORTER:  Yes.  That's better.  Thank you.

6         MR. BAHADORAN:  Okay.  Austin, where are you

7    going with this?  This isn't the underlying case.

8         MR. CALHOUN:  It is.

9         MR. BAHADORAN:  No, it's not, sir.  It's

10   involving coverage for the policy, not whether

11   Outsidein is liable or not.

12        I mean, we can keep doing this if you'd like,

13   but you can't keep asking the same question over and

14   over.

15        MR. CALHOUN:  Sina, this is my deposition and

16   I'll ask what I want as long as it's within the

17   topics in the deposition notice.

18        This is related to a topic in the deposition

19   notice.

20        MR. BAHADORAN:  Which topic does it relate to?

21        (Indiscernible crosstalk.)

22        THE REPORTER:  Y'all are speaking on top of

23   each other.

24        MR. BAHADORAN:  Which topic does it relate to?

25        MR. CALHOUN:  Do not interrupt me, please.

1        MR. BAHADORAN:  Which topic does it relate to?

2        MR. CALHOUN:  I was going there, but you

3   interrupted me.

4        MR. BAHADORAN:  Go ahead.  Please get to it.

5   You don't need to set it up.  What topic does it

6   relate to?

7        MR. CALHOUN:  RLI has asserted a claim for

8   recision of the insurance policy based on

9   allegations that Outsidein knew or should have known

10  that it would be liable for a claim arising from the

11  death, the underlying lawsuit.

12  Q    So my question is, what did Outsidein do that

13  caused the death of Garcia Marrero?

14       MR. BAHADORAN:  Okay.  It doesn't matter

15  whether there's been an adjudication against

16  Outsidein or not.

17       But if you want to go there, do your best,

18  Cory.  Just answer.  That's fine.

19       MR. CALHOUN:  Sina, limit your talking to

20  objections and not speaking objections.

21       MR. BAHADORAN:  Don't tell me what to limit my

22  objections to.  I'm trying to help you out because

23  this is literally question number one and you're

24  totally fumbling it.

25       Okay.  Go ahead.

1      A     What is the question?  I'm sorry.

2      Q     What did Outsidein do to cause the death of

3  Garcia Marrero?

4      A     Again I don't know exactly what you're asking

5  here.  What I can tell you, based on my understanding of

6  the underlying claims against Outsidein, is that the

7  plaintiff has alleged that Outsidein is responsible for

8  the death.

9      Q     So RLI has no position on whether Outsidein

10  caused in whole or in part the death of Garcia Marrero?

11         MR. BAHADORAN:  Objection to the form.

12     Misstates the answer that was provided.

13         THE WITNESS:  I'm sorry.  What was the

14     question?

15     Q     What did Outsidein do -- scratch that?

16         MR. CALHOUN:  Terry, can you read the question

17     back.

18         (Question read back.)

19     A     So my understanding is that the complaint has

20  alleged that Outsidein is liable for the death.

21     Q     Was that a yes or a no?

22     A     That was my answer.

23     Q     What serious ethical violation did Outsidein

24  commit regarding the project at issue in the underlying

25  wrongful death case?

1    A    So I can't remember everything off the top of

2  my head, but my understanding is that prior to the death

3  there was e-mail exchanges with Outsidein and one of its

4  consultants where the consultant was advising Outsidein

5  of violations on the project, including proceeding with

6  demolition without a permit, and also not having an

7  inspector present for the deposi- -- or for the

8  demolition.

9    Q    Is the wrongful death lawsuit frivolous as it

10  relates to the claims against Outsidein?

11    A    I don't know that I can answer that.

12    Q    You don't have an answer to it, or you're not

13  allowed to answer it?

14    A    I don't know anything about the merits of the

15  underlying case.

16    Q    Did you speak with any architect to ask their

17  opinion as to whether Outsidein should have known that

18  death would result in a claim against Outsidein?

19    A    Did I speak with an architect?  Me, personally,

20  no.

21    Q    Again you're the corporate representative.  If

22  I'm asking you personally, I'll tell you personally.  My

23  question was as to RLI.

24    A    So my understanding is that RLI has retained an

25  expert in this case, and that expert has issued a

1  report.

2      Q    Is that expert an architect?

3      A    I don't recall.  I believe he's an architect.

4  He may be an engineer.  His report would state that.  It

5  would state his qualifications.

6      Q    Did RLI speak with any -- anyone other than its

7  expert?

8      A    Well, actually -- sorry -- I recall now.  That

9  expert we disclosed in this case, he's not an architect

10  or an engineer, from what I recall.  So the answer is

11  no.

12      Q    So the answer is --

13      A    Has RLI spoken with an architect?  I believe

14  the answer is no.

15      Q    How about anyone that works in the construction

16  industry; has RLI spoken with anyone that works in the

17  construction industry to ask their opinion as to whether

18  Outsidein should have known the death would result in a

19  claim against Outsidein?

20      A    I can't remember everything off the top of my

21  head.  Obviously RLI has spoken with its attorney and

22  its expert.

23      Q    No one else?

24      A    Not that I'm aware of.

25      Q    Would it help you if I gave you an opportunity

1    to speak with your attorney to be able to answer that

2    question?

3        A    I don't know if it would help me.

4        Q    Is there any document or any person you could

5    speak with that would help you answer the question?

6        A    About whether RLI has spoken with an architect

7    or someone in the construction industry?

8        Q    Yes, to answer my question.

9        A    I believe I've answered the question.

10       Q    You said "I can't remember".

11       A    No, I said I don't believe that aside from our

12   attorneys and our expert that we have spoken with

13   anyone.

14       Q    Is a litigation hold notice a claim?

15       A    It depends on the language of the policy.

16       Q    Anything else?

17       A    And the language that's contained in the

18   litigation hold notice.

19       Q    Cory, where did you personally attend school

20   after high school?

21       A    I went to the University of Illinois.

22       Q    Did you graduate?

23       A    Yes.

24       Q    When?

25       A    2003.

1     Q     What was your degree in?

2     A     I have a BA in Spanish and a BA in political

3  science.

4     Q     Are you fluent in Spanish?

5     A     At one point, yes.  I may be rusty now.

6     Q     But you can read and understand Spanish?

7     A     It depends.  Generally, yes.

8     Q     Do you hold any professional licenses?

9     A     Yes.

10     Q     What license?

11     A     I'm licensed to practice law in Illinois and

12  Wisconsin.

13     Q     You're a licensed attorney?

14     A     Yes.

15     Q     Any other licenses?

16     A     No.

17     Q     Did you go to law school at the University of

18  Illinois?

19     A     No.

20     Q     Where did you go to law school?

21     A     Chicago-Kent College of Law.

22     Q     As to your attorney license, when did you

23  obtain that?

24     A     In Illinois in 2006.

25     Q     Any other states?

1       A       Wisconsin.

2       Q       When did you obtain that license?

3       A       I don't recall the exact year, but it was not

4    the same year.  It was several years after.

5       Q       Have you been subject to any disciplinary

6    action as to your attorney license?

7       A       No.

8       Q       How long have you personally been employed by

9    RLI?

10      A       Since May 2016.

11      Q       What is your current title?

12      A       Assistant vice president.

13      Q       What are your chief duties as assistant vice

14   president?

15      A       So I'm responsible for professional services

16   claims.

17      Q       Have you had any other positions with RLI prior

18   to becoming an assistant VP?

19      A       Yes.

20      Q       What were those positions?

21      A       I was a director.

22      Q       Director, period?

23      A       Yes.  That was in a different department.

24      Q       What department, and what were your chief

25   duties as director?

1      A      It was claim counsel, and I was involved with

2   providing legal advice to the company.

3      Q      Regarding claims?

4      A      Among other things.

5      Q      Are you personally experienced in the business

6   practices of RLI?

7      A      I believe so, yes.

8           MR. CALHOUN:  Adrian, can you put up Tab A(1).

9      Q      Cory, do you have any printed documents with

10  you today?

11     A      My attorney has the documents.  I believe he

12  sent those documents printed out.

13     Q      Printed out.  And are they identified by tab?

14          We sent your attorney a PDF and it had

15  bookmarks based on what's supposed to be binder tabs?

16          MR. BAHADORAN:  Austin, we've printed

17      everything.  It's in order.  So as you go through

18      stuff I'm happy to hand it to Cory to look at, so

19      not to do it on the screen.

20          MR. CALHOUN:  Sina, if I say, for instance, go

21      to Tab B(2) will you know what I'm talking about?

22      Will that be helpful?

23          MR. BAHADORAN:  I'll probably need you just to

24      describe it for me, but I can get there.  It's not

25      that much stuff.

1      Q     All right.  On the screen is a document titled

2   Notice of Taking Deposition of Corporate Representative

3   For Plaintiff RLI Insurance Company.  I'll enter this

4   is?

5            MR. CALHOUN:  I'll enter this as Exhibit 1.

6            (Exhibit No. 1 was marked for identification.)

7            MR. CALHOUN:  Adrian, can you zoom out a little

8       bit.

9      Q     And, Cory, have you seen this document before?

10     A     Yes.

11     Q     You're aware that you're here as the corporate

12   representative for deposition pursuant to this notice?

13     A     Yes.

14            MR. CALHOUN:  Let's look at Schedule A.

15     Q     Schedule A starts with a list of definitions.

16   Can we agree that throughout this deposition we'll use

17   these terms.

18     A     Yeah, to the best of my ability I will.  I

19   didn't memorize these, but, yes.

20     Q     For instance, when I use the word policy I'm

21   referring to the policy defined at Paragraph E.

22     A     Yes.

23            MR. CALHOUN:  Scroll down.

24     Q     Okay.  We've got a section titled Deposition

25   Topics.

1        MR. CALHOUN:  And, by the way, Cory, throughout

2    today's deposition if you want Adrian to, you know,

3    move around the document, scroll up, scroll down,

4    zoom in, zoom out, by all means ask.

5        Q    Okay.  Please take a look at the deposition

6    topics identified on this notice and tell me if you're

7    the designated representative to speak on behalf of RLI

8    on each of these topics.

9        A    So I believe that some of these were stricken.

10   I don't know exactly which ones, but the ones that were

11   not, I'm here to talk about.

12       Q    Which topics are you not the corporate

13   representative for?

14       A    Well, as I just said, any that were not

15   stricken I'm here to talk about.

16       Q    But you don't know which ones were stricken?

17       A    I believe there was one about claim handling.

18       MR. CALHOUN:  Adrian, scroll down.

19       A    Maybe 14.  Oh, no.  That's not claim handling.

20   I apologize.  This may have been updated from the one I

21   saw.  I saw the initial one.  But I'm here to talk about

22   it.

23       Q    As the designated representative for RLI;

24   correct?

25       A    Correct.  Yeah.

1    Q    What did you do it in preparation for this

2    deposition today?

3    A    I spoke with my attorney, I reviewed various

4    documents, I reviewed the documents you sent over, I

5    think yesterday.

6    Q    Were those the only documents you reviewed?

7    A    I reviewed ones provided by my attorney, and I

8    reviewed the ones provided by you.

9    Q    Did you do anything else in preparation for

10   this deposition other than speak with your attorney and

11   review those documents?

12   A    I also spoke with -- in conjunction with my

13   attorney, underwriting.

14   Q    Anything else?

15   A    I don't believe so.  I mean, that's what I

16   remember.

17   Q    So you only reviewed the documents provided to

18   you by RLI's attorney and the documents we provided for

19   this deposition yesterday?

20   A    Correct.

21   Q    You didn't do any review of RLI's files on your

22   own?

23   A    No.

24   Q    Did you interview any persons with knowledge

25   about the facts in this case?

1    A    Again as I stated, I spoke with underwriting in
2  conjunction with my attorney.
3    Q    Who did you speak with in underwriting?
4    A    Vince Castello.
5    Q    Anyone else?
6    A    No.
7    Q    What is Vince's title?
8    A    I believe he is the director.
9    Q    Director of underwriting?
10   A    I believe so.  I don't -- I don't know the
11  exact semantics of his title, but I believe that's
12  correct.
13   Q    So other than your discussions with your
14  attorney and Vince Castello, you did not interview any
15  other persons to find out facts or information relevant
16  to this case?
17   A    No.
18   Q    When did you meet with Vince?
19   A    I don't recall the exact date.
20   Q    Estimate, please.
21   A    I believe it was last week.  If it wasn't last
22  week, it might have been before then, but I think it was
23  last week.
24   Q    Where did you have your discussion with Vince?
25   A    On the phone.

1      Q      Phone?

2      A      Yes.

3      Q      It was just one discussion that you had with

4   Vince about this case?

5      A      In preparation for this deposition, yes.

6      Q      Did you review any documents with Vince?

7      A      I believe so.

8      Q      What documents?

9      A      They were from the underwriting file.  And

10   actually, as I'm thinking about it, we also reviewed the

11   underwriting guidelines.

12      Q      Were they documents you had previously been

13   provided by your attorney?

14      A      Yes.

15      Q      Did Vince give you any advice on how to testify

16   or what to say in this deposition?

17      A      What do you mean by advice?

18      Q      You don't know what the word advice means?

19           MR. BAHADARON:  Objection to the form.

20      Q      Do you understand what the word advice means?

21      A      Well, I understand I have an understanding of

22   it.  I don't exactly understand what you mean by it in

23   this question.

24      Q      What did you discuss with Vince?

25      A      We discussed the documents.

1    Q    Did you talk about any of RLI's allegations in

2  this lawsuit?

3    A    You know, we -- we were speaking with our

4  attorney and getting legal advice at the time.

5         MR. BAHADORAN:  Austin, we're bordering on

6    attorney/client work product privilege here.

7         MR. CALHOUN:  I believe it's fair game for me

8    to ask the deponent what advice Vince gave to her,

9    what did Vince tell her to say in this deposition.

10        MR. BAHADORAN:  No.  Actually it's off limits

11   for you to ask about how we went about preparing

12   with counsel for the deposition.

13        You're totally entitled to ask her questions,

14   but how she formulated those opinions in terms of

15   internal discussions with counsel is off limits.

16   Q    Cory, did Vince give you any advice on how to

17  testify or what to say in this deposition?

18   A    Advice, as I understand the term, no.

19   Q    How long was your call with Vince?

20   A    I don't recall exactly.

21   Q    Estimate?

22   A    One to two hours.  Could have been one, could

23  have been two.

24   Q    Please name all RLI employees that played any

25  role in reviewing, evaluating, and approving Outsidein's

1    application?

2        A    What do you mean by approving?

3        Q    You don't understand what approving means.

4    Okay.  So I'll start with the same question without the

5    word approving.

6            Name all RLI employees that played any role in

7    reviewing or evaluating Outsidein's application.

8        A    Well, I don't know all of the facts, you know,

9    off the top of my head, but what I can tell you from

10   what I can remember is Aylane McDonald is the

11   underwriter.  She received and reviewed the application

12   on behalf of RLI.

13       Q    Spell her name, please.

14       A    I'm guessing.  I'm bad with names.

15   A-y-l-a-n-e, Aylane, and I think McDonald is the common

16   spelling.

17       Q    Anyone else?

18       A    In terms of reviewing the application replacing

19   coverage, she was the one that doing that.

20       Q    Have you spoken to Aylane McDonald regarding

21   this lawsuit?

22       A    Not in preparation for this lawsuit.

23       Q    That wasn't my question at all.

24            Have you spoken with Aylane McDonald regarding

25   this lawsuit?

```
 1      A    I saw her for about a minute where she

 2  introduced herself to me and said that she was the

 3  underwriter for Outsidein.

 4           I don't really think that's discussing the

 5  lawsuit, but that's it.

 6      Q    And that's it?  No other discussions about this

 7  lawsuit?

 8      A    Not substantively, no.  It was more of an

 9  introduction, because I was in the office.

10      Q    When did you have this discussion with Aylane?

11      A    I think it was November 2020 -- no, 2021.  I'm

12  sorry.  That was last year November.

13      Q    Please name all RLI employees that played any

14  role in reviewing or evaluating or making determinations

15  regarding Outsidein's claim.  Outsidein's claim being

16  the claim for the underlying wrongful death lawsuit.

17      A    So my understanding is we weren't talking about

18  claims.

19      Q    What do you mean?

20      A    That that was not a topic in the deposition

21  topics.  Claims handling.

22           THE WITNESS:  Oh.  Oh, this one?  Okay.  I'll

23      answer.

24      A    So it's who was involved in evaluating the

25  claim?
```

1      Q      Yes.

2      A      So from my recollection, Ross Edwards was

3   assigned to handle the claim.  He evaluated it.  Ross

4   reports to me.

5            And we likely also spoke at some point to

6   attorneys.

7      Q      Anyone else?

8      A      I don't know off the top of my head.

9   Definitely Ross Edwards was the claim examiner

10  responsible for the claim.

11     Q      Have you spoken to Ross Edwards regarding this

12  lawsuit?

13     A      Yes.

14     Q      When?

15     A      I don't recall.

16     Q      Multiple occasions?

17     A      I don't recall.  We likely discussed around the

18  time that it was filed the fact that it was filed, but I

19  don't recall.

20     Q      But you don't recall any of the substance of

21  discussions you've had with Ross Edwards regarding this

22  lawsuit?

23            MR. BAHADORAN:  I'm going to object.  I'm not

24        going to allow the client to testify regarding

25        discussions in furtherance of this litigation based

1    on work product as well as attorney/client.

2         MR. CALHOUN:  You're instructing the witness

3    not to answer?

4         MR. BAHADORAN:  Did you not hear my response?

5         MR. CALHOUN:  I want to make sure I understood

6    it correctly.  You're breaking up a little bit.

7         Sina, can you verify that you instructed the

8    witness not to answer?

9         MR. BAHADORAN:  Terry, would you mind reading

10   back the response, please.  My objection, please.

11        (Objection read back.)

12        MR. CALHOUN:  Sina, was that an instruction to

13   the witness specific to my question instructing her

14   not to answer this question?

15        MR. BAHADORAN:  Terry, would you mind reading

16   that one more time?  I think Austin's having a hard

17   time hearing you as well.

18        MR. CALHOUN:  It's not that, Sina.  I heard

19   loud and clear what Terry was saying.

20        MR. BAHADORAN:  Okay.  So then, Austin, you

21   should know that work product and attorney/client

22   should not be entered; right?  Or waived.

23        I'm preserving that objection.  I'm not sure

24   how else to explain it to you.  In fact, your actual

25   notice itself talked about how you were not going to

1    be dwelling on work product or attorney/client

2    privilege.

3         MR. CALHOUN:  You still haven't answered my

4    question.  Are you instructing her not to answer the

5    question?

6         MR. BAHADORAN:  Maybe Adrian can help you

7    figure out what my response is.  We're now up to

8    five times that I've said the same thing.  I don't

9    know how else to say it to you, Counsel.

10        Q    Cory, please name all RLI employees that played

11   any role in reviewing and evaluating whether to rescind

12   Outsidein's policy?

13        A    So I don't recall every single person

14   specifically, but what I recall is Ross Edwards was the

15   claim examiner.  He reported to me we spoke.  We spoke

16   with counsel, and we likely spoke with underwriting in

17   conjunction with counsel.

18        Q    When you said underwriting, do you mean Aylane

19   McDonald or Vince Costello?

20        A    Potentially one or both of those.

21        Q    Anyone else?

22        A    Likely we also would have spoken with another

23   person in underwriting, although I don't recall

24   specifically.  And that would have been done in

25   conjunction with counsel.

1    Q    Who do you think that person is?

2    A    Paul Deitrich.

3    Q    What is Paul's position?

4    A    Vice president.

5    Q    Of underwriting?

6    A    I believe so, yes.

7         And we may have spoken with Aylane's supervisor

8    as well, but I don't recall specifically.

9    Q    Who is that?

10   A    Kimberly Kwong.

11   Q    Spell that last name?

12   A    I don't know exactly.  I would assume it's

13   K-w-o-n-g.

14   Q    So Aylane reports to Kimberly?

15   A    Correct.

16   Q    And Kimberly reports to Paul?

17   A    No.

18   Q    Who does Kimberly report to?

19   A    Vince Costello.

20   Q    And Vince reports to Paul?

21   A    I believe so.

22        MR. CALHOUN:  Adrian, please pull up Tab A(2).

23        I'll enter this as Exhibit 2.  It's the

24   complaint filed by RLI in this case.

25        (Exhibit No. 2 was marked for identification.)

```
 1          MR. CALHOUN:  Standby.  Technical difficulties.

 2          (Short break.)

 3     Q    Cory, are you familiar with RLI's complaint in

 4   this lawsuit?

 5     A    Yes.

 6     Q    And this Exhibit 2 is a copy of that complaint?

 7     A    As long as it hasn't been altered, I'm assuming

 8   that it is.

 9          MR. CALHOUN:  Adrian, scroll down until you get

10     to Count 1.

11          Right there is good.

12     Q    Cory, are you familiar with RLI's Count 1?

13     A    Yes.

14     Q    Is it fair to say that in Count 1 RLI is

15   claiming that there is no coverage because claims

16   relating to the underlying wrongful death action were

17   first made before the March 18, 2020 policy period?

18     A    So RLI's position is set forth in the

19   complaint, but RLI's position is that the claim was

20   first made before the policy incepted.

21     Q    And who made those prior claims before the

22   policy period?

23     A    So I can't remember everything off the top of

24   my head, but from what I recall there were potentially

25   at least two.
```

1           The first was a June 2019 letter, and the

2     second was a later letter from the same attorney.

3        Q     Was the second letter a litigation hold letter?

4        A     Among other things, yes.

5        Q     Any other claims made prior to the policy

6     period relating to the underlying action?

7        A     Based on the information available to me and

8     what's been provided to RLI, those are the two prior

9     claims.

10       Q     Those are the two prior claims that RLI is

11    relying on for its Count 1

12       A     RLI's position is set forth in its complaint,

13    in its answers to interrogatories, in its expert report,

14    and specifics on that I'm sure our attorney has.  But

15    from my recollection, yes, those are the two.

16           MR. CALHOUN:  Adrian, let's go to Tab C(1), the

17       June 10, 2019, letter regarding Intergroup.

18           This will be Exhibit 3.

19           (Exhibit No. 3 was marked for identification.)

20       Q     Is this the June 10, 2019 letter that you

21    mentioned as one of the prior two claims relating to the

22    underlying action?

23       A     Yes, it appears to be.

24           MR. CALHOUN:  Adrian, let's go to Tab B(3).

25           THE WITNESS:  Sorry.  Which one is that?

1          MR. CALHOUN:  B(3) is a letter dated June 21,

2      2019, regarding legal hold notice.

3          I'll enter this as Exhibit 4.

4          (Exhibit No. 4 was marked for identification.)

5      Q    Cory, was this the second of the two claims

6  that you mentioned as the prior claims relating to the

7  underlying action?

8      A    It appears to be, yes.

9      Q    So other than the letters we just admitted as

10  Exhibits 3 and 4, does RLI contend that there's any

11  other claims related to the underlying action that were

12  made against RLI prior to the policy period?

13      A    My understanding, based on what has been

14  provided to RLI, is these are the two claims that RLI is

15  relying on.

16          There may be more documents that RLI has not

17  received that could change this, I don't know, but these

18  are the two that we are relying on.

19          MR. CALHOUN:  Adrian, let's look at Tab A(11).

20          THE WITNESS:  What is that document?

21          MR. CALHOUN:  This is RLI's answers to

22      Outsidein's first set of interrogatories.

23          Adrian, scroll to page 6.

24          (Exhibit No. 5 was marked for identification.)

25      Q    Cory, we're going to talk about Interrogatory

1   2, which starts at the bottom of page 6.

2       A    Okay.

3       Q    Take a minute to refresh on this are

4   interrogatory and RLI's answers.  Just let me know when

5   you're done and ready to talk about it.

6       A    Okay.

7       Q    Interrogatory 2 two is asking for details of

8   the claim that RLI contends in Count 1 of the complaint

9   was made against Outsidein before the policy period.

10  And in its response RLI has identified, or it appears

11  that it identifies three documents that provide the

12  details of the claims contained in Count 1.

13          In addition to the June 2019 letter and the

14  litigation hold letter that we just looked at, are the

15  documents that are identified in the answer to Rog 2 the

16  only documents that provide the details of the claims

17  contended in Count 1?

18      A    So the reservation of rights letter that is

19  referenced there references the June 10th letter and

20  describes that letter, and there you could -- I guess

21  you could separately say that letter, but it is

22  described in the reservation of rights letter.

23      Q    Anything else?

24      A    Not that I'm aware of right now, no.

25          MR. CALHOUN:  Adrian, let's go back to the

1      complaint, Exhibit 2.  Scroll down until you get to

2      Count 2.

3          Q     Cory, are you familiar with RLI's Count 2?

4          A     Yes.

5          Q     And is it fair to say that in Count 2 RLI

6      alleges that there's no coverage for the claim because

7      Outsidein knew or could have reasonably expected that

8      the wrongful acts alleged in the underlying complaint

9      would give rise to a claim against Outsidein?

10         A     That's not what the complaint says.  Paragraph

11     35 says what you have up there, but I don't know that it

12     is simply what is alleged in that complaint.

13         Q     Are you aware of what's alleged in the

14     underlying complaint?

15         A     Generally, yes.  I've reviewed it.

16         Q     And can we agree that the claims asserted

17     against Outsidein in the underlying complaint are all

18     based on Outsidein's alleged negligence in performing

19     its required duties as the architect of record for the

20     project?

21         A     I mean, I would have to review it in detail to

22     agree to that.  I mean, the complaint kind of speaks for

23     itself.

24         Q     Summarize the claims made against Outsidein in

25     the underlying complaint.

1    A    Again, I don't recall everything off the top of

2    my head that would be contained in the complaint.

3    Q    What do you recall off the top of your head?

4    A    What I recall is that the family of the

5    decedent sued Outsidein, among other parties, alleging

6    that Outsidein was the architect of record for the

7    project and had responsibilities pertaining to

8    demolition, that it allowed demolition to proceed

9    without a permit, that it had failed in allowing the

10   demolition to proceed forward without a permit.

11   Q    Anything else?

12   A    That I recall off the top of my head?  No, not

13   right now.

14   Q    Do you recall that all the claims against

15   Outsidein were negligence claims?

16   A    I don't recall what the specific counts were.

17   I could review the complaint, if you'd like me to.

18   Q    Can you explain the factual basis for RLI's

19   allegation in Count 2 of the complaint that Outsidein

20   knew or could have reasonably expected that its alleged

21   wrongful act in the construction project might give rise

22   to a claim?

23   A    I can't recall every single detail off the top

24   of my head.  I believe we've set this forth in our

25   filings, our answers to interrogatories, and our expert

1    report, but I'm happy to share with you what I remember.

2       Q    Actually, let's look at the interrogatory

3    answers.

4       A    Okay.

5            MR. CALHOUN:  Adrian, if we can go back to

6       Exhibit Number 5, which is Tab A(11), RLI answers to

7       Outsidein's first set of interrogatories.

8            And if we scroll to page 9, let's look at RLI's

9       answer to Interrogatory 5.

10      Q    Cory, Rog 5 five asked a question very similar

11   to what I just asked you.  RLI's answer referred to

12   RLI's expert report and a June 21st, 2019 letter.

13           Take as much time as you need to review

14   Interrogatory 5.

15      A    I've reviewed it.

16      Q    So is RLI relying on the two documents

17   identified in its answer to Interrogatory 5 to support

18   its cause of action in Count 2?

19      A    Yes.  And I would say that the -- the facts as

20   well referenced in the expert report.

21      Q    Any other document that RLI is relying on for

22   Count 2?

23      A    Well, I mean, I'm aware of various facts that

24   support that contention.  So there were various e-mails

25   before the death between Outsidein and its consultants

1   where the consultant was informing Outsidein that

2   demolition was proceeding without a permit, and that an

3   inspector was not present for the demolition.

4         The consultant was stating that this was a

5   violation, and he did not want his name tarnished.

6         There was also various reports about the

7   structural stability of the concrete, and Outsidein had

8   expressed concerns about cracks in the cantilever

9   corners of the concrete.

10        They had also received the June 10th letter

11  alleging ethical violations.  They were aware of the

12  death itself.

13        Following the death Outsidein conducted its own

14  investigation, made strategic decisions about obtaining

15  an expert, whether to participate with the expert

16  retained by Bird, who they evaluated to be an

17  internationally respected expert within the field.

18        Consulted with his structural engineer

19  consultant about the stability of the floor, obtained

20  concrete lab test results about the stability of the

21  concrete, consulted with the consultant about negligence

22  of other parties, placed its carrier at the time on

23  notice, received a letter dated June 21st stating that

24  it was involved in a matter involving the death, and

25  that litigation would commence.

1      And that's what I recall off the top of my

2  head.

3      Q    Nothing else?

4      A    Not right now.

5      Q    Has RLI spoken with anyone associated with the

6  project?

7      A    Pertaining to this lawsuit, my guess would be,

8  no.  Obviously, when the claim was reported the claim

9  examiner would have talked to someone from Outsidein.

10     Q    But other than Outsidein, RLI hasn't spoken

11 with any of the project team members such as those that

12 you just referred to in the long list of facts?

13     A    I don't believe so, no.

14     Q    So other than the factual -- strike that.

15 Start over.

16         Other than the facts that you just went

17 through, and the expert report, and the legal hold

18 letter identified in Interrogatory 5 answer, are there

19 any other documents that RLI is relying on for Count 2?

20     A    You know, one other document that may set forth

21 facts would be the coverage letter, which also

22 summarizes facts.

23     Q    Is that the reservation of rights letter that

24 was identified in Rog 2 answer we just looked at?

25     A    Yeah, I believe so.  That sets forth facts as

1    well.  They may be the same as what I just mentioned.

2    You know, I didn't compare side-by-side.

3        Q    Anything else other than what we just talked

4    about in the reservation of rights letter?

5        A    Not that I recall at this time.  I'm sure my

6    attorney can provide that information.

7             Oh, actually, now thinking about it I thought

8    of another fact.  The insurance sub consultant was

9    interviewed by OSHA, and also gave a declaration to

10   OSHA, and gave opinions about the structure and its

11   ability to bear weight.

12       Q    Who was that sub consultant?

13       A    I believe it was the structural engineer.

14   Again, I'm bad with names, but the structural engineer.

15       Q    Is that Morla?

16       A    Yes.  That sounds right.

17       Q    Was that testimony given by -- or statement

18   given by the sub consultant in writing?

19       A    My understanding is it was a written

20   declaration.  I may be wrong about that.  I mean, maybe

21   it was that they gave, you know, a statement.  Maybe

22   that's what it was.

23       Q    Have you seen that written statement?

24       A    No.

25       Q    In that written statement did it accuse

1  Outsidein of any responsibility for the death?

2      A    I don't know because I haven't seen it.

3      Q    In what way then is RLI relying on that

4  document for Count 2?

5      A    Well, our attorneys.  I had discussions with

6  our attorneys about that.

7      Q    So what is it about that document that RLI is

8  relying on?

9      A    As I said, one of its sub consultants, one of

10  Outsidein's sub consultants was interviewed by OSHA and

11  gave statements, to my understanding, that the slab was

12  not structurally sound.

13     Q    How does that support Count 2?

14     A    So if you look -- you'd have to look at the

15  language of the policy.  Let's see.  I need the whole

16  policy.

17          Generally speaking, so the language of the

18  policy, there's facts which could -- the insured could

19  have reasonably expected to give rise to a claim

20  according to the section of the policy.

21     Q    I understand that, but the question is:  How

22  does that written statement support RLI's contention

23  that Outsidein knew or could have reasonably expected

24  that its alleged wrongful act might give rise to a

25  claim?

1      A      Again, I don't recall everything, so my

2  understanding is that Outsidein was aware of structural

3  deficiencies in the slab before demolition started.

4  They made statements about that.  There was an analysis

5  that was done that showed cracking in those areas.

6          It allowed the demolition to continue despite

7  being told by its other sub consultant that it should

8  not be doing that.

9          After the accident its sub consultant confirmed

10  that the slab was not structurally sound.

11          MR. CALHOUN:  Let's look at Tab B(2).

12          THE WITNESS:  What is that tab?

13          MR. CALHOUN:  Let's took at Tab B(2), Expert

14      Witness Report of Benjamin L. Bedard.

15          I'll enter this as Exhibit 6.

16          (Exhibit No. 6 was marked for identification.)

17      Q      Cory, is this -- stop.  Start over.

18          Is this RLI's expert report dated September 24,

19  2021, which RLI refers to in its answer to Rog 5?

20      A      If this is what RLI produced, then it is.  I

21  don't see a date on this, but, I mean, I'm assuming if

22  it has not been altered this is RLI's report.

23      Q      You've reviewed RLI's expert report; correct?

24      A      Yes.

25      Q      And is there only one?

1      A    That I'm aware of, yes.

2      Q    And RLI has adopted the statements in this

3  expert report as its sworn response to Interrogatory 5;

4  correct?

5      A    It refers to this document in response to its

6  interrogatory.

7      Q    Will RLI seek to amend or supplement its expert

8  report?

9      A    I don't know.  That's really a question for my

10 attorney.

11     Q    Have you had any discussion with expert

12 Benjamin L. Bedard?

13     A    Myself, no.

14     Q    Has anyone at RLI?

15     A    I don't know.  If it was anyone, it would be an

16 attorney.

17          MR. CALHOUN:  Let's look at pages 11 and 12.

18     Q    On pages 11 and 12 your expert lists a number

19 of documents that he reviewed in preparing the report.

20          Do you see that?

21     A    Yes.

22     Q    Have you reviewed all the documents that he

23 lists here in his report?

24     A    I don't -- I mean, I'd have to go through all

25 these.  I mean, looking at it, I reviewed the complaint,

1    I reviewed the policy, I believe I reviewed that 2017

2    report.  There were e-mails I reviewed.  I don't know

3    the exact dates of them.  I don't believe I reviewed --

4    like, there's reference to a weekly report.  I don't

5    think I reviewed that.  I reviewed the application.

6            So it appears some of these I reviewed, some I

7    did not.

8        Q    Which ones has RLI not reviewed?

9        A    Well, I believe RLI likely reviewed all of

10   these.  Myself, I know I have not reviewed meeting

11   minutes.

12       Q    Anything else other than meeting minutes that

13   you personally haven't reviewed?

14       A    Again, weekly reports.  I don't know about all

15   of these e-mails.  This looks like more e-mails than I

16   reviewed just based on the number of them.  And I don't

17   know about all of these reports either.

18            I did review some reports.  I don't know that I

19   reviewed all of these.  I don't recall the names of

20   them.

21       Q    On page 11 your expert identifies this as a

22   non-exhaustive list of what he considered.

23            Do you see that?

24       A    Yes.

25       Q    Do you know what documents other than those

```
 1   listed that your expert was provided or reviewed, but
 2   did not list here?
 3        A    Myself, no.
 4        Q    As the corporate representative of RLI.
 5        A    I'm sure my attorney could give you that
 6   information.
 7        Q    Let's look at pages 3 through 5.  And, Cory, do
 8   you see the section entitled Factual Background?
 9        A    Yes.
10        Q    Can you see where your expert is citing to the
11   complaint?
12        A    Yes.
13        Q    When he cites to the complaint, he's citing to
14   the underlying wrongful death case complaint?
15        A    I assume so.  I mean, that sentence says "as
16   alleged in the underlying complaint", so I'm assuming
17   so.
18        Q    So you see in this first paragraph he cites to
19   the underlying complaint for four sentences?
20        A    Yes.
21        Q    The second paragraph you see that he continues
22   to cite the underlying complaint?
23        A    Yes.
24        Q    So your expert's citation to portions of his
25   factual background is to unproven allegations in the
```

1  underlying complaint; correct?

2      A    I don't know whether they're proven or not.

3  They're just alleged as complaints, so they're

4  allegations of the plaintiff.

5          Yes, that is what he is saying.

6          MR. CALHOUN:  Back to page 3.

7      Q    Cory, do you see the sentence that says:

8  Outsidein was responsible for supervising the work of

9  contractors and subcontractors and serving as a

10  compliance officer to ensure compliance with all the

11  standards, laws, and regulations applicable to

12  construction projects, which also includes the

13  government permit component?

14      A    Yes, I see that sentence.

15      Q    In its support of that factual background your

16  expert is citing only to the underlying complaint;

17  correct?

18      A    I mean, that's what the report says.

19      Q    Is it RLI's position that Outsidein was in fact

20  responsible for and owed duties of care with regard to

21  all of the matters stated in the sentence?

22      A    RLI's positions are based on the allegations of

23  the complaint, the policy, and other documents.

24          You know, I can look at something, if you'd

25  like me to look at it.

1    Q    Was Outsidein responsible for supervising the

2  work of contractors?

3    A    I don't know the ultimate answer to that

4  question.  We look at the allegations of the complaint.

5    Q    RLI is taking as true the allegations of the

6  underlying complaint for purposes of its causes of

7  action in Counts 1, 2 and 3?

8    A    I don't know that it takes it as true.  We

9  analyze the complaint against the policy.

10    Q    So RLI is not taking a position as to the truth

11  of the allegations in the underlying complaint?

12    A    I do not have a position about the truth of the

13  allegations.  Those are the allegations that are

14  alleged.  That's one of the things that we look at in

15  reviewing coverage.

16    Q    So whether or not Outsidein knew or should have

17  known that a claim would be alleged against it for the

18  wrongful death, the facts alleged in the complaint,

19  whether true or not, makes no difference?

20    A    So I don't entirely understand your question.

21  Can you say it a different way?

22    Q    Fair enough.  That was a bad question.

23         RLI is claiming that Outsidein knew or should

24  have known that a claim would be alleged against it for

25  the wrongful death prior to the effective period of the

1    policy; right?

2        A    Yes.

3        Q    And as grounds for claiming that Outsidein knew

4    or should have known, RLI is relying on the allegations

5    in the underlying complaint; right?

6        A    So the underlying complaint is not -- it was

7    not in effect at the -- it wasn't filed at the time

8    Outsidein signed the application.

9        Q    Is that yes or no?

10       A    Well, it's -- since it wasn't -- it wasn't

11   filed at the time of -- Outsidein did not have it.  It

12   was not filed at the time the application was signed.

13           I gave you the other facts that we are relying

14   on, and then, you know, that included perhaps some of

15   these allegations that were in other areas, but not the

16   complaint itself.

17       Q    Are you able to point to any document that

18   shows Outsidein was responsible for supervising the work

19   of contractors and subcontractors and serving as a

20   compliance officer?

21       A    From what I've reviewed, I understand that its

22   sub consultant was saying that it had that obligation as

23   the architect of record.  There may be additional

24   documents, but Outsidein was certainly made aware that

25   its sub consultant, who was a local architect in Puerto

1    Rico, believed it had that obligation.

2        Q    Can you point to any other documents?

3        A    Not off the top of my head.  There may be more.

4    And, again, I'm not involved in the underlying

5    litigation.

6        Q    Has RLI considered any project contracts to

7    which Outsidein is a party for the underlying project?

8        A    What do you mean "considered"?

9        Q    Reviewed any contracts that Outsidein is a

10   party.

11       A    So in the initial claim review process we may

12   have reviewed the contracts.  I don't know that we did

13   in this case.  We will frequently review them though.

14       Q    Did your expert review Outsidein's contracts?

15       A    I don't know the answer to that.  I mean, he

16   listed the documents he reviewed.

17            I'm going to take a look at his report.

18            I mean, did you see it in the report?  I mean,

19   all I know about what he reviewed is what's in the

20   report.  So if it's not there, I don't know the answer

21   to that.

22       Q    Yeah.  I don't see it on the list.

23       A    Okay.

24       Q    He calls it a non-exhaustive list, so he may

25   have reviewed it and just not listed it here.

1        So does RLI know if he reviewed Outsidein's
2   contracts?
3        A    I don't know.  You would have to ask him.
4        Q    Do you know if -- before we get there, are you
5   aware that Outsidein contracted with the developer,
6   Tower Group for the project?
7        A    That sounds about right.
8        Q    Do you know whether that contract with the
9   developer says that Outsidein is responsible for
10  supervising the work of contractors, subcontractors,
11  supervising demolition, being a compliance officer?
12       A    I do not know that.  I did not review that
13  contract in preparation for this deposition.
14       Q    Did you not review that document because you
15  don't believe it to be relevant to whether or not
16  Outsidein knew or should have known about the claim for
17  the wrongful death before the policy period?
18       A    I didn't make any determination about relevant
19  or not relevant.  I reviewed the documents provided by
20  my attorney.
21       Q    Did Outsidein have a responsibility for
22  supervising and managing the demolition phase of the
23  project?
24       A    I don't know about ultimate responsibility.  I
25  understand that the underlying complaint has alleged

1  that, that his -- Outsidein's sub consultant, the Puerto

2  Rican architect, stated that he did have that

3  obligation, that Outsidein had that obligation.

4      Q    You just said ultimate -- excuse me.  Start

5  over.

6           You just said you don't know about ultimate

7  responsibility.  What do you mean by ultimate

8  responsibility?

9      A    Well, I'm not the trier of fact in the

10  underlying case.  So I know what the allegations are and

11  I know what the facts are.

12     Q    In other words, you don't know whether it's

13  true or not?

14     A    I know that the sub consultant that Outsidein

15  hired said that they did, and I know that the plaintiffs

16  in the underlying action are alleging that they did.

17     Q    Similar question.  Was Outsidein responsible

18  for permitting and safety compliance for the project?

19     A    Again, the underlying complaint I believe

20  alleges that.  I'd have to review for the specific

21  words, you know, those specific allegations, but

22  generally, yes.  And I believe also that that was what

23  the sub consultant architect was advising Outsidein as

24  well.

25     Q    Anything else?

1      A     Not that I'm aware of right now.

2      Q     Would you agree that Outsidein could be made

3   responsible for supervising and managing the demolition

4   of the project through its contract with the project

5   developer?

6      A     I don't know the answer to that.  I've reviewed

7   the contract.  That's a hypothetical.  I'm not familiar

8   with the underlying facts of the case.

9            I'm aware of what the facts as alleged against

10  Outsidein are in the complaint.

11     Q     Other than its contract with the developer,

12  what could make Outsidein responsible for supervising

13  and managing the demolition phase of the project?

14     A     Again, I've not reviewed all the documents in

15  the underlying case.  I'm not involved in that.  I'm

16  aware of the allegations.

17     Q     Is there anything other than the allegations in

18  the underlying complaint that you could point to?

19     A     Well, there are -- and this is speaking very

20  generally.  There are times that duties are implied as a

21  matter of law, and that's not just in the contract.

22  Sometimes architects have duties of safety, health and

23  safety obligations.

24            Again I'm speaking generally.  I don't know

25  about this case.

1      Q    Are you aware of any architect standard of care
2  applicable to this case that would make Outsidein
3  responsible for supervising and managing the demolition
4  phase?
5      A    Again, I'm not involved in the underlying case.
6  I haven't evaluated that.  That is not something that
7  I'm aware of one way or the other.  I know what the
8  allegations are.
9      Q    Are you aware of any architect standards of
10 care that would apply to our case?
11     A    Off of top of my head, that would apply to the
12 coverage case?  No.
13     Q    Just to be clear.  This instant lawsuit is not
14 solely about coverage.  There's a recision claim.
15          Are you aware of that?
16     A    Yes, I'm aware there's a recision claim.
17     Q    Your prior answer you said you weren't aware of
18 any architect standard of care that would apply to this
19 coverage case.
20          Did you mean the lawsuit inclusive of the
21 recision claim?
22     A    Yes, that's what I meant.  I mean, is there --
23 is there a standard of care you would like me to review?
24     Q    Only if you're aware of any that would apply to
25 this case.

1      A      Not that I'm aware of.

2      Q      What contractual duties has Outsidein violated

3  for its contracts for the project?

4      A      Again, I'm not familiar with all the facts of

5  the underlying case.  I'm familiar with the allegations

6  of the complaint generally.

7      Q      Are you aware of any?

8      A      I'm sorry.  Any what?

9      Q      To the question I just asked.  Are you aware of

10  any violations of contractual duties by Outsidein?

11      A      Well, you know, again, I haven't reviewed

12  everything.  I'm not familiar with the underlying case,

13  but from the documents I reviewed, one of the e-mails

14  was an e-mail where Outsidein stated that it was in

15  breach of contract, and also, you know, again the

16  e-mails I referenced from the architect consultant in

17  Puerto Rico to Outsidein advising it that there were

18  violations on the project.

19      Q      What duties -- what contractual duties were

20  breached as asserted in that letter or those e-mails?

21          MR. BAHADORAN:  Objection to the form.

22      A      I don't know specifically.  You could take a

23  look at the e-mails and also Outsidein's e-mails, you

24  know, for what they say.

25          You know, I don't know.  I have not reviewed

1  the contract.  You know, I'm not involved in the

2  underlying case.

3      Q    Are you aware of any noncontractual duties

4  violated by Outsidein regarding the wrongful death case?

5      A    Again, I'm not involved in that aspect of it,

6  of the underlying case.  I've referred already to those

7  e-mails with the architectural sub consultant.  I don't

8  know if what he's referring to in there is contract,

9  some other duty, common law.  I don't know, but he was

10 making the statement that Outsidein was improper in

11 allowing the demolition to continue without a permit.

12         So you could take a look at those e-mails.

13     Q    So Outsidein -- so RLI is not claiming that

14 Outsidein actually had a duty for supervision and safety

15 for the demolition phase; right?

16     A    RLI's position is based on the allegations and

17 the facts.  It's not undertaking its own investigation

18 or analysis into those allegations.

19     Q    Have you reviewed any documents concerning the

20 investigation by OSHA in Puerto Rico into the safety

21 violations that resulted in the death of Mr. Garcia

22 Marrero?

23     A    I reviewed the ultimate decision of OSHA, and I

24 reviewed some testimony of, I believe, like a supervisor

25 at the demolition company.

1    Q    Anything else?

2    A    I don't believe so.  Not that I recall.

3    Q    Are you aware that Outsidein was not

4  interviewed by OSHA in its investigation?

5    A    That is my understanding, yes.  I was aware, as

6  I previously said, that its consultant which it hired

7  was interviewed.

8    Q    Which consultant was that?

9    A    The structural engineer.

10   Q    And was that -- if we go back to your expert

11 report, is that structural engineer identified there in

12 your expert report?

13   A    I don't know.  I would have to go through this

14 report.

15   Q    Let's do that.  It's important that we get this

16 guy's name right.

17   A    I mean I think it was Morla.

18        Isn't that what you said it was before.

19   Q    I think the person you're talking about is Jose

20 Morla, but I want to make certain.

21   A    Okay.  On page 4 of the it refers to Jose Morla

22 as the consulting engineer retained by Outsidein.  So

23 that sounds right.

24        My understanding is that they retained two

25 consultants.  One was an architect, one was an engineer.

1    Q    Who was the architect consultant?

2    A    Again names aren't my strong suit.  It was like

3    Casino, Cornino, something to that effect, I believe.

4         Oh, yeah.  I see it down there.  His name is

5    Mario Corsino with InterGroup, architectural consultant

6    of the project.

7    Q    Were you aware that Jose Morla, in addition to

8    contracting with Outsidein, also contracted directly

9    with the developer, Tower Group?

10   A    I'm not aware of all the contracts on the

11   project.

12   Q    Are you aware that Jose Morla was contracted

13   directly with the developer?

14   A    All I know about it is that he was contracted

15   by Outsidein.  So I don't know about any other

16   contracts, you know, on the project with other parties.

17   Q    I think you answered this, but I'm not sure.

18        You are not aware that Jose Morla contracted

19   directly with the developer?

20   A    Right.  I answered that question.

21   Q    The answer was, no, you are not aware?

22   A    I said I'm not aware of all the contracts.  I

23   don't even know if that statement is true.  I'm aware

24   that Outsidein contracted with Morla, or at least

25   retained Morla as a consulting engineer.

1    Q    Do you have page 4 of the expert report open in
2  front of you?
3    A    Uh-huh.
4    Q    The first full paragraph, the first sentence
5  identifies Jose Morla.  The second sentence identifies
6  Edgardo Alvaredo of EHA Engineering.
7         Do you see that?
8    A    Yeah, I see that.
9    Q    Who is Edgardo Alvaredo of EHA Engineering?
10   A    I don't know specifically.
11   Q    Do you know anything about Edgardo Alvarado and
12 his involvement with the project?
13   A    Just what I reviewed in preparation for the
14 deposition.  So I reviewed this report.  I was aware of
15 e-mails about the slab thickness not being -- I guess
16 not being as thick as they would have liked.
17   Q    Do you know anything else about Edgardo's
18 involvement with the project?
19   A    No, I don't believe so.  Nothing is coming to
20 mind right now.
21   Q    Do you know who hired him?
22   A    Not off the top of my head, no.
23   Q    Do you know his scope of work for the project?
24   A    Again, no.
25   Q    Back to Jose Morla.

1        You understand he was contracted or hired by

2    Outsidein for a certain scope of work for the project;

3    right?

4        A    I don't know what his scope of work is, but my

5    understanding was that he was retained by Outsidein for

6    the project as a consulting engineer, structural

7    engineer.

8        Q    Do you know anything about his scope of work

9    that he was hired to perform by Outsidein?

10       A    I have not reviewed the contract.

11       Q    Other than not reviewing the contract, you have

12   no other knowledge regarding his scope of work for the

13   project?

14       A    I mean, he was hired as a structural engineer

15   to provide consulting services for Outsidein.  That's my

16   understanding.

17       Q    To do what?

18       A    Provide structural engineering consulting

19   services for Outsidein.

20       Q    Structural engineering regarding what though?

21       A    I'm assuming the project.

22       Q    What parts of the project; the demolition

23   phase?

24       A    Again, I don't know the specifics.

25       Q    Does RLI know whether or not Outsidein engaged

1   Jose Morla to perform any scope of work on Outsidein's

2   behalf on the demolition phase of the project?

3       A    My understanding is that Morla was involved in

4   evaluating the slab thickness, and he also consulted

5   with Outsidein as per the accident about the structural

6   strength of the slab.  He gave an opinion about

7   negligence of Bird after the accident.  And he also

8   consulted with Outsidein about whether they should

9   retain their own expert to do a forensic analysis.

10      Q    Anything else?

11      A    That's what I recall right now.

12      Q    And do you understand that Jose Morla was

13  performing those services as a sub consultant to

14  Outsidein?

15      A    I'm not entirely sure based on what you're

16  saying to me about your -- your implying that perhaps he

17  was retained by the developer as well.  But based on

18  what I see in those e-mails it appears he was doing this

19  for Outsidein.

20          Again, I'm not involved in all the facts of the

21  underlying litigation.

22      Q    Mario Corsino of InterGroup.  You understand

23  that he was a sub consultant, and architecture sub

24  consultant for Outsidein?

25      A    Yes, that's my understanding.

1    Q    What was InterGroup's scope of work for

2  Outsidein?

3    A    Again I don't know the specifics on that.  I

4  know he was a local Puerto Rican architect that was

5  retained by Outsidein.

6    Q    Did InterGroup -- did InterGroup's scope of

7  work for Outsidein include anything regarding the

8  demolition phase?

9    A    I don't know what his specific scope of work

10  is, but I do know he did some site visits for the

11  demolition.  I think he billed for some inspections

12  during the demolition.

13         You know, there may be additional facts.

14  Again, I don't know all the facts of the underlying

15  case.

16    Q    Was InterGroup instructed by Outsidein to

17  perform inspections of the demolition?

18    A    I don't know exactly how the work was parsed

19  out.  I reviewed e-mails where he stated an inspector

20  was required.  He did state that he was onsite at

21  various times, and he witnessed the demolition.  And I

22  believe there was some billing for inspection services

23  during that time.

24    Q    Did the Puerto Rico OSHA cite Outsidein for any

25  safety violations on the project?

1      A      Not that I'm aware of, no.

2      Q      Did OSHA of Puerto Rico find Outsidein

3   responsible in whole or in part for the death?

4      A      I don't know if they have.  I have not seen

5   that document.

6      Q      Is RLI aware of any evidence showing Outsidein

7   to be responsible for, or violating any safety standards

8   during the demolition phase?

9      A      I'm aware that the architectural sub consultant

10  alleged that Outsidein was committing ethical violations

11  by allowing the demolition to continue without a permit.

12  I'm aware they sent a letter citing ethical violations.

13  I'm aware the underlying complaint has made similar

14  allegations against Outsidein.

15      Q      Anything else?

16      A      There may be additional facts that I'm just not

17  recalling off the top of my head.  That's what's coming

18  to mind now.

19          MR. CALHOUN:  Adrian, let's go back to the

20      complaint.  Tab A(2), Depo Exhibit 2.

21          THE WITNESS:  Is that the RLI complaint or the

22      underlying?

23          MR. CALHOUN:  RLI's complaint.

24          THE WITNESS:  Okay.

25          MR. CALHOUN:  Let's look at Count 3.

1    Q    Cory, are you familiar with RLI's Count 3?

2    A    Yes.

3    Q    In Count 3 RLI is asserting that the claim is

4    not covered because the underlying action is based on --

5    it arises out of facts, situations, or events, or

6    wrongful act which was the subject of notice given to

7    AIG on June 17, 2019?

8    A    So I'm just looking at it.  So our positions

9    set forth in 39 and 40 paragraphs there, yeah, was the

10   subject of a notice given by Outsidein to its prior

11   carrier, and then there's reference to notice on

12   June 17, 2019.

13        MR. CALHOUN:  Now let's look at RLI's

14        interrogatory responses, Tab 11, Depo Exhibit 5,

15        Interrogatory 6.

16        THE WITNESS:  I have it in front of me.  The

17        paper one.

18   Q    And Interrogatory 6 is directed at Count 3 of

19   the complaint; correct, which we just looked at?

20   A    Yes.

21   Q    Okay.  And in its answer RLI identifies two

22   facts which establish its claim for Count 3.

23   A    I see that.

24   Q    Yeah.  And the first one is InterGroup's demand

25   on June 10, 2019, and the second is a motion to

1    disqualify counsel filed in the underlying lawsuit;

2    correct?

3        A    Yes, I see that.

4        Q    So the first one pointed to by RLI is that in

5    InterGroup's letter dated June 10th, 2019 it

6    specifically threatens litigation over its payment

7    demand, in that the litigation, the threatened

8    litigation, could uncover unspecified serious ethical

9    violations.

10           Do you see that?

11       A    Yes, I see that.  Yes.

12       Q    What are the serious ethical violations alleged

13   by InterGroup in this letter?

14       A    Well, I don't know all of them, but I can tell

15   you based on my review of the e-mails between -- and

16   InterGroup is the architectural sub consultant.

17           So prior to the accident there were those

18   e-mails I mentioned before where InterGroup was stating

19   that the architect Outsidein was allowing demolition to

20   proceed without a permit, that it was not safe, that the

21   project could get in trouble.  He didn't want his good

22   name tarnished.

23           So I think, you know, reading it as a whole

24   that is what they are referencing.

25       Q    Anything else?

1      A      Not that I'm aware of.  I would definitely

2  direct you to those e-mails between InterGroup and

3  Outsidein prior to this letter.

4      Q      If the demolition proceeded without a permit

5  would that be an ethical violation by Outsidein?

6      A      That is what InterGroup was alleging.

7      Q      Is RLI taking the position as to whether or not

8  it would be a violation?

9      A      Again, I'm not involved in the underlying

10  litigation.  I don't know how it will ultimately turn

11  out.  I know that that is an allegation in the

12  underlying complaint as well.

13      Q      RLI is not taking a position in this lawsuit

14  whether it was an ethical violation, or would have been

15  an ethical violation?

16      A      Right.

17              MR. BAHADORAN:  Objection to form.

18      A      RLI's position, as I stated, is based on the

19  facts and the allegations.

20      Q      When you say facts, what do you mean?  Just the

21  allegations in the underlying complaint?

22      A      Well, I referenced lots of the facts to you,

23  like specifically the e-mails we've talked about, the

24  allegations of the complaint, the June 10th letter, the

25  June 19th letter.  There's -- I'm sure there's others as

1    well.  But those are facts, you know, that those letters

2    were sent and e-mails were sent.

3            There's also the allegations in the complaint

4    as well, the underlying complaint.

5    Q    Is RLI aware of any facts that show that

6    Outsidein committed ethical violations?

7    A    I believe I've answered that question.  So it's

8    the e-mails where the local Puerto Rican architect said

9    that they were allowing the project to continue without

10   a demolition permit.  They were aware of structural

11   issues with the slab.  The architect was making it clear

12   he was concerned about the project being in trouble and

13   tarnishing his reputation.  And then similar allegations

14   were repeated in the underlying complaint.

15   Q    All of those pieces of evidence that you just

16   identified, do those show that Outsidein committed

17   ethical violations?

18   A    Again, those are the allegations and the facts.

19   I don't know how the underlying litigation will

20   ultimately turn out.  That is still pending.

21   Q    So just to be clear, RLI is not taking a

22   position as to whether Outsidein actually committed

23   ethical violations; correct?

24           MR. BAHADORAN:  Object to form.  Asked and

25       answered.

1    A    RLI's position is based on the facts and the

2  allegations.  We don't do our own independent analysis

3  about the truth of those allegations.

4    Q    Whether or not Outsidein committed a violation

5  doesn't affect RLI's case?

6    A    Well, RLI's position is based on the

7  allegations against it.

8         I mean, do you want me to talk about a specific

9  count of RLI's complaint?

10   Q    Here we're talking about Count 3.

11   A    Okay.  So this is based on the prior knowledge

12  exclusion, which is what was noticed to AIG before the

13  inception of the RLI policy.

14   Q    So looking back at Interrogatory 6, the second

15  thing RLI identified in support of Count 3 was a motion

16  to disqualify counsel filed in the underlying complaint.

17   A    Yes, I see that.

18   Q    And RLI is pointing to a factual overlap in

19  relatedness between the underlying complaint and the

20  June 10th, 2019 demand.

21        Do you see that?

22   A    I believe there is a factual overlap.  I think

23  this interrogatory answer is pointing to the fact that

24  Outsidein's attorney stated there's a factual overlap

25  and relatedness between those two things.

1      Q     Is there a factual overlap?

2      A     Between what; the underlying complaint and the

3    notice to AIG.

4      Q     Yeah, what RLI relates here.  Is there a

5    factual overlap in relatedness between the underlying

6    complaint and the June 10, 2019 demand?

7      A     Yes, that's RLI's position.

8      Q     Is that factual overlap in relatedness?

9      A     I'm sorry.  I missed the first part of your

10    question.  Did you say what is that factual relatedness?

11      Q     Yeah.  Explain what that factual overlap and

12    relatedness is.

13      A     All right.  I'm going to refer to the June 10th

14    letter.  So for one thing, it involves the same project

15    as the underlying complaint, and then it talks about

16    uncovered serious ethical violations by OIA, and that

17    the violations could affect -- I'm assuming here --

18    OIA's license to practice architecture in Puerto Rico

19    and Florida.

20            Again, InterGroup had previously made

21    allegations about the things that it believed Outsidein

22    was doing wrong on the project.  We've gone through

23    those e-mails a bunch of time.

24            Very similar allegations are made in the

25    complaint about Outsidein allowing the demolition to

1  continue without a permit, and allowing the project to

2  continue with this unsafe situation.

3      Again, you would have to refer to the complaint

4  for the specific allegations.  I'm paraphrasing.

5      Q    Has RLI discussed with InterGroup -- anyone at

6  InterGroup what it meant by "serious ethical violations

7  committed by Outsidein" in its June 10, 2019 letter?

8      A    I don't believe so.

9      Q    So RLI is just making an assumption of what it

10 thinks InterGroup meant by that statement?

11     A    It's not an assumption.  It's based on facts.

12     Q    What facts?  You just said you haven't talked

13 to InterGroup about it, so you don't know what they

14 think.

15     A    Well, I don't know specifically what they

16 meant, but I know they had alleged violations on the

17 project, that the project could get in trouble, that

18 they were worried about the good name of InterGroup on

19 the project.

20     Those are things that are already documented,

21 and that they were putting this in writing.  And so this

22 is a natural follow to that.

23     Q    But you don't know with certainty what

24 InterGroup meant in this June 10th, 2019 demand?

25     A    You can ask InterGroup's attorney who wrote it.

1    Q    RLI doesn't know; right?

2    A    I know based -- what was the facts that I've

3    relayed to you, and then what is said here, and then

4    what is alleged in the complaint.

5    Q    That's it?

6    A    From what I recall right now.

7         MR. CALHOUN:  I believe now would be a good

8    stopping point for lunch.

9         MR. BAHADORAN:  How much longer do you think

10   you've got?

11        MR. CALHOUN:  I may or may not use all seven

12   hours today.

13        MR. BAHADORAN:  If we're going to go that long

14   then I think our preference is to just keep going.

15        MR. CALHOUN:  No.  We're going to take a lunch

16   right now.

17        MR. BAHADORAN:  Is there anything special you

18   would like to have for lunch?  Do you want us to

19   hang out?  I mean, because, you know, we want to

20   make sure that you have the lunch that you need.

21   Don't mind us in this deposition.

22        MR. CALHOUN:  That was very unprofessionally

23   antagonistic.

24        MR. BAHADORAN:  No.  I think your comment is

25   unprofessional about the fact that we're all just

1      going to yield to your lunch preferences when I've

2      offered to keep going.

3           MR. CALHOUN:  And I think for everyone's health

4      here we need to take a lunch break.

5           MR. BAHADORAN:  Okay.  You're a medical doctor,

6      so you know what peoples' health requirements are.

7           How long do you need for lunch?

8           MR. CALHOUN:  Let's go off the record.

9           (Lunch break.)

10  BY MR. CALHOUN:

11      Q    Cory, are Outsidein's contractual duties

12  relevant to whether Outsidein knew or should have known

13  that a claim would arise against Outsidein for the

14  death?

15      A    I don't know exactly what Outsidein's

16  contractual duties are.  I've given the facts that I

17  think are relevant to whether they knew or should have

18  known.

19      Q    So you said you don't know what their

20  contractual duties are?

21      A    Right.

22      Q    But they would be relevant to whether Outsidein

23  knew or should have known?

24      A    I don't know that they would be relevant.  You

25  know, we talked about the underlying complaint

1    allegations and the other facts involved about whether

2    Outsidein knew or should have known of the potential

3    claim.

4         Q    Are you saying that RLI is not taking a

5    position on whether contractual duties are relevant to

6    whether Outsidein knew or should have known?

7         A    Are there certain contractual duties you want

8    me to review?

9         Q    Just any con- -- whatever the contractual

10   duties are.  Are contractual duties relevant?

11        A    Well, I don't know what they are in this case.

12        Q    So they could be relevant?

13        A    I don't know.  I mean, we do the evaluation

14   based on the allegations of the complaint, and the

15   policy, and I can't evaluate a hypothetical on a

16   contract that is not in front of me.

17        Q    And RLI did not evaluate Outsidein's

18   contractual duties regarding the allegations in the

19   complaint?

20        A    I don't know whether Ross did that or not.  He

21   will typically ask for contracts.  Again, the evaluation

22   is based on the allegations of the complaint and what

23   they knew or should have known at the time.  Well, knew

24   or should have known before the policy incepted.

25        Q    Is it RLI's position that only an expert can

1   determine whether Outsidein knew or should have known

2   that a claim would arise against it for the death?

3       A    I believe that there are many facts, which

4   we've already talked about, which show that Outsidein

5   knew or should have known that a claim either had

6   occurred or was likely as a result of the death.

7       Q    That was not an answer to my question.  My

8   question was is, it RLI's position that only an expert

9   can make that determination?

10      A    Right.  As I said, there are other facts that

11  support that, so the answer is no.

12      Q    Is that a topic that is so complicated that it

13  requires expertise to make the determination of whether

14  Outsidein knew or should have known?

15          MR. BAHADORAN:  Object to the form.

16      A    Well, we have an expert in this case who can

17  provide assistance to the court.  Again, there are facts

18  which also support that.

19      Q    That didn't answer my question.  Is the

20  determination of whether Outsidein knew or should have

21  known a topic that's so complicated that it requires

22  expertise?

23          MR. BAHADORAN:  Object to the form.

24      A    Again, no.  We have relied on various facts,

25  which I've already talked about, and made that

1  determination.  An expert can assist, and we have

2  disclosed an expert.

3     Q    Did Outsidein actually know that the death

4  would result in a claim against Outsidein?

5     A    I don't know what Outsidein actually knew.  You

6  would have to ask them.  I'm assuming you did, because

7  you represent them.

8          But I've already talked about the facts that we

9  are aware of that they knew of at the time that the

10 policy incepted, and at the time they applied for

11 insurance with RLI.

12    Q    Does RLI have any evidence of Outsidein's

13 actual knowledge of whether the death would result in a

14 claim?

15    A    Yes.  We've talked about that.

16    Q    I don't think you've identified any evidence of

17 actual knowledge, just whether Outsidein should have

18 known.

19          My question is, does RLI have any evidence that

20 Outsidein actually knew that a claim would be made?

21    A    So I would -- I would refer you -- and I'm

22 again going off of memory -- to the June 21, 2019,

23 letter, which I believe says that they are involved in a

24 matter which will involve litigation resulting from the

25 death, and then there's also the June 10th letter which

1    references future litigation.

2        Q    Anything else?

3        A    As I sit here right now I don't recall

4    anything, but those are specific facts that were known

5    to Outsidein, and they're expressed, stating that they

6    will likely be involved in litigation.

7        Q    And both of those letters you referenced

8    express litigation regarding the death?

9        A    One mentions ethical violations, as we have

10   talked about.  I'll take a look at it here.  I don't

11   have the June 10th letter in front of me.

12            The June 21st, 2019 letter expressly references

13   the death.

14            MR. CALHOUN:  Let's look at the June 10th

15       letter, which is Exhibit 3, Tab C(1).

16       Q    RLI is relying upon this letter in support of

17   its Counts 1, 2 and 3; correct?

18       A    Let me just look at the counts.  I want to give

19   you a correct answer.  Hold on.  1, 2 -- yes, that's

20   correct.

21       Q    This letter is related to Outsidein's

22   termination of InterGroup's subcontract; correct?

23       A    There's other things in the letter besides

24   that.

25       Q    But it does relate to that?

1     A    It also relates to serious ethical violations.

2     Q    Are you aware of numerous other communications,

3   documents provided to RLI by Outsidein in this case that

4   set out the basis for the termination of InterGroup by

5   Outsidein?

6     A    I may have reviewed some of them.  Again, I

7   reviewed so many e-mails we already discussed.  There

8   may be some that were exchanged that I have not

9   reviewed.

10    Q    And are you aware that Outsidein terminated

11  InterGroup because Outsidein was unhappy with

12  InterGroup's performance and that it was performing work

13  outside the scope of its subcontract?

14    A    Are you reading from a document?

15    Q    No.  Just asking you a question, if you know.

16    A    I'm happy to review a document.  I'm not aware

17  of the specific terms off the top of my head.

18    Q    Are you aware that Outsidein was upset that

19  InterGroup was performing work outside of its scope of

20  work?

21    A    Again, I don't know that off the top of my

22  head.

23         MR. CALHOUN:  Scroll down.  Up a little.

24    Q    Cory, do you see the first paragraph of this

25  letter where it references an egregious breach of

1  contract?

2      A    Yes, I see the first paragraph.

3      Q    So intergroup was alleging that Outsidein had

4  committed an egregious breach of contract; right?

5      A    Yeah.  I mean, the letter says it's engaged th

6  attorney services to collect monies owes, blah, blah,

7  blah, in light of an egregious breach of contract.  Yes,

8  that's what it says.

9      Q    So what egregious breach of contract was

10  InterGroup blaming Outsidein for?

11      A    You would have to ask InterGroup.  I mean, I

12  can talk about what's in the letter.

13      Q    So RLI does not know?

14      A    Not off the top of my head.  I mean, my

15  understanding as I sit here is that it believed the

16  termination was improper.

17      Q    What termination; Outsidein terminating

18  InterGroup?

19      A    That's my understanding.  In some way.

20      Q    Okay.  So the egregious breach of contract here

21  was that Outsidein's termination of InterGroup was

22  improper?

23      A    I don't know that.  As I said, I don't know

24  specifically what they are referring to.

25      Q    Does this letter specify that the violations by

Hedquist & Associates Reporters, Inc.

1    Outsidein related to the death of Mr. Marrero?

2         A    The death is not mentioned in this letter.

3         Q    So the violations for egregious breach of

4    contract mentioned in this letter don't relate to the

5    death?

6         A    I don't agree with that.

7         Q    Why not?

8         A    So the letter mentions the serious ethical

9    violations on Page 2.  So they're talking about

10   litigating this egregious breach of contract.

11   Litigation of this matter in court can uncover serious

12   ethical violations.

13        I'm on Page 2, bottom of Page 2:  These

14   violations could affect your license to practice

15   architecture in Puerto Rico and Florida, and could

16   adversely affect the interest of the project owner.

17        Those allegations are -- those same ones or

18   very similar ones are repeated in the underlying

19   complaint.

20        Q    Where in this letter does it mention the death

21   of Mr. Marrero?

22        A    I already answered that.  It does not mention

23   the death.

24        Q    Does the letter say that ethical violations

25   would potentially expose Outsidein to the liability for

1    the death?

2        A    It does not mention the death.

3             MR. CALHOUN:  Let's look at the legal hold

4        letter on June 21, 2019.  Exhibit 4, Tab B(3).

5             THE WITNESS:  I've got it.

6        Q    This letter is one of the bases for RLI's

7    claims that outside knew or should have known before the

8    policy date; correct?

9        A    Correct.

10       Q    Have you seen any other copies of this legal

11   hold letter?

12       A    I mean, my attorney gave me one, but it looks

13   identical.  So it's probably the same one.

14       Q    How did RLI come to learn of this legal hold

15   letter?

16       A    I don't know specifically, but my understanding

17   is that our attorney found it in the underlying case

18   filings.

19       Q    So the first time this was given to RLI was in

20   this lawsuit?

21       A    I don't know that it was given to RLI.  It

22   was -- I think it was -- and I could be wrong on this,

23   but I believe it was attached as an exhibit to a filing

24   in the underlying case.

25       Q    And that was the first time RLI obtained a copy

1   of it?

2       A    That is my understanding, yes.

3           MR. CALHOUN:  Go to the top of the page.  Let's

4       look at the top of the page.

5       Q    Cory, do you see the line of numbers across the

6   top of the page?

7       A    Yes.

8       Q    Do you know what those represent?

9       A    My guess is that is a filing stamp when it was

10  filed with the court.

11      Q    In the Puerto Rico case?

12      A    That's a safe assumption.  I don't know what

13  the case number is specifically.  I haven't compared it,

14  but that would seem like it.

15      Q    And the date on the top is January 26, 2021?

16      A    Yes, that's what it says.

17      Q    So that stamp looks like it was filed with the

18  Puerto Rico court in January 2021?

19      A    I mean, you could probably get a certified copy

20  if you wanted to confirm it.

21      Q    Does RLI contend that Outsidein received a copy

22  of this litigation hold letter before Outsidein

23  submitted its application to RLI?

24      A    Yes.  My understanding is that this was

25  personally served on Outsidein or its agent on or around

1    the time of the letter, date of the letter.

2         Q    Does RLI have evidence of that?

3         A    I don't -- I don't know specifically what we

4    have.  You could ask the attorneys about that.

5         Q    Have you seen evidence of it?

6         A    I did not review that in preparing for this.

7    Like a document?  No, I have not reviewed a document.

8         Q    Other than your attorneys, has someone told you

9    that Outsidein actually received a copy of this before

10   submitting its application to RLI?

11        A    No, other than -- not including my attorneys.

12        Q    Read to me in this litigation hold letter where

13   it says that a claim is being made against Outsidein.

14        A    I don't know if it says that word-for-word, but

15   I can point you to some of the language that RLI is

16   relying on, if that would be helpful.

17        Q    Please do so.

18        A    Okay.  So starting on the first page it says:

19   You are all involved in a matter that may involve

20   litigation regarding Rise Village at Carolina, Puerto

21   Rico.  The litigation stems from the death of Raul

22   Garcia at the worksite where Bird Group, LLC is the

23   general contractor.  I've been engaged as the legal

24   counsel by the Garcia family to seek redress in light of

25   the negligence of one or more parties, Bird Group, LLC

 1  included, that might be liable for Mr. Garcia's death on

 2  June 10, 2019.  To that end, we are advising you as the

 3  potential custodian of records pertaining to this

 4  potential matter.

 5        There's obviously some additional language

 6  about preserving documents, but among other documents

 7  that it mentions preserving are design consultant

 8  contracts, which would include Outsidein's contract,

 9  insurance policies, inspection contracts, inspection

10  reports, architectural engineering design supervision

11  reports, and there's some various other documents there

12  as well.

13     Q    Is there anything else in this letter that RLI

14  is relying on?

15     A    I believe generally that's it.  My attorney

16  obviously may have some other things.  Let's see.  Hold

17  on.  I'm just looking at it briefly too.

18        Yeah, so it just mentions the potential

19  litigation involving the parties to the letter, and to

20  maintain the documents.

21     Q    Where does it say litigation against the

22  parties to the letter?

23     A    So it says:  Dear All -- which, you know,

24  Outsidein is one of the named parties at the top.

25        Dear All.  You are all involved in a matter

1    that may involve litigation.

2         Q    Anything else?

3         A    I mean, I guess I would refer to what I just

4    read.  Again, it's talking about that, but that's where

5    it expressly says it.

6         Q    The litigation hold letter does not say that

7    Outsidein is liable for the death; correct?

8         A    In those specific words, I don't think so.

9         Q    It only identifies Bird Group, LLC as someone

10   that may be liable for the death; correct?

11        A    That is not correct.

12        Q    Why not?

13        A    It says "you all are involved in a matter that

14   may involve litigation", which means this matter may

15   involve litigation, and Outsidein is involved.  And it

16   also says that:  The attorney has been engaged as legal

17   counsel to seek redress in light of the negligence of

18   one or more parties that may be liable for the death.

19        Q    And again it identifies Bird Group only.

20        A    No, it doesn't.  One or more parties, comma,

21   Bird Group, comma, LLC, included.  One or more parties

22   including Bird Group.  It's not limited to Bird Group.

23        Q    You're an attorney.  As an attorney I'm sure

24   you're familiar with the litigation hold concept.

25             Just going back.  As RLI corporate

1   representative, it's possible for a project participant

2   to have documents but no liability for a death that

3   occurs in that project; correct?

4        A    I can't really answer a hypothetical.  What I

5   can say here is that it says specifically:  Dear All.

6   You are all involved in a matter that may involve

7   litigation.

8        Q    So Outsidein could be involved in the matter

9   where the plaintiff sues Bird, Outsidein has documents

10  relevant to that -- that matter, but isn't sued.

11       A    I can't answer a hypothetical, but what I will

12  note here is Outsidein was sued.

13       Q    Do you know why plaintiff's counsel that wrote

14  this litigation hold letter only identified Bird Group,

15  LLC as one of the potential negligent parties?

16       A    I don't think that that is what it says, and I

17  don't know why this attorney wrote anything in this

18  letter specifically.  You would have to ask them.  But

19  it does say negligence of one or more parties.

20       Q    You have no testimony or statements, you have

21  not spoken with the attorney that wrote this letter?

22       A    I have not, no.

23            MR. CALHOUN:  Turn to page 3 of this letter,

24       the first paragraph under the list, the bullet point

25       list of the documents.

1          THE WITNESS:  Okay.

2      Q    The second sentence says:  In summary, Bird

3  Group, LLC is directed to preserve and keep all relevant

4  documents.  And then it goes on.

5      A    I see that.

6      Q    Do you know why it only says Bird Group, LLC is

7  directed to preserve, and doesn't identify Outsidein or

8  any of the other entities?

9      A    I don't know.  You could ask plaintiff's

10  counsel.

11          MR. CALHOUN:  Let's look at the complaint

12     again.

13          THE WITNESS:  Is this the RLI --

14          MR. CALHOUN:  Yes.  RLI complaint.

15          THE WITNESS:  Got it.

16          MR. CALHOUN:  And look at Count 4.

17          THE WITNESS:  Okay.

18      Q    And Count 4 is for recision based on alleged

19  false responses by Outsidein on its application;

20  correct?

21      A    There are material misrepresentations,

22  omissions, concealment, or statements.

23      Q    On the application made by Outsidein to RLI?

24      A    Yeah.  I mean, there may be some additional

25  allegations here.  I'm just looking at it.  Obviously

1    the complaint is there for allegations.

2         Q    And Count 4 is based on the application that's

3    attached to this complaint?

4         A    I believe so, yes.

5         Q    Is that application part of B to the complaint?

6         A    I'm sorry.  Can you show me?  Are you asking is

7    this the exhibit?

8         Q    Which exhibit?  Which complaint exhibit is it?

9         A    So I don't have the exhibits with the complaint

10   here.  If you have it, could you scroll down and we can

11   see?

12        Q    I think it's Exhibit B?

13        A    I'm looking to see if it's in there attached to

14   the policy.

15        Q    Do you see where it just said Exhibit B?

16        A    I saw that.  Could you go down to where the

17   application is though.  I was just looking to see if it

18   was attached there, if it was separate.  I just wanted

19   to see.

20        Q    The first 16 pages or so of Exhibit B appear to

21   be the policy.

22        A    Okay.

23        Q    Then there's some endorsements.  And it looks

24   like we get to the application on page 30 of Exhibit B.

25        A    Okay.  Yes.  So it appears the application is

1    included in Exhibit B to the complaint.

2            MR. CALHOUN:  Okay.  And because that's a

3    little clunky the way it's buried in that exhibit I

4    want to enter a deposition exhibit that's just this

5    application, which is -- I thought I had that broken

6    out separate -- A(5).  Yes, A(5).

7            Okay.  So at Tab A(5) is a copy of the

8    application that was included as an exhibit to RLI's

9    complaint, and I would like to enter that as depo

10   Exhibit 7.

11           (Exhibit No. 7 was marked for identification.)

12   Q    Cory, using this exhibit, this application, I'd

13   like for you to point to me all of the false responses

14   made by Outsidein in the application that are the basis

15   for Count 4 of RLI's complaint.

16   A    I believe those were set forth in the

17   complaint.

18           Yeah.  So the answers that we're pointing to

19   are set forth in the complaint.  So it's -- mine is

20   stapled in a really weird way.

21           Okay.  So Section B, and then Question 8.

22   Okay.  And then also --

23   Q    You mean Section 1(B)?

24   A    Is that 1(B)?  Let's see.  So it's on Page 2 at

25   the top.  It's the short form eligibility.

1       Q       Okay.

2       A       So Question 8 there.

3       Q       Just Question 8 on this?

4       A       On that page, yes, right now.  And then if you

5   go to, looks like, L or I -- I, Claims History,

6   Questions 3 and 4.

7       Q       So other than those, which are the ones

8   identified in the complaint, there's no other false

9   responses that are the basis for RLI's Count 4?

10      A       Yeah, that is my understanding.  Correct.

11      Q       Okay.  So starting at the top.  Question 8 of

12  Section 1(B), why is Outsidein's response to that

13  question false?

14      A       So the question -- so the question says:  Is

15  the applicant -- so that would be Outsidein -- or any

16  other person for whom coverage is requested aware of any

17  act, error, omission, or circumstance which may result

18  in a claim being made against them, but which has not

19  been yet reported to a professional liability carrier?

20              It's RLI's position that is not correct, and

21  that Outsidein was aware that a claim either had been

22  made or likely would be made against it in connection

23  with the death.

24              Additionally, it was also aware of a claim that

25  had been made against it for egregious breach of

1  contract by InterGroup, which it also did not disclose.

2      Q     The first claim that you referenced there,

3  which claim was that?  Are you talking about the

4  June 10, 2019 letter, or the litigation hold letter?

5      A     With respect to the death there were many acts,

6  errors, omissions, or circumstances that Outsidein was

7  aware of at the time that it signed this application.

8             And I've gone through these before, but they

9  were aware that there were structural deficiencies in

10  the slab.

11      Q     If it -- I just want to make sure there's no

12  additional.  If it's all the claims that we've talked

13  about thus far today, that's all I wanted to know.

14      A     Yeah, I believe that I've mentioned the facts

15  that support this, and it does include the two letters

16  that you referenced in addition to additional facts, and

17  there was also an e-mail where Outsidein stated that it

18  was in default under the contract.

19             MR. CALHOUN:  Moving on to Questions 3 and 4 of

20      Section 2(I).

21             THE WITNESS:  Okay.

22      Q     Question 3 first.  Explain why Outsidein's

23  answer to that question was false.

24      A     So the answer is essentially the same as what I

25  just gave you.  Those two questions are very similar, if

```
1    not identical.

2          I could go through again all the facts that

3    we've talked about today, which include the June 10th

4    letter, the June 19th letter, the prior awareness of

5    structural issues with the slab that Outsidein had been

6    told by its sub consultant local attorney that it was

7    having issues with the project by allowing demolition to

8    continue without a permit, and that InterGroup was

9    concerned about that, that Outsidein stated it was in

10   default under the agreement, it was aware of a death on

11   the project where it was an architect of record.

12         It did a post death analysis and strategy

13   decisions and evaluated negligence for various parties

14   involved.  It made a strategic decision not to

15   participate with an expert retained by Bird Group; that

16   it was going to do its own analysis.

17         It did, I believe, a lab analysis of the

18   concrete with its sub consultant.  It did calculations

19   regarding the slab.  It received the letter, the

20   June 10th letter, alleging ethical violations.  It

21   received the litigation hold letter stating that it may

22   be a party to a litigation, and that it is involved in

23   the matter, namely the death.  And it also did not

24   disclose the contract dispute with InterGroup on the

25   same project.
```

1    Q    Okay.  How about Question 4?  Explain why RLI's

2    response was false.

3    A    So again I don't have all the answers off the

4    top of my head, but my memory is that Outsidein reported

5    a matter to AIG concerning the June 10th letter, which

6    included the serious ethical violations.

7    Q    Anything else?

8    A    Not that I'm aware of currently.

9    Q    Did RLI rely on any of the statements made in

10   Question A(3) and (4) that we just reviewed?

11   A    RLI relied on those statements made in the

12   application.

13   Q    How?

14   A    It relied on those in underwriting the policy.

15   Q    And how did it rely on those in underwriting?

16   A    Prior claim history, from my understanding,

17   is -- prior claim history is a factor that is evaluated

18   in underwriting.  It can affect the decision to

19   underwrite a file, and what terms and conditions are

20   included if it does choose to write a policy.  It can

21   also affect the premium and deductible, and may affect

22   other things as well.  But it can also lead to more

23   investigation in the underwriting of the file as well.

24   Q    If Outsidein had identified the death on its

25   application, would RLI have increased the premium rate

1    offered to Outsidein for its insurance policy?

2        A    It's hard to say in retrospect what RLI would

3    have done because this information was not disclosed.

4            What I can say generally is that RLI would have

5    asked a lot more questions to start with, it would have

6    pulled a loss run, it would have evaluated the death

7    claim, it would have tried to determine an ultimate

8    value for that claim to evaluate it, and then depending

9    on its review of the claim it may have either not

10   written the policy or written the policy on different

11   terms and conditions.

12       Q    Do you know with any certainty whether RLI

13   would have chosen not to issue the policy had Outsidein

14   disclosed the death?

15       A    Most likely RLI would not have issued the

16   policy in this case.  It involved a death, and it

17   involved allegations of ethical violations.  It also

18   included demolition work, which is not typical for an

19   architect.

20           And so all of these would lead it to likely not

21   have issued the policy.  However, again it's hard to

22   look at it retrospectively when this was not disclosed

23   to RLI at the time.

24       Q    You mentioned that it also included demolition,

25   would be one of the factors.  What do you mean by it

1    included demolition?

2         A    Well, the claim was based on the insured's

3    involvement in the demolition, as we talked about those

4    e-mails.

5         Q    Is that it?

6         A    That's all I remember right now, yes.

7         Q    Is it unusual for an architect to be included

8    in demolition?

9         A    I don't know it it's usual or unusual, but it

10   is something that RLI likely would not be interested in

11   writing.

12        Q    Why?

13        A    They ask about this, about the various, I guess

14   subcategories that are -- an insured is involved in.

15        Q    How do you know that?

16        A    It's on the application usually.  I'm speaking

17   generally right now.

18        Q    So that's one of the questions that RLI asks as

19   part of its underwriting, whether or not the design

20   professional performs demolition?

21        A    Usually the question is not so specific, and I

22   don't have that in front of me.  I'm going off memory,

23   but it's usually more about self-performing work, like

24   actual construction work.

25        Q    I see.  Is it RLI's position that Outsidein was

1   alleged to be self-performing demolition work in the

2   underlying complaint?

3        A    So the underlying complaint does allege that

4   Outsidein was involved in the construction, among other

5   things.  I don't know if they specifically say they did

6   demolition, but they do allege, I believe, if I recall

7   correctly, work.

8        Q    That allegation that Outsidein was self-

9   performing work would have factored into the decision on

10  whether to issue the policy?

11       A    It would have been a factor if they were doing

12  their own construction work.

13       Q    Just a point of clarification there.  If the

14  underlying complaint alleged that Outsidein was doing

15  its own construction work, that would have been a

16  factor, or are you saying that would not have been, it's

17  only if they actually were doing in fact self-

18  performance of construction?

19       A    So, I mean, I guess I'm getting confused on all

20  the hypotheticals here, but I'm talking about the

21  application.  The complaint came obviously after the

22  application.

23       Q    I see.  I see.  So if in the application

24  process Outsidein had identified that it was actually

25  self-performing construction work, that would have

1    factored into the underwriting process?

2        A    That is a factor, yes.

3        Q    Is it RLI's policy to never issue a policy if a

4    death on a prior project is disclosed?

5        A    It depends, and it's hard to say based on a

6    hypothetical.

7        Q    How about here?  If RLI would have disclosed

8    the death, would have RLI refused to issue the policy?

9        A    So I think you meant Outsidein disclosed the

10   death.

11       Q    You're right.

12       A    Had Outsidein disclosed the death and disclosed

13   all the other facts, you know, that we've talked about,

14   including the serious ethical violations, it is likely

15   that RLI would not have issued the policy.

16            It certainly would not have issued the policy

17   as it did.  It may have included different terms and

18   conditions.  It may have charged a different premium.

19   It may have put on endorsements to exclude either the

20   specific project, the specific death, any of the

21   specific claimants, including InterGroup, who had made a

22   contract claim, anything involving that work.

23            Those are all options available.  And again

24   those are things that would have been considered

25   following an investigation.

1    Q    Who at RLI would have been the person to make

2    that decision whether to deny issuance of the policy or

3    change the premium, if the death would have been

4    disclosed by Outsidein?

5    A    So as we discussed, Aylane McDonald was the

6    underwriter.  Had a death and all the facts that we

7    discussed today been disclosed she likely would have

8    investigated it further, gotten more information, and

9    probably talked to her supervisor or someone else in

10   underwriting.

11   Q    How do you know that Aylane would have likely

12   refused to issue the policy?

13   A    Because this is -- RLI likely would not have

14   had interest in writing this account.

15   Q    How do you know that though?

16   A    Well, as we discussed earlier, I prepared for

17   this deposition.

18   Q    What did you do to prepare for that question?

19   Or what did you do to determine whether RLI was likely

20   to not issue the policy?

21   A    Well, among other things, I discussed it with

22   underwriting.  I am also generally aware of, you know,

23   some of the practices of RLI.

24   Q    Was that in your discussion with Vince, whether

25   or not RLI underwriting would have issued the policy or

1  not?

2      A      Yes.

3      Q      And did Vince state that RLI would likely have

4  not issued the policy?

5      A      Again, this was done in conjunction with

6  counsel, and I don't want to be accused of waiving

7  anything.  So I did discuss underwriting issues with

8  Vince.  As I said, I don't really want to get into the

9  specifics of it.

10         Another thing that I did in preparation was

11  review the underwriting guidelines as well.

12     Q      Do the underwriting guidelines say what to do

13  in the event a death on a construction project prior to

14  application is disclosed on the application?

15     A      It is not so specific, but it does talk about

16  claims history being one of the most important areas in

17  underwriting a file, and it talks about some of these

18  things that I mentioned:  That additional investigation

19  would be done, we would, you know, obtain loss runs, we

20  would obtain information regarding the death, regarding

21  also the other claim by InterGroup, we would have

22  evaluated it, the goal would be to determine what is the

23  ultimate kind of net value of it, would have evaluated

24  how -- also the ethical violations that Outsidein was

25  accused of, and it would be obvious that there would be

1    issues pertaining to the death coming.

2         Q    The application --

3         A    One other -- so one other thing that would have

4    happened also is RLI would have inquired whether

5    Outsidein had put its current carrier on notice, and it

6    would not have written this policy unless the current

7    carrier had been on notice of the death.

8         Q    Anything else?

9         A    Not that I can recall.  I'll let you know if I

10   remember something else.

11        Q    This application that RLI relied on in issuing

12   the policy, this is from a competitor; right?  This is

13   not RLI's form?

14        A    This is not RLI's application, no.

15        Q    And this version of the application we're

16   looking at, this is the application that RLI considered

17   in determining whether to issue the policy to Outsidein;

18   correct?

19        A    So my understanding is that Outsidein submitted

20   more than one application.  So RLI would have relied on

21   all the applications that were submitted, and all the

22   information that was submitted to RLI in the

23   underwriting process.

24        Q    How many applications were submitted?

25        A    I believe at least two, because I recall that

```
 1   the policy could not be issued because they were waiting

 2   for a signed application within 30 days of issuance.

 3         So I believe there was one perhaps before the

 4   30 days, and then there was a second one submitted.  So

 5   at least two.  I don't know if there was another one.

 6   Q    Let's look at the signature page.  It has a --

 7   I guess I wouldn't call the January 2020 one a

 8   signature, but it's initially dated January 6, 2020, and

 9   then subsequently digitally signed by Darren Azdell of

10   Outsidein on April 13, 2020.

11         Are these the two versions of the application

12   you're talking about?

13         MR. BAHADORAN:  Form.

14   A    I think so.  I can't say for certain, but, I

15   mean, I do recall that you need to update it within

16   30 days of issuance.  So if there were no changes it

17   would make sense to me that he would just update the

18   signature.

19   Q    Is this competitor's application consistent

20   with the information that's collected by RLI in its

21   application form?

22   A    I have not compared them side-by-side, but

23   generally, yes, I believe it asks for similar types of

24   information.

25   Q    Are you aware of any differences?
```

1      A      Off the top of my head, no.

2      Q      Does this competitor's form application include

3  a special emphasis on claims, circumstances, and

4  incident awareness?

5      A      Well, it asks the three questions that we

6  talked about that's specific to claims and, you know,

7  circumstance awareness.

8            I don't know what you mean by special emphasis,

9  but it does ask those three specific questions.

10     Q      You don't know what special emphasis means?

11     A      Relatively, no.

12     Q      Does this competitor's form meet RLI standards,

13  its underwriting guidelines?

14     A      RLI accepts this form in underwriting.

15     Q      Does that mean that this form meets its

16  standards, its underwriting guidelines?

17     A      So the underwriting guidelines are simply

18  guidelines.  They're not requirements.  It was accepted.

19  The application and whatever additional information the

20  underwriter obtained was what the underwriter relied on.

21     Q      Did RLI ever obtain from Outsidein an

22  application on RLI's form?

23     A      I do not believe so.  I believe that they just

24  submitted the New Hampshire form.

25     Q      Is that normal?

```
 1      A    What do you mean by "normal"?
 2      Q    Does RLI underwriting often accept a
 3 competitor's form without subsequently obtaining an RLI
 4 form application?
 5      A    RLI does accept competitor's forms.  The New
 6 Hampshire form I believe is one that they accept.
 7      Q    And they generally accept it without also
 8 getting an additional application on RLI's form?
 9      A    In this case they did not.  There may be
10 circumstances where they do ask for an RLI form.  Here
11 they did not.
12      Q    Did RLI send Outsidein a RLI claims, slash,
13 incident disclosure letter to refresh the outdated
14 application?
15      A    I don't believe so.  I believe that they just
16 asked that the application be signed within 30 days of
17 policy issuance.
18      Q    So RLI chose to rely solely on the competitor's
19 application, and did not request anything further from
20 Outsidein?
21      A    So RLI relied on this application.  I believe
22 there was some additional exchanges between the
23 underwriter and the broker pertaining perhaps to the
24 expiring policy information.  Sometimes information is
25 exchanged that way as well.
```

1          MR. CALHOUN:  Scroll up to Question 3 in

2     Section 2(I).  Yeah, there we go.

3     Q     Cory, there's a blank line right in the middle

4  of Question 3; right?

5     A     I see what you're referring to.

6     Q     You see the blank line?

7     A     Yes.

8     Q     Why is that blank line there?

9     A     I don't know.  I did not -- RLI did not draft

10 this application.  This is what Outsidein chose to

11 submit to RLI.

12    Q     Is the applicant supposed to write something in

13 on that blank line?

14    A     I don't know.  It doesn't appear -- it doesn't

15 appear that it needs anything.

16    Q     Is the insurance carrier or the broker supposed

17 to write something in there?

18    A     It doesn't appear that way.  It looks like a

19 formatting issue to me, but, again, this is not RLI's

20 form.

21    Q     Are there instructions on this form that tells

22 the applicant what to do about this blank line?

23    A     You would have to read the form.  I don't know.

24          MR. CALHOUN:  Let's look at Question 4.

25    A     Actually hold on.  I'm looking -- I'm looking

1   here at the claims history, and I would note that it

2   says "total claims none".  But as we discussed, there

3   was this egregious breach of contract claim by

4   InterGroup that was not disclosed there.

5       Q    What does that have to do with my question

6   about Number 3?

7       A    Well, I was just remembering another fact to

8   one of your prior questions, so I was trying to update

9   you.

10      Q    That has nothing to do with my question about

11  Number 3; right?

12      A    I don't think so.

13      Q    All right.  Question 4 in Section 2(I) of the

14  application asks Outsidein to detail present architect

15  and engineering liability insurance coverage.  And it

16  appears that Outsidein's response was the word Tammy?

17  Is that correct?

18      A    Yes.

19      Q    Do you know why Outsidein wrote the word Tammy

20  there?

21      A    I don't specifically know.

22           THE WITNESS:  I'm getting an echo.

23      A    What I assume happened here --

24           THE WITNESS:  Hold on here.

25           MR. CALHOUN:  Sina needs to mute.

1        THE WITNESS:  Okay.  I'm going to try again.

2     Better?

3        MR. CALHOUN:  Better.

4     A    So I don't know what Outsidein meant by this,

5  but it appears Outsidein completed this application.

6  Tammy was the, I believe, broker for Outsidein.

7        My -- my guess is that this was directing RLI

8  to get the expiring policy information from the broker.

9        MR. CALHOUN:  Go to Question 2 in Section 2.I.

10    Q    It asks to provide information relating to all

11  losses with paid indemnity and, slash, or expenses.

12    A    I see that.

13    Q    Okay.  And Outsidein didn't provide a response

14  to that; correct?

15    A    Yeah, those are blank.

16    Q    What is meant by losses with paid indemnity

17  and/or expenses?

18    A    So this is New Hampshire's form.  My

19  understanding of it would be that with respect to

20  Question 1, if they had answered the claims that they --

21  you know, they said total claims, I don't know, five,

22  for example, then they would be expected to complete

23  this Number 2 with respect to each claim if they had

24  paid indemnity endorsements.

25    Q    So what type of losses?  Are we talking about

1    claims that were paid out by the insured's carrier or --

2        A    It's not limited to that.

3        Q    Okay.  Would it be a loss that the insured

4    incurred, but didn't make a claim on its insurance?

5        A    It's possible.

6            MR. CALHOUN:  Going to Question 1 in this same

7        Section 2.I.

8            THE WITNESS:  I see it.

9        Q    It uses the word claims:  Please provide the

10   total number of claims.

11           What is meant by the word claims in this

12   Question 1?

13       A    It is not defined here.

14       Q    Okay.  Is it defined anywhere in this

15   application?

16       A    I don't know that it is.  I mean, I can tell

17   you that typically it would include any claim against an

18   insured, which could be a demand, it could be an oral

19   demand or a written demand.  It could be a lawsuit.  It

20   could be a request to toll statute of limitations.  It

21   could be a variety of different things that are a claim.

22       Q    How is the applicant supposed to know what it

23   means?

24       A    Well, this is what Outsidein chose to submit to

25   RLI.  This is not RLI's form.

1         RLI would expect that it would at least at a

2    minimum have reported the claim that it reported to AIG

3    in answer to that there.

4         Q    Are you talking about the payment dispute

5    between Outsidein and InterGroup that AIG said was not a

6    claim?

7         A    So there was the June 10th letter with the

8    egregious breach of contract, and also that Outsidein

9    admitted that it was in default under its contract.

10        Q    And that's -- Outsidein submitted that to AIG.

11   And then what was AIG's response?

12        A    I can answer generally.  I don't have all the

13   facts.  But it looked like AIG did not actually review

14   the June 10th letter, and took the position that a -- a

15   general position that a payment dispute would not be

16   covered, and then asked Outsidein to withdraw the claim.

17        Q    And Outsidein did withdraw the claim based on

18   that suggestion?

19        A    That is my understanding.

20        MR. CALHOUN:  Let's look at Question 4 in this

21   Section 2.I.

22        Q    It asks the applicant about potential claim,

23   comma, circumstance.  Do you see that?

24        A    Are you on Question 4?

25        Q    In Question 4.

1      A     Yes, I see it.

2      Q     And you see where it says potential claim,

3    comma, circumstance?

4      A     Yes.

5      Q     Again use of the word claim here.  Is it

6    defined what the term claim means here?

7      A     My answer remains the same.  It doesn't appear

8    to be defined in this application.

9      Q     How about circumstance?  Does it define

10   circumstance?

11     A     Again, no, I don't believe it's defined here.

12     Q     Well, the use of a word -- start over.

13           The use of a comma in between claim and

14   circumstance, that causes confusion; right?

15     A     No.

16     Q     You've seen the use of the terminology

17   potential claim, comma, circumstance used before?

18     A     I'm seeing it right here.  It is not confusing.

19     Q     And the comma is there to tell you that claim

20   and circumstance are two different things, or is it

21   saying that the only circumstance is a claim

22   circumstance.

23     A     No.  This appears to be two different things.

24   I mean, it's a plain English reading of this.

25     Q     And are these -- is this a claim circumstance

1   made only to the liability carrier of the applicant, or

2   is this reporting a claim circumstance to a liability

3   carrier of someone else that may be responsible for that

4   claim circumstance?

5          MR. BAHADORAN:  Objection to the form.

6      A    Okay.  So you're asking me have they ever

7   reported a claim to a professional liability carrier?

8      Q    It doesn't say their professional liability

9   carrier, does it?  It just says "a", so it would be

10  someone else's.

11     A    It could be.  But, I mean, here we know that

12  they did report the dispute with InterGroup to AIG.

13     Q    Does RLI's application form include a

14  definition for the word claim?

15     A    I would have to look at it, but I don't believe

16  so.

17     Q    Okay.  And does this competitor's application

18  ask for information of an incident that may result in a

19  claim?

20     A    Let me see.  I'm just going to look at Question

21  8 again.

22          So I don't see specifically the word incident

23  used looking at the three questions we're talking about.

24  I see act, error, omission, or circumstance which may

25  possibly result in a claim.

```
1        Q    So no reference to incident that may result in

2   a claim?

3        A    I don't see that specific language.

4        Q    How about event; asking for information of an

5   event that may result in a claim?

6        A    I mean, I think it's the same answer.  What I'm

7   looking at with these questions, they're asking for act,

8   error, omission, or circumstance, and also potential

9   claim or circumstance.

10       Q    So it doesn't ask about incident, event, or

11  unresolved fee dispute?

12       A    I don't see that in those three questions.

13       Q    But it does ask for instances -- that's not the

14  right wording.

15            It does ask about circumstances which may

16  result in a claim; correct?

17       A    I mean, it says what it says:  Act, error,

18  omission, or circumstance which may possibly result in a

19  claim.

20       Q    Is there a difference between the term

21  circumstance and the term incident?

22       A    Are you -- I mean, are you giving me a

23  hypothetical?  I mean, generally I would say no.

24       Q    How about between circumstance and event?  Is

25  there a difference between the term circumstance and the
```

1   term event?

2       A    I mean, for both of these questions it's kind

3   of odd.  I mean, they -- they -- you know, it's -- it's

4   the plain English language.  They're obviously different

5   words.

6            I would say based on my experience circumstance

7   can include an incident or an event.

8       Q    Does this competitor's form ask for information

9   about claims made against the firm or claims made

10  against the applicant?

11      A    I believe it does in the -- one second -- in

12  the claim history question, I(1) and I(2).

13      Q    And point to me where it mentions claims made

14  against the applicant.

15      A    So it says:  Please provide the total number of

16  claims.

17      Q    So that means claims made against the

18  applicant?

19      A    That seems obvious.  They're the ones

20  completing and signing the application.

21      Q    It doesn't mean claims made by the applicant to

22  the applicant's insurance carrier?

23      A    I don't know what you mean by that.

24      Q    So you just pointed to Section 2(I)(1) as the

25  place in this competitor's form where it's asking for

1  information about claims made again the applicant.  You

2  said total number of claims means number of claims made

3  against the applicant.

4       So it then does not mean claims made by the

5  applicant to its insurance company?

6     A    You mean like first party coverage?

7     Q    Yeah.

8     A    So this is a third-party liability policy, and

9  the application is asking about third-party losses.  So

10  I highly doubt that this would be asking about first-

11  party claims.

12     Q    Is this asking about if someone's making a

13  claim against the applicant, or if the applicant is

14  making a claim on its insurance?

15     A    So it is the total number of claims against the

16  applicant.  Whether it reports it to its carrier is not

17  asked here.

18          MR. CALHOUN:  Let's look at Tab D(2), which is

19     RLI's proposal for insurance to Outsidein.

20          We'll enter that as Exhibit 8.

21          (Exhibit No. 8 was marked for identification.)

22          THE WITNESS:  February 26, 2020 letter.  Hold

23     on.  We're finding the paper copy.  It's easier for

24     me that way.

25          Okay.  I've got it.

1    Q    Okay.  So this is an RLI document dated

2  February 26, 2020, to Tammy Johnson proposing coverage

3  for Outsidein?

4    A    So this is a binder, it says.  So this is the

5  binder that was issued.

6         THE WITNESS:  Oh, I'm looking at the wrong

7      thing.  Sorry.  Okay.  We're not with you on the

8      same thing.  Hold on.  Can you scroll down so I can

9      see what that is?

10         MR. CALHOUN:  It appears the binder is

11      included.

12    A    So this is a cover letter.  Yeah, this appears

13  to be a quote.

14    Q    And this is the quote RLI gave for the

15  insurance policy that it ultimately issued to Outsidein?

16    A    I believe it appears that way.  I think they

17  may have issued more than one quote, so I don't know.  I

18  could be wrong on that, but I thought perhaps the

19  insured requested different terms.

20    Q    And this proposal was issued February 26th, and

21  it was for coverage that would begin March 18th?

22         THE WITNESS:  Can you scroll down?  It will

23      talk about the terms.

24    A    Yeah, so it has the proposed policy period

25  there of March 18, 2020 to March 18, 2021.

1      Q      And so RLI had already completed its

2   underwriting at the time it issued this proposal and

3   binder; correct?

4      A      Not entirely.  So this is the quote that was

5   based on the information available to it at the time.

6           Again, one of the things that it needs is an

7   application within 30 days.  So RLI would still be

8   reviewing information.

9           Additionally, the application contains a duty

10  to supplement if additional facts or information would

11  change the answers.  So RLI is continuing to underwrite,

12  and if additional information becomes available it could

13  withdraw a quick quote or change terms and conditions,

14  various other things, as we discussed.

15     Q      If we look at page 3 on this proposal letter,

16  it identifies two conditions; right?  The first one

17  being enrollment in a risk management class, and the

18  second one being a signed and dated application within

19  30 days prior to the policy effective date.

20          Did those conditions ever happen?

21     A      I believe that Outsidein submitted a re-signed

22  application.  It may have been after the policy.

23          What was the date you said on that, on the

24  electronically-signed application ?  So that's when they

25  accepted that.

1    Q    April 13.

2    A    Right.  So that was after the policy incepted.

3    Q    So RLI didn't satisfy this condition by --

4    sorry.  Start over.

5         Outsidein didn't satisfy this condition of

6    signing and dating an application within 30 days prior

7    to the policy effective date; correct?

8    A    Yeah.  The underwriter chose to accept it dated

9    after the policy incepted.

10   Q    So the policy became effective before Outsidein

11   signed the application?

12   A    The effective date's on the policy.

13   Q    Which is March 18, 2020.  And Outsidein signed

14   the application on April 13, 2020.

15        I just want to confirm I understand it

16   correctly.  The policy was issued before the application

17   was signed by Outsidein; correct?

18   A    So I -- I do not believe that is correct.  I

19   believe that they did not issue the policy until they

20   received the signed application.  And it was -- it was

21   signed and submitted -- well, it was signed

22   January 2020.  The policy was not issued.  And then once

23   the updated signature was provided the policy was

24   issued.

25   Q    And then it backdated the effective date?

1      A     Well, it's the policy period.

2      Q     Right.  Which is -- so the start of the policy

3  period was backdated to before the insurance was issued?

4      A     I don't know that backdated is the correct

5  term.

6      Q     What is?

7      A     I don't know.

8      Q     Was additional underwriting performed by RLI

9  when Outsidein submitted its signed application on

10  April 13, 2020?

11      A     I believe it was reviewed to confirm that there

12  were not changes in the answers.

13      Q     And were there any changes?

14      A     I don't believe so.

15      Q     Did the broker Tammy Johnson assist in the

16  underwriting?

17      A     No.  She's a broker.  She's not an underwriter.

18            MR. CALHOUN:  Scroll down to the next page.

19      Q     The RDP binding instructions form.  What is

20  this form, and how is it used?

21      A     What do you mean?  I mean, the broker uses it

22  to request binder coverage.

23      Q     So the broker fills out this form?

24      A     I believe that is -- well, this is the binding

25  instruction form.  So typically, I mean, the broker will

1    request the binder, and then a binder will be issued.

2         Q    I'm just trying to figure out how RLI uses this

3    form that it included in its proposal.

4         A    Right.  So there's a quote with various

5    options, and here they can select which options from the

6    quote and ask for binding.

7         Q    So who fills it out; the broker or the insured?

8         A    Yeah, I believe so.  I mean, we typ- --

9    typically a binder is requested by a broker.

10        MR. CALHOUN:  Scroll down to the binder of

11        insurance included with the proposal.  Here.

12        Q    A binder of insurance was provided along with

13   the proposal on February 26th; correct?

14        A    This binder was issued, yes, on February 26th.

15   I believe there was a quote also.  Yeah, the quote was

16   also -- a quote was also issued that day too.

17        Q    But the underwriting had not been fully

18   completed by this date?

19        A    It had been completed based on the application

20   information provided with the January signature, and

21   then obviously the -- we talked about before that one of

22   the contingencies was an application within 30 days of

23   the effective date of the policy.

24        Q    And that condition, signed and dated

25   application within 30 days, is it referring to an RLI

1   application form?

2       A    No, I don't believe so, because I believe the

3   binder references the waiver of application endorsement.

4       Q    Did RLI's underwriting rely solely on the

5   application?

6       A    It did rely on the application.  It also relied

7   on any other information that was provided by the

8   insured or the broker referred to RLI.

9       Q    And what was that any other information?

10      A    I believe some issues regarding the expiring

11  coverage may have been provided, although I'm not

12  entirely sure.

13      Q    Is that it?

14      A    I don't -- I don't recall off the top of my

15  head anything else.  There may have been additional

16  exchanges.  I don't know.

17      Q    How about key personnel resumes; did RLI

18  request or rely on key personnel resumes?

19      A    I believe that they looked at Outsidein's

20  website.

21      Q    How do you know that, or what makes you believe

22  that?

23      A    In reviewing some of the underwriting documents

24  in preparation for today I saw a reference I think to

25  that.

1    Q    Okay.  Did RLI request or rely upon project

2  listings?

3    A    I don't believe so.  At least separate from

4  what was in the application, I should say.

5        So any of these answers are outside of the

6  application.

7    Q    Correct.  Yeah, that's the intent here.

8        Did RLI request or rely upon standard

9  contractual agreements?

10   A    I don't believe so.  I believe that the

11 application asks whether they were used and whether when

12 it's a liability were used, that -- or that information

13 was asked for.  But the exact contract form, I don't

14 know that.  I don't think that that was asked for.

15   Q    Did RLI request or rely upon marketing

16 material?

17   A    I believe, as I mentioned, that they reviewed

18 the website.

19   Q    That's it?

20   A    From what I remember right now.

21   Q    Did RLI request or rely upon loss history?

22   A    In the application, yes.

23   Q    Nothing in addition to the application?  No

24 separate loss history?

25   A    No, because the application said that there

1     were no claims and no knowledge of any circumstances.

2        Q    Outsidein's annual revenues exceeded 1 million

3     a year; correct?

4        A    I -- I don't know.  I know what they disclosed.

5        Q    What did they disclose?

6        A    Slightly over 1 million, like between 1 -- one

7     million and a hundred thousand, I believe.  But I think

8     there was some discussion about that, including payment

9     to subcontractors.

10       Q    And that's the annual revenue used by

11    underwriting in calculating the insurance premium?

12       A    It is one -- it is -- it is a factor that is

13    involved in underwriting the policy.

14       Q    Okay.  And when an applicant's annual revenue

15    exceeds a million dollars does RLI have any practices to

16    require more information in addition to just the

17    application?

18       A    RLI does not require that in order to issue a

19    quote.

20       Q    To issue a policy?

21       A    Or a policy.  It does not require that.

22       Q    Is that standard practice?

23       A    Is what standard practice?

24       Q    When an applicant's annual revenue exceeds a

25    million dollars to obtain more information from the

1    applicant and not rely solely on the application.

2        A    It depends.  It's up to the judgment of the

3    underwriter.  The underwriting guidelines are

4    guidelines.  It is up to the underwriter to determine

5    what they ultimately ask for and rely upon.

6        Q    Even if the guidelines say "we suggest you do

7    this", the underwriter does not necessarily do what's

8    suggested?

9        A    They are guidelines again, and the underwriter

10   has the ultimate discretion.

11       Q    Did RLI give Outsidein a reduction in its

12   premium rate based on Outsidein stating on its

13   application that there was no claims in the past five

14   years?

15       A    So claim history definitely factors into the

16   rate.  I would have to look at the rating worksheet to

17   see how it applied.

18           MR. CALHOUN:  That rating worksheet should be

19       in the documents in front of you.

20           MR. BAHADORAN:  So this has to do with the

21       discussion we had this morning.  Pursuant to the

22       confidentiality agreement that's in place, we're

23       going to mark this entire transcript as confidential

24       if you're going to get into that sheet.

25           And I would ask you not to put it up on the

1    screen because it says for attorneys' eyes only.

2         MR. CALHOUN:  I'm intentionally trying to get

3    to the answer without putting it up on the screen or

4    divulging any underwriting guidelines that may be

5    protected.

6         MR. BAHADORAN:  I understand.  We'll try to

7    help you get there.

8    A    So I -- I mean, I guess I could answer that

9    that you could take a look at the rating worksheet and

10   it would be obvious whether it was applied or not.

11        I just -- I don't have it in front of me to

12   look at, so I would have to know for sure.

13        MR. BAHADORAN:  Give us like one minute.

14        MR. CALHOUN:  Yeah, please.

15        MR. BAHADORAN:  Hang on one second.

16        (Off the record.)

17        THE WITNESS:  All right.  I've got it.

18        MR. BAHADORAN:  Would you like Madam Court

19   Reporter to read the question back or do you recall

20   the question.

21        THE WITNESS:  Could you please do that.  I

22   don't recall specifically.

23        (Question read back.)

24   A    So I am reviewing the rating worksheet and the

25   underwriting worksheet.  Claims awareness is a factor,

1    and it is factored into the rate.  And if you review

2    that -- if you review it, it will be obvious there.

3       Q    I'm not seeing any reduction given, any

4    reduction in the rate.

5       A    Well, I don't -- I guess I don't know how much

6    you want me to get into on this with the -- I mean, the

7    rate is affected by the claims.  It is in there.

8            The way it would have typically manifested if

9    there are prior claims or other claims being taken into

10   account is the rate would be affected if they decided to

11   write the policy it would likely be higher.

12           Again we talked about there could also be other

13   terms and conditions, but here it is listed.

14      Q    Okay.  But no reduction in premium rates that

15   would have otherwise been quoted to RLI -- or to

16   Outsidein based on stating no losses in the past five

17   years?

18      A    So typically the rate would go up based on the

19   loss ratio, and here, because they claimed there was no

20   claims, you know, it did not go up.  It would have went

21   up as a whole if there had been claims reported.

22      Q    Now I see it.  Now I see what you meant by it's

23   obvious.  I was looking at the wrong location in that

24   document.

25      A    I was trying to, you know, give judicious

1  answers there for you.

2      Q    Did Outsidein have a professional

3  responsibility to participate in the demolition phase of

4  construction?

5      A    I don't know the answer to that.  Again, you

6  know, I'm not involved in the underlying litigation.  I

7  don't know how it all turned out specifically.  I know

8  that the plaintiffs have alleged that they did.

9      Q    Did Outsidein have a professional

10  responsibility to ensure compliance with OSHA?

11      A    Again it's the same answer.  I believe that

12  that was alleged in the complaint, the underlying

13  complaint.  I would have to double-check, but I don't

14  know what will come out of the underlying case.

15      Q    Is it your expert's opinion that Outsidein did

16  have a professional responsibility to participate in the

17  demolition phase and to ensure compliance with OSHA?

18      A    Can you show me where you're referring to?

19          MR. CALHOUN:  Let's look at the expert report.

20          THE WITNESS:  Okay.  I've got it.

21      Q    It's on page 8 where your expert's opinion

22  starts.

23      A    Okay.

24      Q    And as we're starting in the first paragraph,

25  it mentions depth of the concrete.

1        A      Yeah, that's something we talked about before.

2        Q      And was Outsidein responsible for the depth of

3    the concrete slabs in the building?

4        A      You mean did they lay the concrete?

5        Q      Were they responsible for either installing it,

6    surveying it, inspecting it, making recommendations

7    about how it would affect demolition?

8        A      So my recollection is that there was that 2017

9    report which said there was structural issues with the

10   slab, maybe the depth of the concrete as well, and that

11   Outsidein mentioned concern in an e-mail about the

12   concrete, specifically cracks in the cantilever corners

13   of that concrete.

14              I believe there's also some discussion of this

15   in the underlying complaint as well.

16       Q      Okay.  So it's not that your expert is saying

17   that Outsidein was actually responsible for the depth of

18   the concrete, he's just referring to allegations in the

19   underlying complaint?

20       A      I can't tell you for certain.  That would be my

21   assumption, especially, you know, we talked previously

22   about this fact section where he was referring to like

23   the underlying complaint, and you had me look at that

24   paragraph where he cited to it.

25              So that would be my guess is what he is saying

1  here.  You could certainly ask him.

2      Q    As we continue down that same paragraph it

3  says:  As design professionals Outsidein was aware of

4  its contractual obligation and professional

5  responsibilities with respect to management and

6  supervision of the project, and that for those reasons,

7  those are the reasons why Outsidein could have

8  reasonably foreseen that a claim would be brought

9  against it as a result of Marrero's death.

10     A    Okay.  I see the section that you're talking

11 about.

12     Q    You see that, what I've just read?

13     A    Yes, I see it.

14     Q    So what were -- he says two things, contractual

15 obligations and professional responsibilities.

16          Does he in his report identify the contractual

17 obligations?  Are you --

18     A    I would have to review the whole report.  I

19 mean, obviously it's there.  I would assume that

20 Outsidein is aware of its contractual obligations,

21 especially since it sent e-mails saying it was in

22 default under the contract.

23          The underlying complaint also alleges that

24 Outsidein was the architect of record and the manager

25 for the project, and was responsible for everything on

1    the project, including the design and management of it.

2         Q    You just mentioned something that raises

3    another question for me.  You mentioned a letter that

4    states that Outsidein is in default of its contract.

5              Are you only talking about the communication

6    from its subcontractor, InterGroup, regarding the

7    subcontract between Outsidein and InterGroup?

8         A    So from what I recall is an e-mail from

9    Outsidein to, I believe, InterGroup where Outsidein is

10   saying that it, Outsidein, is in default under the prime

11   agreement.

12        Q    Outsidein is telling InterGroup that Outsidein

13   is in default of the prime agreement?

14        A    That's what I recall, yes.

15        Q    Okay.  Are you aware of any other documents, or

16   any witness saying that Outsidein was in any default of

17   the prime agreement with the owner?

18        A    That's what I remember, that Outsidein admitted

19   that it was in default under the agreement.

20        Q    You're not aware of any other evidence of

21   default by Outsidein under the prime agreement?

22        A    Not as I sit here today.  There may be

23   evidence.  I just don't know what it is.

24        Q    Okay.  Going back to the expert report, and the

25   expert relying on Outsidein's awareness of its

1   contractual obligations, does RLI know what contractual

2   obligations that the expert was referring to here on

3   page 8?

4       A    What do you mean?  Like, do I know specifically

5   what it's talking about?

6       Q    What contractual obligations?

7       A    I, as I sit here today, do not know

8   specifically what the expert is referring to.  I'm sure

9   he could point you to that.

10      Q    And the list of documents that your expert

11  reviewed does not include any contracts; correct?

12      A    If it doesn't, it doesn't.  I'll take a look

13  for you.  Hang on.  What page is -- oh, it's on page 11.

14           Okay.  Scrolling through this I don't see that

15  a contract is mentioned here in the report.

16      Q    Did your expert review Outsidein's contracts?

17      A    I don't know.

18      Q    Going back to page 8, your expert's statement

19  about Outsidein was aware of its professional

20  responsibilities.

21           Does RLI know what those professional

22  responsibilities were?

23      A    I think what -- you know, you would have to ask

24  the expert, but what I think the expert is referring to

25  here is that Outsidein was aware of what its contractual

1    responsibilities were, it was aware of what its

2    professional responsibilities were on the project.  It

3    was architect of record on a project where a death

4    occurred.

5         With all these other facts that we talked

6    about, about the prior knowledge, the issues with the

7    slab, and allowing the demolition to continue, and

8    saying it's aware of all of these things, it could have

9    reasonably foreseen that a claim would be brought

10   against it as a result of the death.

11      Q    And that would only be if the contractual

12   obligations and professional responsibilities actually

13   made Outsidein responsible for, you know, the

14   construction that led to the death?

15      A    I don't agree with that statement.

16      Q    Why not?

17      A    Because a claim is an allegation, and whether

18   it's ultimately proven or not in the underlying claim

19   has nothing to do with whether Outsidein could foresee

20   that a claim or a lawsuit would be filed against it.

21      Q    I see, because even if it was factually

22   inaccurate someone could make the claim.  It doesn't

23   have to be supported by the factual facts, just are they

24   going to make a claim?  Is that what you mean?

25      A    Generally it's what -- I mean, I'm looking at

1    the report language now.  Whether they could have

2    reasonably foreseen that a claim would be made.  And

3    based on all these facts that he's citing, and also what

4    we've talked about, he could have anticipated that a

5    claim would have been made.  He meaning Outsidein.

6              And, in fact, a claim was made in that

7    June 2019 letter, and at a minimum the letter says that

8    they're involved in a matter that may involve

9    litigation.

10   Q    You mentioned before that Tammy Johnson was

11   RLI's broker with respect to Outsidein's insurance

12   policy; right?

13   A    That is not correct.  Tammy was the broker for

14   Outsidein.

15   Q    She was not RLI's broker, just Outsidein's

16   broker?

17   A    She was Outsidein's broker.

18   Q    Did RLI have a broker with respect to

19   Outsidein's insurance policy?

20   A    I don't believe so.  Typically underwriting

21   will work with the insured's broker or agent.

22   Q    Did Tammy Johnson, at the time application was

23   made, know about the existence of this project in Puerto

24   Rico?

25   A    I don't know.  You would have to ask her.

Hedquist & Associates Reporters, Inc.

1    Q    At the time that application was made did she

2    know about the dispute between InterGroup and Outsidein?

3    A    Again I don't know what she knew.  You would

4    have to ask her.  My guess is, usually when a carrier --

5    this is speaking generally -- gets notice of something,

6    and here they were on notice of that dispute, an

7    acknowledgment with like a claim information like the

8    claim handler and number -- and I don't know what AIG's

9    process is, I'm just speaking generally -- will go to

10   the insured and its broker so that they will have

11   contact information.

12        So likely when the dispute was reported to AIG

13   she got some sort of notice.  Again you would have to

14   ask her specifically what she knew.

15   Q    Did Tammy help Outsidein fill out the

16   application?

17   A    Based on what I've reviewed it does not appear

18   so.  I saw e-mails where she sent, I believe, a blank

19   application to Outsidein, and then Outsidein filled it

20   out.

21        I know they did ask her questions about how to

22   answer some of the questions, and then she would give

23   advice in response.  But I believe that Outsidein

24   completed it, but again you can certainly ask Outsidein.

25   Q    At the time of the application did Tammy

 1  Johnson know about the death or the litigation hold
 2  notice that was mailed in June 2019?
 3      A    I don't know.  You would have to ask her.
 4      Q    When did RLI first learn about the death?
 5      A    My understanding is it was when the lawsuit was
 6  reported to RLI.  So I'm guessing shortly after it was
 7  filed or served.  Like perhaps fall of 2020.  Well, I'm
 8  speculating.  Around that time when it was reported to
 9  RLI.
10      Q    When the lawsuit was reported by Outsidein?
11      A    Yes.
12          MR. CALHOUN:  I want to take a five-minute
13      break, and if we're not done, we're real, real
14      close.
15          THE WITNESS:  Okay.
16          MR. CALHOUN:  Be right back.
17          (Short break.)
18      Q    The legal hold letter.  We have talked about it
19  a lot.  It's Exhibit 4.
20      A    We're looking for it here.
21      Q    You know what I'm referring to?
22      A    Yes.
23      Q    The one dated June 21st, 2019.
24      A    I have it, yes.
25      Q    Never mind.  You already answered my question.

1          MR. CALHOUN:  All right.  Then I'm done.

2     Sina, do you have any questions?

3          MR. BAHADORAN:  I don't.

4     And, Terry, we'll read, please.

5     (Witness excused.)

6     (The deposition concluded at 4:40 p.m.)

7                         - - -

<u>**CERTIFICATE OF OATH**</u>

STATE OF FLORIDA)

                 )

COUNTY OF DUVAL )

        I, the undersigned authority, certify that CORY
FIGIEL was properly identified and appeared before me
via Zoom and was duly sworn.

        WITNESS my hand and official seal this 11th day
of February 2022.

_____
                    Terry T. Hurley, RPR

TERRY T. HURLEY
Commission # HH 130424
Expires June 17, 2025
Bonded Thru Troy Fain Insurance 800-385-7019

<u>**REPORTER'S DEPOSITION CERTIFICATE**</u>

STATE OF FLORIDA)
                 )
COUNTY OF DUVAL )

        I, Terry T. Hurley, Registered Professional
Reporter, certify that I was authorized to and did
stenographically report the deposition of CORY FIGIEL;
that a review of the transcript was requested; and that
the transcript is a true and complete record of my
stenographic notes.

        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

        DATED this 11th day of February, 2022.


                              _____
                              Terry T. Hurley, RPR

TERRY T. HURLEY
Commission # HH 130424
Expires June 17, 2025
Bonded Thru Troy Fain Insurance 800-385-7019

1 **ERRATA SHEET**

2 **DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE**

3 In re:  RLI Insurance v Outsidein
        Date of deposition:  January 22, 2022

4

5 PAGE NO.  LINE NO.      CHANGE          REASON

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21

22 **Under penalties of perjury, I declare that I have read**
   **my deposition and that it is true and correct, subject**
23 **to any changes in form or substance entered here.**

24 _____                _____
   DATE                     CORY FIGIEL
25 (th)

## 0

**004** [1] - 3:6
**016** [1] - 3:10
**027** [1] - 3:11
**029** [1] - 3:11
**030** [2] - 3:12, 3:12
**039** [1] - 3:13
**084** [1] - 3:13

## 1

**1** [19] - 3:10, 16:5, 16:6, 28:10, 28:12, 28:14, 29:11, 31:8, 31:12, 31:17, 44:7, 72:17, 72:19, 101:20, 102:6, 102:12, 116:2, 116:6
**1(B** [3] - 84:23, 84:24, 85:12
**10** [7] - 29:17, 29:20, 60:25, 65:6, 66:7, 79:2, 86:4
**108** [1] - 3:14
**10:00** [1] - 1:14
**10th** [15] - 31:19, 35:10, 61:5, 62:24, 64:20, 65:13, 66:24, 71:25, 72:11, 72:14, 87:3, 87:20, 88:5, 103:7, 103:14
**11** [5] - 40:17, 40:18, 41:21, 60:14, 124:13
**11th** [2] - 130:14, 131:12
**12** [2] - 40:17, 40:18
**1221** [1] - 2:5
**13** [4] - 96:10, 111:1, 111:14, 112:10
**14** [1] - 17:19
**1400** [1] - 2:10
**16** [1] - 83:20
**1600** [1] - 2:5
**17** [2] - 60:7, 60:12
**18** [4] - 28:17, 109:25, 111:13
**18th** [1] - 109:21
**19th** [2] - 62:25, 87:4

## 2

**2** [28] - 3:11, 27:23, 27:25, 28:6, 31:1, 31:7, 31:15, 32:1, 32:2, 32:3, 32:5, 33:19, 34:18, 34:22, 36:19, 36:24, 38:4, 38:13, 44:7, 59:20, 72:17, 72:19, 75:9,

75:13, 84:24, 101:9, 101:23
**2(l** [1] - 100:13
**2(l)** [2] - 86:20, 99:2
**2(l)(1** [1] - 107:24
**2.l** [3] - 101:9, 102:7, 103:21
**2003** [1] - 12:25
**2006** [1] - 13:24
**2016** [1] - 14:10
**2017** [2] - 41:1, 121:8
**2019** [20] - 29:1, 29:17, 29:20, 30:2, 31:13, 34:12, 60:7, 60:12, 60:25, 61:5, 64:20, 65:6, 66:7, 66:24, 71:22, 72:12, 76:4, 79:2, 86:4, 126:7, 128:2, 128:23
**2020** [13] - 23:11, 28:17, 96:7, 96:8, 96:10, 108:22, 109:2, 109:25, 111:13, 111:14, 111:22, 112:10, 128:7
**2021** [5] - 23:11, 39:19, 77:15, 77:18, 109:25
**2022** [4] - 1:14, 130:15, 131:12, 132:3
**21** [3] - 30:1, 71:22, 76:4
**21st** [4] - 34:12, 35:23, 72:12, 128:23
**22** [1] - 132:3
**24** [1] - 39:18
**25** [1] - 1:14
**26** [3] - 77:15, 108:22, 109:2
**26th** [3] - 109:20, 113:13, 113:14

## 3

**3** [25] - 3:11, 29:18, 29:19, 30:10, 42:7, 43:6, 44:7, 59:25, 60:1, 60:3, 60:18, 60:22, 64:10, 64:15, 72:15, 72:17, 81:23, 85:6, 86:19, 86:22, 99:1, 99:4, 100:6, 100:11, 110:15
**30** [10] - 83:24, 96:2, 96:4, 96:16, 98:16, 110:7, 110:19, 111:6, 113:22, 113:25

**32202** [1] - 2:10
**33131** [1] - 2:6
**35** [1] - 32:11
**39** [1] - 60:9

## 4

**4** [22] - 3:12, 30:3, 30:4, 30:10, 53:21, 55:1, 76:4, 82:16, 82:18, 83:2, 84:15, 85:6, 85:9, 86:19, 88:1, 88:10, 99:24, 100:13, 103:20, 103:24, 103:25, 128:19
**40** [1] - 60:9
**4:40** [1] - 129:6

## 5

**5** [12] - 3:12, 30:24, 34:6, 34:9, 34:10, 34:14, 34:17, 36:18, 39:19, 40:3, 42:7, 60:14

## 6

**6** [9] - 3:13, 30:23, 31:1, 39:15, 39:16, 60:15, 60:18, 64:14, 96:8

## 7

**7** [3] - 3:13, 84:10, 84:11

## 8

**8** [11] - 3:14, 84:21, 85:2, 85:3, 85:11, 105:21, 108:20, 108:21, 120:21, 124:3, 124:18
**8:20-cv-02395-CEH-AEP** [1] - 1:3

## 9

**9** [1] - 34:8

## A

**A(1)** [1] - 15:8
**A(11** [1] - 34:6
**A(11)** [1] - 30:19
**A(2** [1] - 59:20
**A(2)** [1] - 27:22
**A(3** [1] - 88:10

**A(5** [1] - 84:7
**A(5)** [2] - 84:6
**a.m** [1] - 1:14
**ability** [2] - 16:18, 37:11
**able** [2] - 12:1, 45:17
**accept** [5] - 98:2, 98:5, 98:6, 98:7, 111:8
**accepted** [2] - 97:18, 110:25
**accepts** [1] - 97:14
**accident** [4] - 39:9, 57:5, 57:7, 61:17
**according** [1] - 38:20
**account** [2] - 93:14, 119:10
**accuse** [1] - 37:25
**accused** [2] - 94:6, 94:25
**acknowledgment** [1] - 127:7
**act** [7] - 33:21, 38:24, 60:6, 85:17, 105:24, 106:7, 106:17
**acted** [1] - 4:22
**action** [12] - 14:6, 28:16, 29:6, 29:22, 30:7, 30:11, 34:18, 44:7, 48:16, 60:4, 131:10, 131:11
**acts** [2] - 32:8, 86:5
**actual** [4] - 25:24, 71:13, 71:17, 90:24
**addition** [5] - 31:13, 54:7, 86:16, 115:23, 116:16
**additional** [15] - 45:23, 58:13, 59:16, 79:5, 82:24, 86:12, 86:16, 94:18, 97:19, 98:8, 98:22, 110:10, 110:12, 112:8, 114:15
**additionally** [2] - 85:24, 110:9
**adjudication** [1] - 8:15
**admitted** [3] - 30:9, 103:9, 123:18
**adopted** [1] - 40:2
**adrian** [4] - 15:8, 16:7, 17:18, 27:22
**Adrian** [10] - 17:2, 26:6, 28:9, 29:16, 29:24, 30:19, 30:23, 31:25, 34:5, 59:19
**adversely** [1] - 75:16
**advice** [10] - 15:2, 20:15, 20:17, 20:18, 20:20, 21:4, 21:8, 21:16, 21:18, 127:23

**advising** [4] - 10:4, 48:23, 51:17, 79:2
**affect** [4] - 64:5, 65:17, 75:14, 75:16, 88:18, 88:21, 121:7
**affected** [1] - 119:7, 119:10
**agent** [2] - 77:25, 126:21
**agree** [6] - 16:16, 32:16, 32:22, 49:2, 75:6, 125:15
**agreement** [7] - 87:10, 117:22, 123:11, 123:13, 123:17, 123:19, 123:21
**agreements** [1] - 115:9
**ahead** [2] - 8:4, 8:25
**AIG** [10] - 60:7, 64:12, 65:3, 88:5, 103:2, 103:5, 103:10, 103:13, 105:12, 127:12
**AIG's** [2] - 103:11, 127:8
**allegation** [4] - 33:19, 62:11, 91:8, 125:17
**allegations** [42] - 8:9, 21:1, 42:25, 43:4, 43:22, 44:4, 44:5, 44:11, 44:13, 45:4, 45:15, 48:10, 48:21, 49:16, 49:17, 50:8, 51:5, 52:16, 52:18, 59:14, 62:19, 62:21, 62:24, 63:3, 63:13, 63:18, 64:2, 64:3, 64:7, 65:21, 65:24, 66:4, 69:1, 69:14, 69:18, 69:22, 75:17, 82:25, 83:1, 89:17, 121:18
**allege** [2] - 91:3, 91:6
**alleged** [26] - 6:16, 9:7, 9:20, 32:8, 32:12, 32:13, 32:18, 33:20, 38:24, 42:16, 43:3, 44:14, 44:17, 44:18, 44:24, 47:25, 49:9, 59:10, 61:12, 66:16, 67:4, 82:18, 91:1, 91:14, 120:8, 120:12
**alleges** [3] - 32:6, 48:20, 122:23
**alleging** [6] - 33:5, 35:11, 48:16, 62:6, 74:3, 87:20
**allow** [2] - 5:22, 24:24

**allowed** [3] - 10:13, 33:8, 39:6
**allowing** [9] - 33:9, 52:11, 59:11, 61:19, 63:9, 65:25, 66:1, 87:7, 125:7
**altered** [2] - 28:7, 39:22
**Alvarado** [1] - 55:11
**Alvaredo** [2] - 55:6, 55:9
**amend** [1] - 40:7
**analysis** [7] - 39:4, 52:18, 57:9, 64:2, 87:12, 87:16, 87:17
**analyze** [1] - 44:9
**annual** [4] - 116:2, 116:10, 116:14, 116:24
**answer** [53] - 5:17, 5:18, 5:22, 5:25, 8:18, 9:12, 9:22, 10:11, 10:12, 10:13, 11:10, 11:12, 11:14, 12:1, 12:5, 12:8, 23:23, 25:3, 25:8, 25:14, 26:4, 31:15, 34:9, 34:11, 34:17, 36:18, 36:24, 39:19, 44:3, 46:15, 46:20, 49:6, 50:17, 54:21, 60:21, 64:23, 70:7, 70:11, 70:19, 72:19, 81:4, 81:11, 86:23, 86:24, 103:3, 103:12, 104:7, 106:6, 118:3, 118:8, 120:5, 120:11, 127:22
**answered** [9] - 12:9, 26:3, 54:17, 54:20, 63:7, 63:25, 75:22, 101:20, 128:25
**answers** [13] - 5:10, 29:13, 30:21, 31:4, 33:25, 34:3, 34:6, 84:18, 88:3, 110:11, 112:12, 115:5, 120:1
**antagonistic** [1] - 67:23
**anticipated** [1] - 126:4
**apologize** [1] - 17:20
**appear** [6] - 83:20, 99:14, 99:15, 99:18, 104:7, 127:17
**appeared** [1] - 130:11
**applicable** [2] - 43:11, 50:2
**applicant** [17] - 85:15, 99:12, 99:22,

102:22, 103:22, 105:1, 107:10, 107:14, 107:18, 107:21, 108:1, 108:3, 108:5, 108:13, 108:16, 117:1
**applicant's** [3] - 107:22, 116:14, 116:24
**application** [89] - 22:1, 22:7, 22:11, 22:18, 41:5, 45:8, 45:12, 77:23, 78:10, 82:19, 82:23, 83:2, 83:5, 83:17, 83:24, 83:25, 84:5, 84:8, 84:12, 84:14, 86:7, 88:12, 88:25, 90:16, 91:21, 91:22, 91:23, 94:14, 95:2, 95:11, 95:14, 95:15, 95:16, 95:20, 96:2, 96:11, 96:19, 96:21, 97:2, 97:19, 97:22, 98:4, 98:8, 98:14, 98:16, 98:19, 98:21, 99:10, 100:14, 101:5, 102:15, 104:8, 105:13, 105:17, 107:20, 108:9, 110:7, 110:9, 110:18, 110:22, 110:24, 111:6, 111:11, 111:14, 111:16, 111:20, 112:9, 113:19, 113:22, 113:25, 114:1, 114:3, 114:5, 114:6, 115:4, 115:6, 115:11, 115:22, 115:23, 115:25, 116:17, 117:1, 117:13, 126:22, 127:1, 127:16, 127:19, 127:25
**applications** [2] - 95:21, 95:24
**applied** [3] - 71:10, 117:17, 118:10
**apply** [4] - 50:10, 50:11, 50:18, 50:24
**approving** [4] - 21:25, 22:2, 22:3, 22:5
**April** [4] - 96:10, 111:1, 111:14, 112:10
**architect** [29] - 10:16, 10:19, 11:2, 11:3, 11:9, 11:13, 12:6,

32:19, 33:6, 45:23, 45:25, 48:2, 48:23, 50:1, 50:9, 50:18, 51:16, 53:25, 54:1, 58:4, 61:19, 63:8, 63:11, 87:11, 89:19, 90:7, 100:14, 122:24, 125:3
**architects** [1] - 49:22
**architectural** [5] - 52:7, 54:5, 59:9, 61:16, 79:10
**ARCHITECTURE** [1] - 1:8
**architecture** [3] - 57:23, 65:18, 75:15
**Architecture** [3] - 4:7, 6:8, 6:10
**areas** [3] - 39:5, 45:15, 94:16
**arise** [2] - 68:13, 70:2
**arises** [1] - 60:5
**arising** [1] - 8:10
**aside** [1] - 12:11
**aspect** [1] - 52:5
**asserted** [3] - 8:7, 32:16, 51:20
**asserting** [1] - 60:3
**assigned** [1] - 24:3
**assist** [2] - 71:1, 112:15
**assistance** [1] - 70:17
**assistant** [3] - 14:12, 14:13, 14:18
**associated** [1] - 36:5
**assume** [4] - 27:12, 42:15, 100:23, 122:19
**assuming** [6] - 28:7, 39:21, 42:16, 56:21, 65:17, 71:6
**assumption** [4] - 66:9, 66:11, 77:12, 121:21
**attached** [4] - 76:23, 83:3, 83:13, 83:18
**attend** [1] - 12:19
**attorney** [41] - 4:7, 5:15, 5:16, 5:17, 11:21, 12:1, 13:13, 13:22, 14:6, 15:11, 15:14, 18:3, 18:7, 18:10, 18:13, 18:18, 19:2, 19:14, 20:13, 21:4, 29:2, 29:14, 37:6, 40:10, 40:16, 42:5, 47:20, 64:24, 66:25, 74:6, 76:12, 76:17, 79:15, 80:16, 80:23, 81:17, 81:21, 87:6, 131:9, 131:10

**attorney/client** [4] - 21:6, 25:1, 25:21, 26:1
**attorneys** [7] - 12:12, 24:6, 38:5, 38:6, 78:4, 78:8, 78:11
**Attorneys** [2] - 2:7, 2:11
**attorneys'** [1] - 118:1
**austin** [1] - 21:5
**Austin** [4] - 4:6, 7:6, 15:16, 25:20
**AUSTIN** [1] - 2:9
**Austin's** [1] - 25:16
**authority** [1] - 130:10
**authorized** [1] - 131:6
**available** [4] - 29:7, 92:23, 110:5, 110:12
**Avenue** [1] - 2:5
**aware** [64] - 11:24, 16:11, 31:24, 32:13, 34:23, 35:11, 39:2, 40:1, 45:24, 47:5, 49:1, 49:9, 49:16, 50:1, 50:7, 50:9, 50:15, 50:16, 50:17, 50:24, 51:1, 51:7, 51:9, 52:3, 53:3, 53:5, 54:7, 54:10, 54:12, 54:18, 54:21, 54:22, 54:23, 55:14, 59:1, 59:6, 59:9, 59:12, 59:13, 62:1, 63:5, 63:10, 71:9, 73:2, 73:10, 73:16, 73:18, 85:16, 85:21, 85:24, 86:7, 86:9, 87:10, 88:8, 93:22, 96:25, 122:3, 122:20, 123:15, 123:20, 124:19, 124:25, 125:1, 125:8
**awareness** [5] - 87:4, 97:4, 97:7, 118:25, 123:25
**Aylane** [9] - 22:10, 22:15, 22:20, 22:24, 23:10, 26:18, 27:14, 93:5, 93:11
**AYLANE** [1] - 22:15
**Aylane's** [1] - 27:7
**Azdell** [1] - 96:9

---

# B

**B(2** [2] - 15:21, 39:13
**B(2)** [1] - 39:11
**B(3** [1] - 30:1
**B(3)** [2] - 29:24, 76:4
**BA** [2] - 13:2

**backdated** [3] - 111:25, 112:3, 112:4
**Background** [1] - 42:8
**background** [2] - 42:25, 43:15
**bad** [3] - 22:14, 37:14, 44:22
**BAHADARON** [1] - 20:19
**BAHADORAN** [40] - 2:4, 7:2, 7:4, 7:6, 7:9, 7:20, 7:24, 8:1, 8:4, 8:14, 8:21, 9:11, 15:16, 15:23, 21:5, 21:10, 24:23, 25:4, 25:9, 25:15, 25:20, 26:6, 51:21, 62:17, 63:24, 67:9, 67:13, 67:17, 67:24, 68:5, 70:15, 70:23, 96:13, 105:5, 117:20, 118:6, 118:13, 118:15, 118:18, 129:3
**based** [35] - 8:8, 9:5, 15:15, 24:25, 29:7, 30:13, 32:18, 41:16, 43:22, 52:16, 57:15, 57:17, 60:4, 61:15, 62:18, 64:1, 64:6, 64:11, 66:11, 67:2, 69:14, 69:22, 82:18, 83:2, 90:2, 92:5, 103:17, 107:6, 110:5, 113:19, 117:12, 119:16, 119:18, 126:3, 127:17
**bases** [1] - 76:6
**basis** [4] - 33:18, 73:4, 84:14, 85:9
**bear** [1] - 37:11
**became** [1] - 111:10
**becomes** [1] - 110:12
**becoming** [1] - 14:18
**Bedard** [2] - 39:14, 40:12
**begin** [1] - 109:21
**behalf** [4] - 1:12, 17:7, 22:12, 57:2
**Benjamin** [2] - 39:14, 40:12
**best** [4] - 5:10, 6:4, 8:17, 16:18
**better** [3] - 7:5, 101:2, 101:3
**between** [16] - 34:25, 61:15, 62:2, 64:19, 64:25, 65:2, 65:5, 98:22, 103:5,

104:13, 106:20, 106:24, 106:25, 116:6, 123:7, 127:2
**billed** [1] - 58:11
**billing** [1] - 58:22
**binder** [13] - 15:15, 109:4, 109:5, 109:10, 110:3, 112:22, 113:1, 113:9, 113:10, 113:12, 113:14, 114:3
**binding** [3] - 112:19, 112:24, 113:6
**Bird** [14] - 35:16, 57:7, 78:22, 78:25, 80:9, 80:19, 80:21, 80:22, 81:9, 81:14, 82:2, 82:6, 87:15
**Birr** [1] - 2:9
**bit** [2] - 16:8, 25:6
**blah** [3] - 74:6, 74:7
**blaming** [1] - 74:10
**blank** [7] - 99:3, 99:6, 99:8, 99:13, 99:22, 101:15, 127:18
**body** [1] - 5:23
**bookmarks** [1] - 15:15
**bordering** [1] - 21:5
**bottom** [2] - 31:1, 75:13
**breach** [11] - 51:15, 73:25, 74:4, 74:7, 74:9, 74:20, 75:3, 75:10, 85:25, 100:3, 103:8
**breached** [1] - 51:20
**break** [5] - 28:2, 68:4, 68:9, 128:13, 128:17
**breaking** [1] - 25:6
**Brickell** [1] - 2:5
**briefly** [1] - 79:17
**broken** [1] - 84:5
**broker** [20] - 98:23, 99:16, 101:6, 101:8, 112:15, 112:17, 112:21, 112:23, 112:25, 113:7, 113:9, 114:8, 126:11, 126:13, 126:15, 126:16, 126:17, 126:18, 126:21, 127:10
**brought** [2] - 122:8, 125:9
**building** [1] - 121:3
**bullet** [1] - 81:24
**bunch** [1] - 65:23
**buried** [1] - 84:3
**business** [1] - 15:5

**BY** [2] - 4:5, 68:10

# C

**C(1** [1] - 29:16
**C(1)** [1] - 72:15
**calculating** [1] - 116:11
**calculations** [1] - 87:18
**cALHOUN** [2] - 25:5, 67:11
**CALHOUN** [74] - 2:9, 4:5, 7:8, 7:15, 7:25, 8:2, 8:7, 8:19, 9:16, 15:8, 15:20, 16:5, 16:7, 16:14, 16:23, 17:1, 17:18, 21:7, 25:2, 25:12, 25:18, 26:3, 27:22, 28:1, 28:9, 29:16, 29:24, 30:1, 30:19, 30:21, 31:25, 34:5, 39:11, 39:13, 40:17, 43:6, 59:19, 59:23, 59:25, 60:13, 67:7, 67:15, 67:22, 68:3, 68:8, 68:10, 72:14, 73:23, 76:3, 77:3, 81:23, 82:11, 82:14, 82:16, 84:2, 86:19, 99:1, 99:24, 100:25, 101:3, 101:9, 102:6, 103:20, 108:18, 109:10, 112:18, 113:10, 117:18, 118:2, 118:14, 120:19, 128:12, 128:16, 129:1
**Calhoun** [2] - 3:6, 4:6
**cannot** [2] - 6:4, 7:3
**cantilever** [2] - 35:8, 121:12
**care** [5] - 43:20, 50:1, 50:10, 50:18, 50:23
**Carolina** [1] - 78:20
**carrier** [14] - 35:22, 60:11, 85:19, 95:5, 95:7, 99:16, 102:1, 105:1, 105:3, 105:7, 105:9, 107:22, 108:16, 127:4
**CASE** [1] - 1:3
**case** [38] - 7:7, 9:25, 10:15, 10:25, 11:9, 18:25, 19:16, 20:4, 27:24, 42:14, 46:13, 48:10, 49:8, 49:15, 49:25, 50:2, 50:5, 50:10, 50:12, 50:19,

50:25, 51:5, 51:12, 52:2, 52:4, 52:6, 58:15, 64:5, 69:11, 70:16, 73:3, 76:17, 76:24, 77:11, 77:13, 89:16, 98:9, 120:14
**Casino** [1] - 54:3
**Castello** [2] - 19:4, 19:14
**caused** [2] - 8:13, 9:10
**causes** [2] - 44:6, 104:14
**certain** [6] - 5:16, 53:20, 56:2, 69:7, 96:14, 121:20
**certainly** [4] - 45:24, 92:16, 122:1, 127:24
**certainty** [2] - 66:23, 89:12
**CERTIFICATE** [2] - 130:1, 131:1
**certified** [1] - 77:19
**certify** [3] - 130:10, 131:6, 131:9
**change** [4] - 30:17, 93:3, 110:11, 110:13
**CHANGE** [1] - 132:5
**changes** [4] - 96:16, 112:12, 112:13, 132:23
**CHANGES** [1] - 132:2
**charged** [1] - 92:18
**check** [1] - 120:13
**Chicago** [1] - 13:21
**Chicago-Kent** [1] - 13:21
**chief** [2] - 14:13, 14:24
**choose** [1] - 88:20
**chose** [4] - 98:18, 99:10, 102:24, 111:8
**chosen** [1] - 89:13
**circumstance** [22] - 85:17, 97:7, 103:23, 104:3, 104:9, 104:10, 104:14, 104:17, 104:20, 104:21, 104:22, 104:25, 105:2, 105:4, 105:24, 106:8, 106:9, 106:18, 106:21, 106:24, 106:25, 107:6
**circumstances** [5] - 86:6, 97:3, 98:10, 106:15, 116:1
**citation** [1] - 42:24
**cite** [2] - 42:22, 58:24
**cited** [1] - 121:24
**cites** [2] - 42:13, 42:18

**citing** [5] - 42:10, 42:13, 43:16, 59:12, 126:3
**claim** [100] - 8:7, 8:10, 10:18, 11:19, 12:14, 15:1, 17:17, 17:19, 23:15, 23:16, 23:25, 24:3, 24:9, 24:10, 26:15, 28:19, 31:8, 32:6, 32:9, 33:22, 36:8, 38:19, 38:25, 44:17, 44:24, 46:11, 47:16, 50:14, 50:16, 50:21, 60:3, 60:22, 68:13, 69:3, 70:2, 70:5, 71:4, 71:14, 71:20, 78:13, 85:18, 85:21, 85:24, 86:2, 86:3, 88:16, 88:17, 89:7, 89:8, 89:9, 90:2, 92:22, 94:21, 100:3, 101:23, 102:4, 102:17, 102:21, 103:2, 103:6, 103:16, 103:17, 103:22, 104:2, 104:5, 104:6, 104:13, 104:17, 104:19, 104:21, 104:25, 105:2, 105:4, 105:7, 105:14, 105:19, 105:25, 106:2, 106:5, 106:9, 106:16, 106:19, 107:12, 108:13, 108:14, 117:15, 122:8, 125:9, 125:17, 125:18, 125:20, 125:22, 125:24, 126:2, 126:5, 126:6, 127:7, 127:8
**claimants** [1] - 92:21
**claimed** [1] - 119:19
**claiming** [4] - 28:15, 44:23, 45:3, 52:13
**Claims** [1] - 85:5
**claims** [56] - 9:6, 10:10, 14:16, 15:3, 23:18, 23:21, 28:15, 28:21, 29:5, 29:9, 29:10, 29:21, 30:5, 30:6, 30:11, 30:14, 31:12, 31:16, 32:16, 32:24, 33:14, 33:15, 76:7, 86:12, 94:16, 97:3, 97:6, 98:12, 100:1, 100:2, 101:20, 101:21,

102:1, 102:9, 102:10, 102:11, 107:9, 107:13, 107:16, 107:17, 107:21, 108:1, 108:2, 108:4, 108:11, 108:15, 116:1, 117:13, 118:25, 119:7, 119:9, 119:20, 119:21
**clarification** [1] - 91:13
**class** [1] - 110:17
**clear** [5] - 5:21, 25:19, 50:13, 63:11, 63:21
**client** [1] - 24:24
**close** [1] - 128:14
**clunky** [1] - 84:3
**Clyde** [1] - 2:5
**collect** [1] - 74:6
**collected** [1] - 96:20
**College** [1] - 13:21
**coming** [3] - 55:19, 59:17, 95:1
**comma** [7] - 80:20, 80:21, 103:23, 104:3, 104:13, 104:17, 104:19
**commence** [1] - 35:25
**comment** [1] - 67:24
**commit** [1] - 9:24
**committed** [6] - 63:6, 63:16, 63:22, 64:4, 66:7, 74:4
**committing** [1] - 59:10
**common** [2] - 22:15, 52:9
**communication** [1] - 123:5
**communications** [1] - 73:2
**COMPANY** [1] - 1:5
**company** [3] - 15:2, 52:25, 108:5
**Company** [2] - 2:5, 16:3
**compare** [1] - 37:2
**compared** [2] - 77:13, 96:22
**competitor** [1] - 95:12
**competitor's** [9] - 96:19, 97:2, 97:12, 98:3, 98:5, 98:18, 105:17, 107:8, 107:25
**complaint** [89] - 9:19, 27:24, 28:3, 28:6, 28:19, 29:12, 31:8, 32:1, 32:8, 32:10,

32:12, 32:14, 32:17, 32:22, 32:25, 33:2, 33:17, 33:19, 40:25, 42:11, 42:13, 42:14, 42:16, 42:19, 42:22, 43:1, 43:16, 43:23, 44:4, 44:6, 44:9, 44:11, 44:18, 45:5, 45:6, 45:16, 47:25, 48:19, 49:10, 49:18, 51:6, 59:13, 59:20, 59:21, 59:23, 60:19, 62:12, 62:21, 62:24, 63:3, 63:4, 63:14, 64:9, 64:16, 64:19, 65:2, 65:6, 65:15, 65:25, 66:3, 67:4, 68:25, 69:14, 69:19, 69:22, 75:19, 82:11, 82:14, 83:1, 83:2, 83:5, 83:8, 83:9, 84:1, 84:9, 84:15, 84:17, 84:19, 85:8, 91:2, 91:3, 91:14, 91:21, 120:12, 120:13, 121:15, 121:19, 121:23, 122:23
**complaints** [1] - 43:3
**complete** [3] - 5:22, 101:22, 131:7
**completed** [5] - 101:5, 110:1, 113:18, 113:19, 127:24
**completing** [1] - 107:20
**compliance** [7] - 43:10, 45:20, 47:11, 48:18, 120:10, 120:17
**complicated** [2] - 70:12, 70:21
**component** [1] - 43:13
**con** [1] - 69:9
**concealment** [1] - 82:22
**concept** [1] - 80:24
**concern** [1] - 121:11
**concerned** [2] - 63:12, 87:9
**concerning** [2] - 52:19, 88:5
**concerns** [1] - 35:8
**concluded** [1] - 129:6
**concrete** [12] - 35:7, 35:9, 35:20, 35:21, 87:18, 120:25, 121:3, 121:4, 121:10, 121:12, 121:13, 121:18

**condition** [3] - 111:3, 111:5, 113:24
**conditions** [7] - 88:19, 89:11, 92:18, 110:13, 110:16, 110:20, 119:13
**conducted** [1] - 35:13
**confidential** [1] - 117:23
**confidentiality** [1] - 117:22
**confirm** [3] - 77:20, 111:15, 112:11
**confirmed** [1] - 39:9
**confused** [1] - 91:19
**confusing** [1] - 104:18
**confusion** [1] - 104:14
**conjunction** [5] - 18:12, 19:2, 26:17, 26:25, 94:5
**connected** [1] - 131:10
**connection** [1] - 85:22
**considered** [5] - 41:22, 46:6, 46:8, 92:24, 95:16
**consistent** [1] - 96:19
**construction** [14] - 11:15, 11:17, 12:7, 33:21, 43:12, 90:24, 91:4, 91:12, 91:15, 91:18, 91:25, 94:13, 120:4, 125:14
**consultant** [29] - 10:4, 35:1, 35:4, 35:19, 35:21, 37:8, 37:12, 37:18, 39:7, 39:9, 45:22, 45:25, 48:1, 48:14, 48:23, 51:16, 52:7, 53:6, 53:8, 54:1, 54:5, 57:13, 57:23, 57:24, 59:9, 62:16, 79:7, 87:6, 87:18
**consultants** [5] - 10:4, 34:25, 38:9, 38:10, 53:25
**consulted** [4] - 35:18, 35:21, 57:4, 57:8
**consulting** [5] - 53:22, 54:25, 56:6, 56:15, 56:18
**contact** [1] - 127:11
**contained** [3] - 12:17, 31:12, 33:2
**contains** [1] - 110:9
**contend** [2] - 30:10, 77:21
**contended** [1] - 31:17
**contends** [1] - 31:8

**contention** [2] - 34:24, 38:22
**contingencies** [1] - 113:22
**continue** [9] - 39:6, 52:11, 59:11, 63:9, 66:1, 66:2, 87:8, 122:2, 125:7
**continues** [1] - 42:21
**continuing** [1] - 110:11
**contract** [31] - 47:8, 47:13, 49:4, 49:7, 49:11, 49:21, 51:15, 52:1, 52:8, 56:10, 56:11, 69:16, 74:1, 74:4, 74:7, 74:9, 74:20, 75:4, 75:10, 79:8, 86:1, 86:18, 87:24, 92:22, 100:3, 103:8, 103:9, 115:13, 122:22, 123:4, 124:15
**contracted** [7] - 47:5, 54:8, 54:12, 54:14, 54:18, 54:24, 56:1
**contracting** [1] - 54:8
**contractor** [1] - 78:23
**contractors** [4] - 43:9, 44:2, 45:19, 47:10
**contracts** [14] - 46:6, 46:9, 46:12, 46:14, 47:2, 51:3, 54:10, 54:16, 54:22, 69:21, 79:8, 79:9, 124:11, 124:16
**contractual** [21] - 51:2, 51:10, 51:19, 68:11, 68:16, 68:20, 69:5, 69:7, 69:9, 69:10, 69:18, 115:9, 122:4, 122:14, 122:16, 122:20, 124:1, 124:6, 124:25, 125:11
**copies** [1] - 76:10
**copy** [7] - 28:6, 76:25, 77:19, 77:21, 78:9, 84:7, 108:23
**corners** [2] - 35:9, 121:12
**Cornino** [1] - 54:3
**corporate** [9] - 1:11, 4:10, 4:22, 5:2, 10:21, 16:11, 17:12, 42:4, 80:25
**Corporate** [1] - 16:2
**correct** [4] - 4:12, 17:24, 17:25, 18:20, 19:12, 27:15, 39:23,

40:4, 43:1, 43:17, 60:19, 61:2, 63:23, 72:17, 72:19, 72:20, 72:22, 76:8, 76:9, 80:7, 80:10, 80:11, 81:3, 82:20, 85:10, 85:20, 95:18, 100:17, 101:14, 106:16, 110:3, 111:7, 111:17, 111:18, 112:4, 113:13, 115:7, 116:3, 124:11, 126:13, 132:22
**correctly** [3] - 25:6, 91:7, 111:16
**Corsino** [2] - 54:5, 57:22
**CORY** [6] - 1:11, 3:2, 4:1, 130:10, 131:6, 132:24
**Cory** [20] - 4:6, 8:18, 12:19, 15:9, 15:18, 16:9, 17:1, 21:16, 28:3, 28:12, 32:3, 34:10, 39:17, 42:7, 43:7, 60:1, 68:11, 77:5, 84:12, 99:3
**cory** [5] - 4:9, 26:10, 30:5, 30:25, 73:24
**Costello** [2] - 26:19, 27:19
**counsel** [15] - 15:1, 21:12, 21:15, 26:16, 26:17, 26:25, 61:1, 64:16, 78:24, 80:17, 81:13, 82:10, 94:6, 131:9, 131:10
**Counsel** [1] - 26:9
**Count** [28] - 28:10, 28:12, 28:14, 29:11, 31:8, 31:12, 31:17, 32:2, 32:3, 32:5, 33:19, 34:18, 34:22, 36:19, 38:4, 38:13, 59:25, 60:1, 60:3, 60:18, 60:22, 64:10, 64:15, 82:16, 82:18, 83:2, 84:15, 85:9
**count** [1] - 64:9
**counts** [2] - 33:16, 72:18
**Counts** [2] - 44:7, 72:17
**COUNTY** [2] - 130:7, 131:4
**COURT** [1] - 1:1
**court** [5] - 5:7, 70:17, 75:11, 77:10, 77:18
**Court** [1] - 118:18

**cover** [1] - 109:12
**coverage** [16] - 7:10, 22:19, 28:15, 32:6, 36:21, 44:15, 50:12, 50:14, 50:19, 85:16, 100:15, 108:6, 109:2, 109:21, 112:22, 114:11
**covered** [2] - 60:4, 103:16
**cracking** [1] - 39:5
**cracks** [2] - 35:8, 121:12
**crosstalk** [1] - 7:21
**current** [3] - 14:11, 95:5, 95:6
**custodian** [1] - 79:3

**D**

**D(2** [1] - 108:18
**Darren** [1] - 96:9
**date** [11] - 19:19, 39:21, 76:8, 77:15, 78:1, 110:19, 110:23, 111:7, 111:25, 113:18, 113:23
**Date** [1] - 132:3
**DATE** [1] - 132:24
**date's** [1] - 111:12
**dated** [10] - 30:1, 35:23, 39:18, 61:5, 96:8, 109:1, 110:18, 111:8, 113:24, 128:23
**DATED** [1] - 131:12
**dates** [1] - 41:3
**dating** [1] - 111:6
**days** [9] - 96:2, 96:4, 96:16, 98:16, 110:7, 110:19, 111:6, 113:22, 113:25
**dear** [3] - 79:23, 79:25, 81:5
**death** [76] - 6:12, 6:18, 6:19, 6:25, 8:11, 8:13, 9:2, 9:8, 9:10, 9:20, 9:25, 10:2, 10:9, 10:18, 11:18, 23:16, 28:16, 34:25, 35:12, 35:13, 35:24, 38:1, 42:14, 44:18, 44:25, 47:17, 52:4, 52:21, 59:3, 68:14, 70:2, 70:6, 71:3, 71:13, 71:25, 72:8, 72:13, 75:1, 75:2, 75:5, 75:20, 75:23, 76:1, 76:2, 78:21,

79:1, 80:7, 80:10, 80:18, 81:2, 85:23, 86:5, 87:10, 87:12, 87:23, 88:24, 89:6, 89:14, 89:16, 92:4, 92:8, 92:10, 92:12, 92:20, 93:3, 93:6, 94:13, 94:20, 95:1, 95:7, 122:9, 125:3, 125:10, 125:14, 128:1, 128:4
**death"** [1] - 6:22
**decedent** [1] - 33:5
**decided** [1] - 119:10
**decision** [5] - 52:23, 87:14, 88:18, 91:9, 93:2
**decisions** [2] - 35:14, 87:13
**declaration** [2] - 37:9, 37:20
**declare** [1] - 132:22
**deductible** [1] - 88:21
**default** [10] - 86:18, 87:10, 103:9, 122:22, 123:4, 123:10, 123:13, 123:16, 123:19, 123:21
**Defendant** [2] - 1:9, 2:11
**defendant** [1] - 1:12
**deficiencies** [2] - 39:3, 86:9
**define** [1] - 104:9
**defined** [6] - 16:21, 102:13, 102:14, 104:6, 104:8, 104:11
**definitely** [3] - 24:9, 62:1, 117:15
**definition** [1] - 105:14
**definitions** [1] - 16:15
**degree** [1] - 13:1
**Deitrich** [1] - 27:2
**demand** [8] - 60:24, 61:7, 64:20, 65:6, 66:24, 102:18, 102:19
**demolition** [43] - 10:6, 10:8, 33:8, 33:10, 35:2, 35:3, 39:3, 39:6, 47:11, 47:22, 49:3, 49:13, 50:3, 52:11, 52:15, 52:25, 56:22, 57:2, 58:8, 58:11, 58:12, 58:17, 58:21, 59:8, 59:11, 61:19, 62:4, 63:10, 65:25, 87:7, 89:18, 89:24, 90:1, 90:3,

90:8, 90:20, 91:1, 91:6, 120:3, 120:17, 121:7, 125:7
**deny** [1] - 93:2
**department** [2] - 14:23, 14:24
**depo** [1] - 84:9
**Depo** [2] - 59:20, 60:14
**deponent** [1] - 21:8
**deposed** [3] - 4:18, 4:20, 5:2
**deposi** [1] - 10:7
**deposition** [25] - 7:15, 7:17, 7:18, 16:12, 16:16, 17:2, 17:5, 18:2, 18:10, 18:19, 20:5, 20:16, 21:9, 21:12, 21:17, 23:20, 47:13, 55:14, 67:21, 84:4, 93:17, 129:6, 131:6, 132:3, 132:22
**Deposition** [4] - 1:11, 1:13, 16:2, 16:24
**DEPOSITION** [1] - 131:1
**depositions** [1] - 5:5
**depth** [4] - 120:25, 121:2, 121:10, 121:17
**describe** [1] - 15:24
**described** [1] - 31:22
**describes** [1] - 31:20
**design** [5] - 79:7, 79:10, 90:19, 122:3, 123:1
**designated** [2] - 17:7, 17:23
**despite** [1] - 39:6
**detail** [3] - 32:21, 33:23, 100:14
**details** [3] - 31:7, 31:12, 31:16
**determination** [5] - 47:18, 70:9, 70:13, 70:20, 71:1
**determinations** [1] - 23:14
**determine** [5] - 70:1, 89:7, 93:19, 94:22, 117:4
**determining** [1] - 95:17
**developer** [8] - 47:5, 47:9, 49:5, 49:11, 54:9, 54:13, 54:19, 57:17
**difference** [3] - 44:19, 106:20, 106:25
**differences** [1] - 96:25

**different** [10] - 14:23, 44:21, 89:10, 92:17, 92:18, 102:21, 104:20, 104:23, 107:4, 109:19
**difficulties** [1] - 28:1
**digitally** [1] - 96:9
**DIRECT** [1] - 3:5
**direct** [2] - 4:4, 62:2
**directed** [3] - 60:18, 82:3, 82:7
**directing** [1] - 101:7
**directly** [3] - 54:8, 54:13, 54:19
**director** [5] - 14:21, 14:22, 14:25, 19:8, 19:9
**disciplinary** [1] - 14:5
**disclose** [3] - 86:1, 87:24, 116:5
**disclosed** [15] - 11:9, 71:2, 89:3, 89:14, 89:22, 92:4, 92:7, 92:9, 92:12, 93:4, 93:7, 94:14, 100:4, 116:4
**disclosure** [1] - 98:13
**discretion** [1] - 117:10
**discuss** [3] - 5:4, 20:24, 94:7
**discussed** [10] - 20:25, 24:17, 66:5, 73:7, 93:5, 93:7, 93:16, 93:21, 100:2, 110:14
**discussing** [1] - 23:4
**discussion** [8] - 19:24, 20:3, 23:10, 40:11, 93:24, 116:8, 117:21, 121:14
**discussions** [6] - 19:13, 21:15, 23:6, 24:21, 24:25, 38:5
**dispute** [8] - 87:24, 103:4, 103:15, 105:12, 106:11, 127:2, 127:6, 127:12
**disqualify** [2] - 61:1, 64:16
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**divulging** [1] - 118:4
**DO** [1] - 132:2
**doctor** [1] - 68:5
**document** [19] - 12:4, 16:1, 16:9, 17:3, 30:20, 34:21, 36:20, 38:4, 38:7, 40:5, 45:17, 47:14, 59:5, 73:14, 73:16, 78:7,

109:1, 119:24
**documented** [1] - 66:20
**documents** [43] - 15:9, 15:11, 15:12, 18:4, 18:6, 18:11, 18:17, 18:18, 20:6, 20:8, 20:12, 20:25, 30:16, 31:11, 31:15, 31:16, 34:16, 36:19, 40:19, 40:22, 41:25, 43:23, 45:24, 46:2, 46:16, 47:19, 49:14, 51:13, 52:19, 73:3, 79:6, 79:11, 79:20, 81:2, 81:9, 81:25, 82:4, 114:23, 117:19, 123:15, 124:10
**dollars** [2] - 116:15, 116:25
**done** [8] - 26:24, 31:5, 39:5, 89:3, 94:5, 94:19, 128:13, 129:1
**double** [1] - 120:13
**double-check** [1] - 120:13
**doubt** [1] - 108:10
**down** [14] - 16:23, 17:3, 17:18, 28:9, 32:1, 54:4, 73:23, 83:10, 83:16, 109:8, 109:22, 112:18, 113:10, 122:2
**draft** [1] - 99:9
**Drive** [1] - 2:10
**duly** [2] - 4:2, 130:12
**during** [3] - 58:12, 58:23, 59:8
**duties** [19] - 14:13, 14:25, 32:19, 43:20, 49:20, 49:22, 51:2, 51:10, 51:19, 52:3, 68:11, 68:16, 68:20, 69:5, 69:7, 69:10, 69:18
**duty** [3] - 52:9, 52:14, 110:9
**DUVAL** [2] - 130:7, 131:4
**dwelling** [1] - 26:1

### E

**e-mail** [5] - 10:3, 51:14, 86:17, 121:11, 123:8
**e-mails** [25] - 34:24, 41:2, 41:15, 51:13, 51:16, 51:20, 51:23,

52:7, 52:12, 55:15, 57:18, 58:19, 61:15, 61:18, 62:2, 62:23, 63:2, 63:8, 65:23, 73:7, 90:4, 122:21, 127:18
**easier** [1] - 108:23
**echo** [1] - 100:22
**Edgardo** [3] - 55:6, 55:9, 55:11
**Edgardo's** [1] - 55:17
**Edwards** [5] - 24:2, 24:9, 24:11, 24:21, 26:14
**effect** [2] - 45:7, 54:3
**effective** [7] - 44:25, 110:19, 111:7, 111:10, 111:12, 111:25, 113:23
**egregious** [10] - 73:25, 74:4, 74:7, 74:9, 74:20, 75:3, 75:10, 85:25, 100:3, 103:8
**EHA** [2] - 55:6, 55:9
**either** [6] - 41:17, 70:5, 85:21, 89:9, 92:19, 121:5
**electronically** [1] - 110:24
**electronically-signed** [1] - 110:24
**eligibility** [1] - 84:25
**emphasis** [3] - 97:3, 97:8, 97:10
**employed** [1] - 14:8
**employee** [2] - 131:9, 131:10
**employees** [4] - 21:24, 22:6, 23:13, 26:10
**end** [1] - 79:2
**endorsement** [1] - 114:3
**endorsements** [3] - 83:23, 92:19, 101:24
**engaged** [4] - 56:25, 74:5, 78:23, 80:16
**engineer** [13] - 11:4, 11:10, 35:18, 37:13, 37:14, 53:9, 53:11, 53:22, 53:25, 54:25, 56:6, 56:7, 56:14
**Engineering** [2] - 55:6, 55:9
**engineering** [4] - 56:18, 56:20, 79:10, 100:15
**English** [2] - 104:24, 107:4
**enrollment** [1] -

110:17
**ensure** [3] - 43:10, 120:10, 120:17
**ENTER** [1] - 132:2
**enter** [8] - 16:3, 16:5, 27:23, 30:3, 39:15, 84:4, 84:9, 108:20
**entered** [2] - 25:22, 132:23
**entire** [1] - 117:23
**entirely** [4] - 44:20, 57:15, 110:4, 114:12
**entities** [1] - 82:8
**entitled** [2] - 21:13, 42:8
**ERRATA** [1] - 132:1
**error** [4] - 85:17, 105:24, 106:8, 106:17
**errors** [1] - 86:6
**especially** [2] - 121:21, 122:21
**ESQUIRE** [2] - 2:4, 2:9
**essentially** [1] - 86:24
**establish** [1] - 60:22
**estimate** [2] - 19:20, 21:21
**ethical** [24] - 9:23, 35:11, 59:10, 59:12, 61:8, 61:12, 62:5, 62:14, 62:15, 63:6, 63:17, 63:23, 65:16, 66:6, 72:9, 73:1, 75:8, 75:12, 75:24, 87:20, 88:6, 89:17, 92:14, 94:24
**evaluate** [3] - 69:15, 69:17, 89:8
**evaluated** [8] - 24:3, 35:16, 50:6, 87:13, 88:17, 89:6, 94:22, 94:23
**evaluating** [6] - 21:25, 22:7, 23:14, 23:24, 26:11, 57:4
**evaluation** [2] - 69:13, 69:21
**event** [7] - 94:13, 106:4, 106:5, 106:10, 106:24, 107:1, 107:7
**events** [1] - 60:5
**evidence** [9] - 59:6, 63:15, 71:12, 71:16, 71:19, 78:2, 78:5, 123:20, 123:23
**exact** [5] - 14:3, 19:11, 19:19, 41:3, 115:13
**exactly** [7] - 9:4, 17:10, 20:22, 21:20,

27:12, 58:18, 68:15
**EXAMINATION** [2] - 3:5, 4:4
**examiner** [3] - 24:9, 26:15, 36:9
**example** [1] - 101:22
**exceeded** [1] - 116:2
**exceeds** [2] - 116:15, 116:24
**exchanged** [2] - 73:8, 98:25
**exchanges** [3] - 10:3, 98:22, 114:16
**exclude** [1] - 92:19
**exclusion** [1] - 64:12
**excuse** [1] - 48:4
**excused** [1] - 129:5
**exhaustive** [2] - 41:22, 46:24
**Exhibit** [28] - 16:5, 16:6, 27:23, 27:25, 28:6, 29:18, 29:19, 30:3, 30:4, 30:24, 32:1, 34:6, 39:15, 39:16, 59:20, 60:14, 72:15, 76:4, 83:12, 83:15, 83:20, 83:24, 84:1, 84:10, 84:11, 108:20, 108:21, 128:19
**exhibit** [8] - 76:23, 83:7, 83:8, 84:3, 84:4, 84:8, 84:12
**Exhibits** [1] - 30:10
**exhibits** [1] - 83:9
**existence** [1] - 126:23
**expect** [1] - 103:1
**expected** [5] - 32:7, 33:20, 38:19, 38:23, 101:22
**expenses** [2] - 101:11, 101:17
**experience** [1] - 107:6
**experienced** [1] - 15:5
**expert** [46] - 10:25, 11:2, 11:7, 11:9, 11:22, 12:12, 29:13, 33:25, 34:12, 34:20, 35:15, 35:17, 36:17, 39:18, 39:23, 40:3, 40:7, 40:11, 40:18, 41:21, 42:1, 42:10, 43:16, 46:14, 53:10, 53:12, 55:1, 57:9, 69:25, 70:8, 70:16, 71:1, 71:2, 87:15, 120:19, 121:16, 123:24, 123:25, 124:2, 124:8, 124:10, 124:16,

124:24
**Expert** [1] - 39:13
**expert's** [4] - 42:24, 120:15, 120:21, 124:18
**expertise** [2] - 70:13, 70:22
**expiring** [3] - 98:24, 101:8, 114:10
**explain** [5] - 25:24, 33:18, 65:11, 86:22, 88:1
**expose** [1] - 75:25
**express** [1] - 72:8
**expressed** [2] - 35:8, 72:5
**expressly** [2] - 72:12, 80:5
**eyes** [1] - 118:1

## F

**fact** [11] - 24:18, 25:24, 37:8, 43:19, 48:9, 64:23, 67:25, 91:17, 100:7, 121:22, 126:6
**factor** [6] - 88:17, 91:11, 91:16, 92:2, 116:12, 118:25
**factored** [3] - 91:9, 92:1, 119:1
**factors** [2] - 89:25, 117:15
**facts** [52] - 18:25, 19:15, 22:8, 34:19, 34:23, 36:12, 36:16, 36:21, 36:22, 36:25, 38:18, 44:18, 45:13, 48:11, 49:8, 49:9, 51:4, 52:17, 57:20, 58:13, 58:14, 59:16, 60:5, 60:22, 62:19, 62:20, 62:22, 63:1, 63:5, 63:18, 64:1, 66:11, 66:12, 67:2, 68:16, 69:1, 70:3, 70:10, 70:17, 70:24, 71:8, 72:4, 86:14, 86:16, 87:2, 92:13, 93:6, 103:13, 110:10, 125:5, 125:23, 126:3
**Factual** [1] - 42:8
**factual** [13] - 33:18, 36:14, 42:25, 43:15, 64:18, 64:22, 64:24, 65:1, 65:5, 65:8, 65:10, 65:11, 125:23
**factually** [1] - 125:21

**failed** [1] - 33:9
**fair** [4] - 21:7, 28:14, 32:5, 44:22
**fall** [1] - 128:7
**false** [6] - 82:19, 84:13, 85:8, 85:13, 86:23, 88:2
**familiar** [9] - 28:3, 28:12, 32:3, 49:7, 51:4, 51:5, 51:12, 60:1, 80:24
**family** [2] - 33:4, 78:24
**far** [1] - 86:13
**february** [1] - 108:22
**February** [6] - 109:2, 109:20, 113:13, 113:14, 130:15, 131:12
**fee** [1] - 106:11
**field** [1] - 35:17
**FIGIEL** [6] - 1:11, 3:2, 4:1, 130:11, 131:6, 132:24
**Figiel** [1] - 4:9
**figure** [2] - 26:7, 113:2
**file** [4] - 20:9, 88:19, 88:23, 94:17
**filed** [12] - 24:18, 27:24, 45:7, 45:11, 45:12, 61:1, 64:16, 77:10, 77:17, 125:20, 128:7
**files** [1] - 18:21
**filing** [2] - 76:23, 77:9
**filings** [2] - 33:25, 76:18
**fill** [1] - 127:15
**filled** [1] - 127:19
**fills** [2] - 112:23, 113:7
**financially** [1] - 131:11
**fine** [1] - 8:18
**firm** [1] - 107:9
**first** [26] - 4:2, 28:17, 28:20, 29:1, 30:22, 34:7, 42:18, 55:4, 60:24, 61:4, 65:9, 73:24, 74:2, 76:19, 76:25, 78:18, 81:24, 83:20, 86:2, 86:22, 108:6, 108:10, 110:16, 120:24, 128:4
**five** [6] - 26:8, 34:10, 101:21, 117:13, 119:16, 128:12
**five-minute** [1] - 128:12
**floor** [1] - 35:19
**FLORIDA** [3] - 1:1, 130:5, 131:3

**Florida** [5] - 1:16, 2:6, 2:10, 65:19, 75:15
**fluent** [1] - 13:4
**follow** [1] - 66:22
**following** [2] - 35:13, 92:25
**follows** [1] - 4:3
**forensic** [1] - 57:9
**foresee** [1] - 125:19
**foreseen** [3] - 122:8, 125:9, 126:2
**form** [39] - 9:11, 20:19, 51:21, 62:17, 63:24, 70:15, 70:23, 84:25, 95:13, 96:13, 96:21, 97:2, 97:12, 97:14, 97:15, 97:22, 97:24, 98:3, 98:4, 98:6, 98:8, 98:10, 99:20, 99:21, 99:23, 101:18, 102:25, 105:5, 105:13, 107:8, 107:25, 112:19, 112:20, 112:23, 112:25, 113:3, 114:1, 115:13, 132:23
**formatting** [1] - 99:19
**forms** [1] - 98:5
**formulated** [1] - 21:14
**forth** [8] - 28:18, 29:12, 33:24, 36:20, 36:25, 60:9, 84:16, 84:19
**forward** [1] - 33:10
**four** [1] - 42:19
**free** [1] - 5:12
**frequently** [1] - 46:13
**frivolous** [1] - 10:9
**front** [7] - 55:2, 60:16, 69:16, 72:11, 90:22, 117:19, 118:11
**full** [2] - 4:8, 55:4
**fully** [1] - 113:17
**fumbling** [1] - 8:24
**furtherance** [1] - 24:25
**future** [1] - 72:1

## G

**game** [1] - 21:7
**Garcia** [8] - 6:13, 6:18, 8:13, 9:3, 9:10, 52:21, 78:22, 78:24
**Garcia's** [1] - 79:1
**general** [3] - 5:5, 78:23, 103:15
**generally** [18] - 13:7, 32:15, 38:17, 48:22,

49:20, 49:24, 51:6, 79:15, 89:4, 90:17, 93:22, 96:23, 98:7, 103:12, 106:23, 125:25, 127:5, 127:9
**gestures** [1] - 5:23
**given** [8] - 37:17, 37:18, 60:6, 60:10, 68:16, 76:19, 76:21, 119:3
**goal** [1] - 94:22
**government** [1] - 43:13
**graduate** [1] - 12:22
**ground** [1] - 5:4
**grounds** [1] - 45:3
**Group** [13] - 47:6, 54:9, 78:22, 78:25, 80:9, 80:19, 80:21, 80:22, 81:14, 82:3, 82:6, 87:15
**guess** [14] - 6:14, 31:20, 36:7, 55:15, 77:9, 80:3, 90:13, 91:19, 96:7, 101:7, 118:8, 119:5, 121:25, 127:4
**guessing** [2] - 22:14, 128:6
**guidelines** [12] - 20:11, 94:11, 94:12, 97:13, 97:16, 97:17, 97:18, 117:3, 117:4, 117:6, 117:9, 118:4

## H

**Hampshire** [2] - 97:24, 98:6
**Hampshire's** [1] - 101:18
**hand** [2] - 15:18, 130:14
**handle** [1] - 24:3
**handler** [1] - 127:8
**handling** [3] - 17:17, 17:19, 23:21
**hands** [1] - 5:24
**hang** [3] - 67:19, 118:15, 124:13
**happy** [3] - 15:18, 34:1, 73:16
**hard** [4] - 25:16, 89:2, 89:21, 92:5
**head** [21] - 5:24, 10:2, 11:21, 22:9, 24:8, 28:24, 33:2, 33:3, 33:12, 33:24, 36:2, 46:3, 50:11, 55:22, 59:17, 73:17, 73:22,

74:14, 88:4, 97:1, 114:15
**health** [3] - 49:22, 68:3, 68:6
**hear** [3] - 7:3, 7:4, 25:4
**heard** [1] - 25:18
**hearing** [1] - 25:17
**help** [7] - 8:22, 11:25, 12:3, 12:5, 26:6, 118:7, 127:15
**helpful** [1] - 15:22, 78:16
**HERE** [1] - 132:2
**herein** [1] - 1:12
**herself** [1] - 23:2
**high** [1] - 12:20
**higher** [1] - 119:11
**highly** [1] - 108:10
**hired** [6] - 48:15, 53:6, 55:21, 56:1, 56:9, 56:14
**History** [1] - 85:5
**history** [8] - 88:16, 88:17, 94:16, 100:1, 107:12, 115:21, 115:24, 117:15
**hold** [25] - 12:14, 12:18, 13:8, 29:3, 30:2, 31:14, 36:17, 72:19, 76:3, 76:11, 76:14, 77:22, 78:12, 79:16, 80:6, 80:24, 81:14, 86:4, 87:21, 99:25, 100:24, 108:22, 109:8, 128:1, 128:18
**hours** [2] - 21:22, 67:12
**hundred** [1] - 116:7
**Hurley** [4] - 1:14, 130:18, 131:5, 131:15
**hypothetical** [6] - 49:7, 69:15, 81:4, 81:11, 92:6, 106:23
**hypotheticals** [1] - 91:20

## I

**I(1** [1] - 107:12
**I(2)** [1] - 107:12
**identical** [2] - 76:13, 87:1
**Identification** [1] - 3:9
**identification** [8] - 16:6, 27:25, 29:19, 30:4, 30:24, 39:16, 84:11, 108:21

**identified** [16] - 15:13, 17:6, 31:10, 31:15, 34:17, 36:18, 36:24, 53:11, 63:16, 64:15, 71:16, 81:14, 85:8, 88:24, 91:24, 130:17
**identifies** [8] - 31:11, 41:21, 55:5, 60:21, 80:9, 80:19, 110:16
**identify** [2] - 82:7, 122:16
**Illinois** [4] - 12:21, 13:11, 13:18, 13:24
**implied** [1] - 49:20
**implying** [1] - 57:16
**important** [2] - 53:15, 94:16
**improper** [3] - 52:10, 74:16, 74:22
**IN** [1] - 1:1
**inaccurate** [1] - 125:22
**inaudible** [1] - 7:2
**incepted** [5] - 28:20, 69:24, 71:10, 111:2, 111:9
**inception** [1] - 64:13
**incident** [8] - 97:4, 98:13, 105:18, 105:22, 106:1, 106:10, 106:21, 107:7
**include** [9] - 58:7, 79:8, 86:15, 87:3, 97:2, 102:17, 105:13, 107:7, 124:11
**included** [15] - 45:14, 79:1, 80:21, 84:1, 84:8, 88:6, 88:20, 89:18, 89:24, 90:1, 90:7, 92:17, 109:11, 113:3, 113:11
**includes** [1] - 43:12
**including** [7] - 10:5, 78:11, 80:22, 92:14, 92:21, 116:8, 123:1
**inclusive** [1] - 50:20
**increased** [1] - 88:25
**incurred** [1] - 102:4
**indemnity** [3] - 101:11, 101:16, 101:24
**Independent** [1] - 2:10
**independent** [1] - 64:2
**indiscernible** [1] - 7:21
**industry** [3] - 11:16, 11:17, 12:7
**information** [31] -

19:15, 29:7, 37:6, 42:6, 89:3, 93:8, 94:20, 95:22, 96:20, 96:24, 97:19, 98:24, 101:8, 101:10, 105:18, 106:4, 107:8, 108:1, 110:5, 110:8, 110:10, 110:12, 113:20, 114:7, 114:9, 115:12, 116:16, 116:25, 127:7, 127:11
**informing** [1] - 35:1
**initial** [2] - 17:21, 46:11
**inquired** [1] - 95:4
**inspecting** [1] - 121:6
**inspection** [3] - 58:22, 79:9
**inspections** [2] - 58:11, 58:17
**inspector** [3] - 10:7, 35:3, 58:19
**installing** [1] - 121:5
**instance** [2] - 15:20, 16:20
**instances** [1] - 106:13
**instant** [1] - 50:13
**instructed** [2] - 25:7, 58:16
**instructing** [3] - 25:2, 25:13, 26:4
**instruction** [2] - 25:12, 112:25
**instructions** [2] - 99:21, 112:19
**insurance** [19] - 8:8, 37:8, 71:11, 79:9, 89:1, 99:16, 100:15, 102:4, 107:22, 108:5, 108:14, 108:19, 109:15, 112:3, 113:11, 113:12, 116:11, 126:11, 126:19
**Insurance** [3] - 4:11, 16:3, 132:3
**INSURANCE** [1] - 1:5
**insured** [8] - 38:18, 90:14, 102:3, 102:18, 109:19, 113:7, 114:8, 127:10
**insured's** [3] - 90:2, 102:1, 126:21
**intent** [1] - 115:7
**intentionally** [1] - 118:2
**interest** [2] - 75:16, 93:14

**interested** [2] - 90:10, 131:11
**Intergroup** [37] - 29:17, 54:5, 57:22, 58:6, 58:16, 61:13, 61:16, 61:18, 62:2, 62:6, 65:20, 66:5, 66:6, 66:10, 66:13, 66:18, 66:24, 73:4, 73:11, 73:19, 74:10, 74:11, 74:18, 74:21, 86:1, 87:8, 87:24, 92:21, 94:21, 100:4, 103:5, 105:12, 123:6, 123:7, 123:9, 123:12, 127:2
**intergroup** [1] - 74:3
**InterGroup's** [7] - 58:1, 58:6, 60:24, 61:5, 66:25, 72:22, 73:12
**internal** [1] - 21:15
**internationally** [1] - 35:17
**interrogatories** [4] - 29:13, 30:22, 33:25, 34:7
**Interrogatory** [9] - 30:25, 34:9, 34:14, 34:17, 36:18, 40:3, 60:15, 60:18, 64:14
**interrogatory** [6] - 31:4, 31:7, 34:2, 40:6, 60:14, 64:23
**interrupt** [1] - 7:25
**interrupted** [1] - 8:3
**interview** [2] - 18:24, 19:14
**interviewed** [4] - 37:9, 38:10, 53:4, 53:7
**introduced** [1] - 23:2
**introduction** [1] - 23:9
**investigated** [1] - 93:8
**investigation** [7] - 35:14, 52:17, 52:20, 53:4, 88:23, 92:25, 94:18
**involve** [7] - 71:24, 78:19, 80:1, 80:14, 80:15, 81:6, 126:8
**involved** [29] - 15:1, 23:24, 35:24, 46:4, 49:15, 50:5, 52:1, 52:5, 57:3, 57:20, 62:9, 69:1, 71:23, 72:6, 78:19, 79:25, 80:13, 80:15, 81:6, 81:8, 87:14, 87:22, 89:16, 89:17, 90:14, 91:4, 116:13, 120:6,

126:8
**involvement** [3] -
55:12, 55:18, 90:3
**involves** [1] - 65:14
**involving** [4] - 7:10,
35:24, 79:19, 92:22
**issuance** [4] - 93:2,
96:2, 96:16, 98:17
**issue** [12] - 9:24,
89:13, 91:10, 92:3,
92:8, 93:12, 93:20,
95:17, 99:19,
111:19, 116:18,
116:20
**issued** [20] - 10:25,
89:15, 89:21, 92:15,
92:16, 93:25, 94:4,
96:1, 109:5, 109:15,
109:17, 109:20,
110:2, 111:16,
111:22, 111:24,
112:3, 113:1,
113:14, 113:16
**issues** [8] - 63:11,
87:5, 87:7, 94:7,
95:1, 114:10, 121:9,
125:6
**issuing** [1] - 95:11
**itself** [4] - 25:25,
32:23, 35:12, 45:16

### J

**Jacksonville** [1] - 2:10
**January** [8] - 1:14,
77:15, 77:18, 96:7,
96:8, 111:22,
113:20, 132:3
**Jimerson** [1] - 2:9
**Johnson** [5] - 109:2,
112:15, 126:10,
126:22, 128:1
**Jose** [9] - 53:19,
53:21, 54:7, 54:12,
54:18, 55:5, 55:25,
57:1, 57:12
**judgment** [1] - 117:2
**judicious** [1] - 119:25
**June** [37] - 29:1,
29:17, 29:20, 30:1,
31:13, 31:19, 34:12,
35:10, 35:23, 60:7,
60:12, 60:25, 61:5,
62:24, 62:25, 64:20,
65:6, 65:13, 66:7,
66:24, 71:22, 71:25,
72:11, 72:12, 72:14,
76:4, 79:2, 86:4,
87:3, 87:4, 87:20,
88:5, 103:7, 103:14,

126:7, 128:2, 128:23

### K

**K-w-o-n-g** [1] - 27:13
**keep** [5] - 7:12, 7:13,
67:14, 68:2, 82:3
**Kent** [1] - 13:21
**key** [2] - 114:17,
114:18
**Kimberly** [4] - 27:10,
27:14, 27:16, 27:18
**kind** [3] - 32:22, 94:23,
107:2
**knowledge** [7] -
18:24, 56:12, 64:11,
71:13, 71:17, 116:1,
125:6
**known** [21] - 8:9,
10:17, 11:18, 44:17,
44:24, 45:4, 47:16,
68:12, 68:18, 68:23,
69:2, 69:6, 69:23,
69:24, 70:1, 70:5,
70:14, 70:21, 71:18,
72:4, 76:7
**knows** [1] - 4:15
**Kwong** [1] - 27:10

### L

**lab** [2] - 35:20, 87:17
**language** [9] - 12:15,
12:17, 38:15, 38:17,
78:15, 79:5, 106:3,
107:4, 126:1
**Large** [1] - 1:16
**last** [5] - 19:21, 19:23,
23:12, 27:11
**law** [5] - 13:11, 13:17,
13:20, 49:21, 52:9
**Law** [1] - 13:21
**laws** [1] - 43:11
**lawsuit** [22] - 8:11,
10:9, 21:2, 22:21,
22:22, 22:25, 23:5,
23:7, 23:16, 24:12,
24:22, 28:4, 36:7,
50:13, 50:20, 61:1,
62:13, 76:20,
102:19, 125:20,
128:5, 128:10
**lay** [1] - 121:4
**lead** [2] - 88:22, 89:20
**learn** [2] - 76:14,
128:4
**least** [6] - 28:25,
54:24, 95:25, 96:5,
103:1, 115:3
**led** [1] - 125:14

**legal** [10] - 15:2, 21:4,
30:2, 36:17, 76:3,
76:10, 76:14, 78:23,
80:16, 128:18
**letter** [81] - 29:1, 29:2,
29:3, 29:17, 29:20,
30:1, 31:13, 31:14,
31:18, 31:19, 31:20,
31:21, 31:22, 34:12,
35:10, 35:23, 36:18,
36:21, 36:23, 37:4,
51:20, 59:12, 61:5,
61:13, 62:3, 62:24,
62:25, 65:14, 66:7,
71:23, 71:25, 72:11,
72:12, 72:15, 72:16,
72:21, 72:23, 73:25,
74:5, 74:12, 74:25,
75:2, 75:4, 75:8,
75:20, 75:24, 76:4,
76:6, 76:11, 76:15,
77:22, 78:1, 78:12,
79:13, 79:19, 79:22,
80:6, 81:14, 81:18,
81:21, 81:23, 86:4,
87:4, 87:19, 87:20,
87:21, 88:5, 98:13,
103:7, 103:14,
108:22, 109:12,
110:15, 123:3,
126:7, 128:18
**letters** [4] - 30:9, 63:1,
72:7, 86:15
**liability** [10] - 75:25,
81:2, 85:19, 100:15,
105:1, 105:2, 105:7,
105:8, 108:8, 115:12
**liable** [7] - 7:11, 8:10,
9:20, 79:1, 80:7,
80:10, 80:18
**license** [6] - 13:10,
13:22, 14:2, 14:6,
65:18, 75:14
**licensed** [2] - 13:11,
13:13
**licenses** [2] - 13:8,
13:15
**light** [3] - 74:7, 78:24,
80:17
**likely** [19] - 24:5,
24:17, 26:16, 26:22,
41:9, 70:6, 72:6,
85:22, 89:15, 89:20,
90:10, 92:14, 93:7,
93:11, 93:13, 93:19,
94:3, 119:11, 127:12
**limit** [2] - 8:19, 8:21
**limitations** [1] -
102:20
**limited** [2] - 80:22,

102:2
**limits** [2] - 21:10,
21:15
**LINE** [1] - 132:5
**line** [6] - 77:5, 99:3,
99:6, 99:8, 99:13,
99:22
**list** [9] - 16:15, 36:12,
41:22, 42:2, 46:22,
46:24, 81:24, 81:25,
124:10
**listed** [4] - 42:1, 46:16,
46:25, 119:13
**listings** [1] - 115:2
**lists** [2] - 40:18, 40:23
**literally** [1] - 8:23
**litigating** [1] - 75:10
**litigation** [37] - 12:14,
12:18, 24:25, 29:3,
31:14, 35:25, 46:5,
57:21, 61:6, 61:7,
61:8, 62:10, 63:19,
71:24, 72:1, 72:6,
72:8, 75:11, 77:22,
78:12, 78:20, 78:21,
79:19, 79:21, 80:1,
80:6, 80:14, 80:15,
80:24, 81:7, 81:14,
86:4, 87:21, 87:22,
120:6, 126:9, 128:1
**LLC** [8] - 1:8, 78:22,
78:25, 80:9, 80:21,
81:15, 82:3, 82:6
**local** [4] - 45:25, 58:4,
63:8, 87:6
**location** [1] - 119:23
**look** [41] - 15:18,
16:14, 17:5, 30:19,
34:2, 34:8, 38:14,
39:11, 40:17, 42:7,
43:24, 43:25, 44:4,
44:14, 46:17, 51:23,
52:12, 59:25, 60:13,
72:10, 72:14, 72:18,
76:3, 77:4, 82:11,
82:16, 89:22, 96:6,
99:24, 103:20,
105:15, 105:20,
108:18, 110:15,
117:16, 118:9,
118:12, 120:19,
121:23, 124:12
**looked** [5] - 31:14,
36:24, 60:19,
103:13, 114:19
**looking** [16] - 40:25,
60:8, 64:14, 79:17,
82:25, 83:13, 83:17,
95:16, 99:25,
105:23, 106:7,

109:6, 119:23,
125:25, 128:20
**looks** [6] - 41:15,
76:12, 77:17, 83:23,
85:5, 99:18
**loss** [6] - 89:6, 94:19,
102:3, 115:21,
115:24, 119:19
**losses** [5] - 101:11,
101:16, 101:25,
108:9, 119:16
**loud** [1] - 25:19
**lunch** [6] - 67:8,
67:15, 67:18, 67:20,
68:1, 68:4, 68:7,
68:9

### M

**Madam** [1] - 118:18
**mail** [5] - 10:3, 51:14,
86:17, 121:11, 123:8
**mailed** [1] - 128:2
**mails** [25] - 34:24,
41:2, 41:15, 51:13,
51:16, 51:20, 51:23,
52:7, 52:12, 55:15,
57:18, 58:19, 61:15,
61:18, 62:2, 62:23,
63:2, 63:8, 65:23,
73:7, 90:4, 122:21,
127:18
**maintain** [1] - 79:20
**management** [3] -
110:17, 122:5, 123:1
**manager** [1] - 122:24
**managing** [4] - 47:22,
49:3, 49:13, 50:3
**manifested** [1] - 119:8
**March** [5] - 28:17,
109:21, 109:25,
111:13
**Mario** [2] - 54:5, 57:22
**mark** [1] - 117:23
**marked** [8] - 16:6,
27:25, 29:19, 30:4,
30:24, 39:16, 84:11,
108:21
**marketing** [1] - 115:15
**Marrero** [8] - 6:13,
6:18, 8:13, 9:3, 9:10,
52:22, 75:1, 75:21
**Marrero's** [1] - 122:9
**material** [2] - 82:21,
115:16
**matter** [17] - 4:23,
8:14, 35:24, 49:21,
71:24, 75:11, 78:19,
79:4, 79:25, 80:13,
80:14, 81:6, 81:8,

81:10, 87:23, 88:5,
126:8
**matters** [1] - 43:21
**McDonald** [6] - 22:10,
22:15, 22:20, 22:24,
26:19, 93:5
**mean** [70] - 5:2, 6:19,
6:21, 7:12, 18:15,
20:17, 20:22, 22:2,
23:19, 26:18, 32:21,
32:22, 34:23, 37:20,
39:21, 40:24, 40:25,
42:15, 43:18, 46:8,
46:15, 46:18, 48:7,
50:20, 50:22, 53:17,
56:14, 62:20, 64:8,
67:19, 69:13, 74:5,
74:11, 74:14, 76:12,
77:19, 80:3, 82:24,
84:23, 89:25, 91:19,
96:15, 97:8, 97:15,
98:1, 102:16,
104:24, 105:11,
106:6, 106:17,
106:22, 106:23,
107:2, 107:3,
107:21, 107:23,
108:4, 108:6,
112:21, 112:25,
113:8, 118:8, 119:6,
121:4, 122:19,
124:4, 125:24,
125:25
**meaning** [1] - 126:5
**means** [11] - 6:20,
17:4, 20:18, 20:20,
22:3, 80:14, 97:10,
102:23, 104:6,
107:17, 108:2
**meant** [10] - 50:22,
66:6, 66:10, 66:16,
66:24, 92:9, 101:4,
101:16, 102:11,
119:22
**medical** [1] - 68:5
**meet** [2] - 19:18, 97:12
**meeting** [2] - 41:10,
41:12
**meets** [1] - 97:15
**members** [1] - 36:11
**memorize** [1] - 16:19
**memory** [3] - 71:22,
88:4, 90:22
**mention** [3] - 75:20,
75:22, 76:2
**mentioned** [15] -
29:21, 30:6, 37:1,
61:18, 75:2, 75:4,
86:14, 89:24, 94:18,
115:17, 121:11,

123:2, 123:3,
124:15, 126:10
**mentions** [6] - 72:9,
75:8, 79:7, 79:18,
107:13, 120:25
**merits** [1] - 10:14
**Miami** [1] - 2:6
**Michelle** [1] - 4:9
**middle** [1] - 99:3
**MIDDLE** [1] - 1:1
**might** [4] - 19:22,
33:21, 38:24, 79:1
**million** [5] - 116:2,
116:6, 116:7,
116:15, 116:25
**mind** [6] - 25:9, 25:15,
55:20, 59:18, 67:21,
128:25
**mine** [1] - 84:19
**minimum** [2] - 103:2,
126:7
**minute** [4] - 23:1,
31:3, 118:13, 128:12
**minutes** [2] - 41:11,
41:12
**misrepresentations**
[1] - 82:21
**missed** [1] - 65:9
**misstates** [1] - 9:12
**monies** [1] - 74:6
**Morla** [14] - 37:15,
53:17, 53:20, 53:21,
54:7, 54:12, 54:18,
54:24, 54:25, 55:5,
55:25, 57:1, 57:3,
57:12
**morning** [2] - 4:6,
117:21
**most** [2] - 89:15,
94:16
**motion** [2] - 60:25,
64:15
**mouthful** [1] - 6:8
**move** [1] - 17:3
**moving** [2] - 5:24,
86:19
**MR** [115] - 4:5, 7:2,
7:4, 7:6, 7:8, 7:9,
7:15, 7:20, 7:24,
7:25, 8:1, 8:2, 8:4,
8:7, 8:14, 8:19, 8:21,
9:11, 9:16, 15:8,
15:16, 15:20, 15:23,
16:5, 16:7, 16:14,
16:23, 17:1, 17:18,
20:19, 21:5, 21:7,
21:10, 24:23, 25:2,
25:4, 25:5, 25:9,
25:12, 25:15, 25:18,
25:20, 26:3, 26:6,

27:22, 28:1, 28:9,
29:16, 29:24, 30:1,
30:19, 30:21, 31:25,
34:5, 39:11, 39:13,
40:17, 43:6, 51:21,
59:19, 59:23, 59:25,
60:13, 62:17, 63:24,
67:7, 67:9, 67:11,
67:13, 67:15, 67:17,
67:22, 67:24, 68:3,
68:5, 68:8, 68:10,
70:15, 70:23, 72:14,
73:23, 76:3, 77:3,
81:23, 82:11, 82:14,
82:16, 84:2, 86:19,
96:13, 99:1, 99:24,
100:25, 101:3,
101:9, 102:6,
103:20, 105:5,
108:18, 109:10,
112:18, 113:10,
117:18, 117:20,
118:2, 118:6,
118:13, 118:14,
118:15, 118:18,
120:19, 128:12,
128:16, 129:1, 129:3
**multiple** [1] - 24:16
**mute** [1] - 100:25

# N

**name** [13] - 4:6, 4:8,
21:24, 22:6, 22:13,
23:13, 26:10, 27:11,
35:5, 53:16, 54:4,
61:22, 66:18
**named** [1] - 79:24
**namely** [1] - 87:23
**names** [4] - 22:14,
37:14, 41:19, 54:2
**natural** [1] - 66:22
**necessarily** [1] - 117:7
**need** [10] - 5:24, 5:25,
8:5, 15:23, 34:13,
38:15, 67:20, 68:4,
68:7, 96:15
**needs** [3] - 99:15,
100:25, 110:6
**negligence** [8] -
32:18, 33:15, 35:21,
57:7, 78:25, 80:17,
81:19, 87:13
**negligent** [1] - 81:15
**net** [1] - 94:23
**never** [4] - 4:20, 4:22,
92:3, 128:25
**New** [3] - 97:24, 98:5,
101:18
**next** [1] - 112:18

**NO** [3] - 1:3, 132:5
**non** [2] - 41:22, 46:24
**non-exhaustive** [2] -
41:22, 46:24
**noncontractual** [1] -
52:3
**none"** [1] - 100:2
**normal** [2] - 97:25,
98:1
**NOT** [1] - 132:2
**Notary** [1] - 1:15
**note** [2] - 81:12, 100:1
**notes** [1] - 131:8
**nothing** [5] - 36:3,
55:19, 100:10,
115:23, 125:19
**notice** [19] - 7:17,
7:19, 12:14, 12:18,
16:12, 17:6, 25:25,
30:2, 35:23, 60:6,
60:10, 60:11, 65:3,
95:5, 95:7, 127:5,
127:6, 127:13, 128:2
**Notice** [2] - 1:13, 16:2
**noticed** [1] - 64:12
**November** [2] - 23:11,
23:12
**Number** [4] - 34:6,
100:6, 100:11,
101:23
**number** [10] - 8:23,
40:18, 41:16, 77:13,
102:10, 107:15,
108:2, 108:15, 127:8
**numbers** [1] - 77:5
**numerous** [1] - 73:2

# O

**oath** [1] - 5:6
**OATH** [1] - 130:1
**object** [5] - 5:15,
24:23, 63:24, 70:15,
70:23
**objection** [8] - 9:11,
20:19, 25:10, 25:11,
25:23, 51:21, 62:17,
105:5
**objections** [3] - 8:20,
8:22
**objects** [1] - 5:16
**obligated** [1] - 5:17
**obligation** [5] - 45:22,
46:1, 48:3, 122:4
**obligations** [8] -
49:23, 122:15,
122:17, 122:20,
124:1, 124:2, 124:6,
125:12
**obtain** [6] - 13:23,

14:2, 94:19, 94:20,
97:21, 116:25
**obtained** [2] - 35:19,
76:25, 97:20
**obtaining** [2] - 35:14,
98:3
**obvious** [5] - 94:25,
107:19, 118:10,
119:2, 119:23
**obviously** [9] - 11:21,
36:8, 79:5, 79:16,
82:25, 91:21, 107:4,
113:21, 122:19
**occasions** [1] - 24:16
**occurred** [2] - 70:6,
125:4
**occurs** [1] - 81:3
**odd** [1] - 107:3
**OF** [6] - 1:1, 130:1,
130:5, 130:7, 131:3,
131:4
**offered** [2] - 68:2, 89:1
**office** [1] - 23:9
**officer** [3] - 43:10,
45:20, 47:11
**official** [1] - 130:14
**often** [1] - 98:2
**OIA** [1] - 65:16
**OIA's** [1] - 65:18
**omission** [4] - 85:17,
105:24, 106:8,
106:18
**omissions** [2] - 82:22,
86:6
**ON** [1] - 132:2
**once** [1] - 111:22
**one** [63] - 8:23, 10:3,
11:23, 13:5, 17:17,
17:20, 17:21, 20:3,
21:22, 22:19, 23:22,
25:16, 26:20, 29:21,
29:25, 36:20, 38:9,
39:25, 44:14, 50:7,
51:13, 53:25, 60:17,
60:24, 61:4, 65:14,
72:9, 76:6, 76:12,
76:13, 78:25, 79:24,
80:18, 80:20, 80:21,
81:15, 81:19, 89:25,
90:18, 94:16, 95:3,
95:20, 96:3, 96:4,
96:5, 96:7, 98:6,
100:8, 107:11,
109:17, 110:6,
110:16, 110:18,
113:21, 116:6,
116:12, 118:13,
118:15, 128:23
**One** [1] - 2:10
**ones** [10] - 17:10,

17:16, 18:7, 18:8, 41:8, 75:17, 75:18, 85:7, 107:19
**onsite** [1] - 58:20
**open** [1] - 55:1
**opinion** [5] - 10:17, 11:17, 57:6, 120:15, 120:21
**opinions** [2] - 21:14, 37:10
**opportunity** [1] - 11:25
**options** [3] - 92:23, 113:5
**oral** [1] - 102:18
**order** [2] - 15:17, 116:18
**OSHA** [10] - 37:9, 37:10, 38:10, 52:20, 52:23, 53:4, 58:24, 59:2, 120:10, 120:17
**otherwise** [1] - 119:15
**outdated** [1] - 98:13
**outside** [4] - 73:13, 73:19, 76:7, 115:5
**Outsidein** [237] - 4:7, 6:6, 6:8, 6:9, 6:10, 6:12, 6:17, 7:11, 8:9, 8:12, 8:16, 9:2, 9:6, 9:7, 9:9, 9:15, 9:20, 9:23, 10:3, 10:4, 10:10, 10:17, 10:18, 11:18, 11:19, 23:3, 31:9, 32:7, 32:9, 32:17, 32:24, 33:5, 33:6, 33:15, 33:19, 34:25, 35:1, 35:7, 35:13, 36:9, 36:10, 38:1, 38:23, 39:2, 43:8, 43:19, 44:1, 44:16, 44:23, 45:3, 45:8, 45:11, 45:18, 45:24, 46:7, 46:9, 47:5, 47:9, 47:16, 47:21, 48:3, 48:14, 48:17, 48:23, 49:2, 49:10, 49:12, 50:2, 51:2, 51:10, 51:14, 51:17, 52:4, 52:10, 52:13, 52:14, 53:3, 53:22, 54:8, 54:15, 54:24, 56:2, 56:5, 56:9, 56:15, 56:19, 56:25, 57:5, 57:8, 57:14, 57:19, 57:24, 58:2, 58:5, 58:7, 58:16, 58:24, 59:2, 59:6, 59:10, 59:14, 60:10, 61:19, 62:3, 62:5, 63:6, 63:16,

63:22, 64:4, 65:21, 65:25, 66:7, 68:12, 68:13, 68:22, 69:2, 69:6, 70:1, 70:4, 70:14, 70:20, 71:3, 71:4, 71:5, 71:17, 71:20, 72:5, 73:3, 73:5, 73:10, 73:11, 73:18, 74:3, 74:10, 74:17, 75:1, 75:25, 77:21, 77:22, 77:25, 78:9, 78:13, 79:24, 80:7, 80:15, 81:8, 81:9, 81:12, 82:7, 82:19, 82:23, 84:14, 85:15, 85:21, 86:6, 86:17, 87:5, 87:9, 88:4, 88:24, 89:1, 89:13, 90:25, 91:4, 91:8, 91:14, 91:24, 92:9, 92:12, 93:4, 94:24, 95:5, 95:17, 95:19, 96:10, 97:21, 98:12, 98:20, 99:10, 100:14, 100:19, 101:4, 101:5, 101:6, 101:13, 102:24, 103:5, 103:8, 103:10, 103:16, 103:17, 108:19, 109:3, 109:15, 110:21, 111:5, 111:10, 111:13, 111:17, 112:9, 117:11, 117:12, 119:16, 120:2, 120:9, 120:15, 121:2, 121:11, 121:17, 122:3, 122:7, 122:20, 122:24, 123:4, 123:7, 123:9, 123:10, 123:12, 123:16, 123:18, 123:21, 124:19, 124:25, 125:13, 125:19, 126:5, 126:14, 127:2, 127:15, 127:19, 127:23, 127:24, 128:10, 132:3
**OUTSIDEIN** [1] - 1:8
**Outsidein's** [33] - 21:25, 22:7, 23:15, 26:12, 30:22, 32:18, 34:7, 38:10, 46:14, 47:1, 48:1, 51:23, 57:1, 64:24, 68:11, 68:15, 69:17, 71:12, 72:21, 74:21, 79:8, 85:12, 86:22,

100:16, 114:19, 116:2, 123:25, 124:16, 126:11, 126:15, 126:17, 126:19
**overlap** [7] - 64:18, 64:22, 64:24, 65:1, 65:5, 65:8, 65:11
**owed** [1] - 43:20
**owes** [1] - 74:6
**own** [8] - 18:22, 35:13, 52:17, 57:9, 64:2, 87:16, 91:12, 91:15
**owner** [2] - 75:16, 123:17

---

## P

**P.A** [1] - 2:9
**p.m** [1] - 129:6
**page** [22] - 30:23, 31:1, 34:8, 41:21, 43:6, 53:21, 55:1, 77:3, 77:4, 77:6, 78:18, 81:23, 83:24, 85:4, 96:6, 110:15, 112:18, 120:21, 124:3, 124:13, 124:18
**Page** [5] - 3:4, 75:9, 75:13, 84:24
**PAGE** [1] - 132:5
**pages** [4] - 40:17, 40:18, 42:7, 83:20
**paid** [4] - 101:11, 101:16, 101:24, 102:1
**paper** [2] - 60:17, 108:23
**paragraph** [10] - 32:10, 42:18, 42:21, 55:4, 73:24, 74:2, 81:24, 120:24, 121:24, 122:2
**Paragraph** [1] - 16:21
**paragraphs** [1] - 60:9
**paraphrasing** [1] - 66:4
**parsed** [1] - 58:18
**part** [6] - 6:15, 9:10, 59:3, 65:9, 83:5, 90:19
**participant** [1] - 81:1
**participate** [4] - 35:15, 87:15, 120:3, 120:16
**parties** [14] - 33:5, 35:22, 54:16, 78:25, 79:19, 79:22, 79:24, 80:18, 80:20, 80:21, 81:15, 81:19, 87:13,

131:9
**parties'** [1] - 131:10
**parts** [1] - 56:22
**party** [7] - 46:7, 46:10, 87:22, 108:6, 108:8, 108:9, 108:11
**past** [2] - 117:13, 119:16
**Paul** [3] - 27:2, 27:16, 27:20
**Paul's** [1] - 27:3
**payment** [4] - 61:6, 103:4, 103:15, 116:8
**PDF** [1] - 15:14
**penalties** [1] - 132:22
**pending** [1] - 63:20
**peoples'** [1] - 68:6
**per** [1] - 57:5
**perform** [3] - 56:9, 57:1, 58:17
**performance** [2] - 73:12, 91:18
**performed** [1] - 112:8
**performing** [8] - 32:18, 57:13, 73:12, 73:19, 90:23, 91:1, 91:9, 91:25
**performs** [1] - 90:20
**perhaps** [6] - 45:14, 57:16, 96:3, 98:23, 109:18, 128:7
**period** [11] - 14:22, 28:17, 28:22, 29:6, 30:12, 31:9, 44:25, 47:17, 109:24, 112:1, 112:3
**perjury** [1] - 132:22
**permit** [12] - 10:6, 33:9, 33:10, 35:2, 43:13, 52:11, 59:11, 61:20, 62:4, 63:10, 66:1, 87:8
**permitting** [1] - 48:18
**person** [7] - 12:4, 26:13, 26:23, 27:1, 53:19, 85:16, 93:1
**personally** [9] - 4:15, 10:19, 10:22, 12:19, 14:8, 15:5, 41:13, 77:25
**personnel** [2] - 114:17, 114:18
**persons** [2] - 18:24, 19:15
**pertaining** [5] - 33:7, 36:7, 79:3, 95:1, 98:23
**phase** [10] - 47:22, 49:13, 50:4, 52:15, 56:23, 57:2, 58:8,

59:8, 120:3, 120:17
**phone** [2] - 19:25, 20:1
**pick** [1] - 5:23
**pieces** [1] - 63:15
**place** [2] - 107:25, 117:22
**placed** [1] - 35:22
**plain** [2] - 104:24, 107:4
**Plaintiff** [3] - 1:6, 2:7, 16:3
**plaintiff** [3] - 9:7, 43:4, 81:9
**plaintiff's** [2] - 81:13, 82:9
**plaintiffs** [2] - 48:15, 120:8
**played** [4] - 21:24, 22:6, 23:13, 26:10
**point** [12] - 13:5, 24:5, 45:17, 46:2, 49:18, 67:8, 78:15, 81:24, 84:13, 91:13, 107:13, 124:9
**pointed** [2] - 61:4, 107:24
**pointing** [3] - 64:18, 64:23, 84:18
**policies** [1] - 79:9
**policy** [77] - 7:10, 8:8, 12:15, 16:20, 16:21, 26:12, 28:17, 28:20, 28:22, 29:5, 30:12, 31:9, 38:15, 38:16, 38:18, 38:20, 41:1, 43:23, 44:9, 45:1, 47:17, 64:13, 69:15, 69:24, 71:10, 76:8, 83:14, 83:21, 88:14, 88:20, 89:1, 89:10, 89:13, 89:16, 89:21, 91:10, 92:3, 92:8, 92:15, 92:16, 93:2, 93:12, 93:20, 93:25, 94:4, 95:6, 95:12, 95:17, 96:1, 98:17, 98:24, 101:8, 108:8, 109:15, 109:24, 110:19, 110:22, 111:2, 111:7, 111:9, 111:10, 111:12, 111:16, 111:19, 111:22, 111:23, 112:1, 112:2, 113:23, 116:13, 116:20, 116:21, 119:11, 126:12, 126:19
**political** [1] - 13:2

**portions** [1] - 42:24
**position** [23] - 9:9, 27:3, 28:18, 28:19, 29:12, 43:19, 44:10, 44:12, 52:16, 62:7, 62:13, 62:18, 63:22, 64:1, 64:6, 65:7, 69:5, 69:25, 70:8, 85:20, 90:25, 103:14, 103:15
**positions** [4] - 14:17, 14:20, 43:22, 60:8
**possible** [2] - 81:1, 102:5
**possibly** [2] - 105:25, 106:18
**post** [1] - 87:12
**potential** [9] - 69:2, 79:3, 79:4, 79:18, 81:15, 103:22, 104:2, 104:17, 106:8
**potentially** [3] - 26:20, 28:24, 75:25
**practice** [5] - 13:11, 65:18, 75:14, 116:22, 116:23
**practices** [3] - 15:6, 93:23, 116:15
**preference** [1] - 67:14
**preferences** [1] - 68:1
**premium** [7] - 88:21, 88:25, 92:18, 93:3, 116:11, 117:12, 119:14
**preparation** [8] - 18:1, 18:9, 20:5, 22:22, 47:13, 55:13, 94:10, 114:24
**prepare** [1] - 93:18
**prepared** [1] - 93:16
**preparing** [3] - 21:11, 40:19, 78:6
**present** [3] - 10:7, 35:3, 100:14
**preserve** [2] - 82:3, 82:7
**preserving** [3] - 25:23, 79:6, 79:7
**president** [3] - 14:12, 14:14, 27:4
**previously** [4] - 20:12, 53:6, 65:20, 121:21
**prime** [4] - 123:10, 123:13, 123:17, 123:21
**printed** [4] - 15:9, 15:12, 15:13, 15:16
**privilege** [2] - 21:6, 26:2
**proceed** [3] - 33:8,

33:10, 61:20
**proceeded** [1] - 62:4
**proceeding** [2] - 10:5, 35:2
**process** [5] - 46:11, 91:24, 92:1, 95:23, 127:9
**produced** [2] - 4:2, 39:20
**product** [4] - 21:6, 25:1, 25:21, 26:1
**professional** [15] - 13:8, 14:15, 85:19, 90:20, 105:7, 105:8, 120:2, 120:9, 120:16, 122:4, 122:15, 124:19, 124:21, 125:2, 125:12
**Professional** [2] - 1:15, 131:5
**professionals** [1] - 122:3
**project** [55] - 9:24, 10:5, 32:20, 33:7, 33:21, 36:6, 36:11, 46:6, 46:7, 47:6, 47:23, 48:18, 49:4, 49:13, 51:3, 51:18, 54:6, 54:11, 54:16, 55:12, 55:18, 55:23, 56:2, 56:6, 56:13, 56:21, 56:22, 57:2, 58:25, 61:21, 63:9, 63:12, 65:14, 65:22, 66:1, 66:17, 66:19, 75:16, 81:1, 81:3, 87:7, 87:11, 87:25, 92:4, 92:20, 94:13, 115:1, 122:6, 122:25, 123:1, 125:2, 125:3, 126:23
**projects** [1] - 43:12
**properly** [1] - 130:11
**proposal** [7] - 108:19, 109:20, 110:2, 110:15, 113:3, 113:11, 113:13
**proposed** [1] - 109:24
**proposing** [1] - 109:2
**protected** [1] - 118:5
**proven** [2] - 43:2, 125:18
**provide** [10] - 31:11, 31:16, 37:6, 56:15, 56:18, 70:17, 101:10, 101:13, 102:9, 107:15
**provided** [16] - 9:12, 18:7, 18:8, 18:17,

18:18, 20:13, 29:8, 30:14, 42:1, 47:19, 73:3, 111:23, 113:12, 113:20, 114:7, 114:11
**providing** [1] - 15:2
**Public** [1] - 1:15
**Puerto** [14] - 45:25, 48:1, 51:17, 52:20, 58:4, 58:24, 59:2, 63:8, 65:18, 75:15, 77:11, 77:18, 78:20, 126:23
**pull** [1] - 27:22
**pulled** [1] - 89:6
**purposes** [1] - 44:6
**pursuant** [3] - 1:13, 16:12, 117:21
**put** [4] - 15:8, 92:19, 95:5, 117:25
**putting** [2] - 66:21, 118:3

---

## Q

**qualifications** [1] - 11:5
**Questions** [2] - 85:6, 86:19
**questions** [18] - 4:14, 5:11, 5:16, 5:22, 21:13, 86:25, 89:5, 90:18, 97:5, 97:9, 100:8, 105:23, 106:7, 106:12, 107:2, 127:21, 127:22, 129:2
**quick** [1] - 110:13
**quote** [11] - 109:13, 109:14, 109:17, 110:4, 110:13, 113:4, 113:6, 113:15, 113:16, 116:19
**quoted** [1] - 119:15

---

## R

**raises** [1] - 123:2
**rate** [8] - 88:25, 117:12, 117:16, 119:1, 119:4, 119:7, 119:10, 119:18
**rates** [1] - 119:14
**rating** [4] - 117:16, 117:18, 118:9, 118:24
**ratio** [1] - 119:19
**Raul** [1] - 78:21
**RDP** [1] - 112:19

**re** [2] - 110:21, 132:3
**re-signed** [1] - 110:21
**read** [12] - 9:16, 9:18, 13:6, 25:11, 78:12, 80:4, 99:23, 118:19, 118:23, 122:12, 129:4, 132:22
**reading** [5] - 25:9, 25:15, 61:23, 73:14, 104:24
**ready** [1] - 31:5
**real** [2] - 128:13
**really** [5] - 23:4, 40:9, 81:4, 84:20, 94:8
**REASON** [1] - 132:5
**reason** [1] - 6:3
**reasonably** [7] - 32:7, 33:20, 38:19, 38:23, 122:8, 125:9, 126:2
**reasons** [2] - 122:6, 122:7
**recalling** [1] - 59:17
**received** [9] - 22:11, 30:17, 35:10, 35:23, 77:21, 78:9, 87:19, 87:21, 111:20
**recision** [2] - 8:8, 50:14, 50:16, 50:21, 82:18
**recollection** [3] - 24:2, 29:15, 121:8
**recommendations** [1] - 121:6
**record** [11] - 4:8, 5:21, 32:19, 33:6, 45:23, 68:8, 87:11, 118:16, 122:24, 125:3, 131:7
**records** [1] - 79:3
**redress** [2] - 78:24, 80:17
**reduction** [4] - 117:11, 119:3, 119:4, 119:14
**refer** [4] - 65:13, 66:3, 71:21, 80:3
**reference** [4] - 41:4, 60:11, 106:1, 114:24
**referenced** [7] - 31:19, 34:20, 51:16, 62:22, 72:7, 86:2, 86:16
**references** [5] - 31:19, 72:1, 72:12, 73:25, 114:3
**referencing** [1] - 61:24
**referred** [4] - 34:11, 36:12, 52:6, 114:8
**referring** [13] - 6:9, 16:21, 52:8, 74:24, 99:5, 113:25, 120:18, 121:18, 121:22, 124:2,

124:8, 124:24, 128:21
**refers** [3] - 39:19, 40:5, 53:21
**refresh** [2] - 31:3, 98:13
**refused** [2] - 92:8, 93:12
**regard** [1] - 43:20
**regarding** [22] - 9:24, 15:3, 22:20, 22:24, 23:15, 24:11, 24:21, 24:24, 29:17, 30:2, 52:4, 56:12, 56:20, 58:7, 69:18, 72:8, 78:20, 87:19, 94:20, 114:10, 123:6
**Registered** [2] - 1:15, 131:5
**regulations** [1] - 43:11
**relate** [6] - 7:20, 7:24, 8:1, 8:6, 72:25, 75:4
**related** [4] - 7:18, 30:11, 72:21, 75:1
**relatedness** [6] - 64:19, 64:25, 65:5, 65:8, 65:10, 65:12
**relates** [3] - 10:10, 65:4, 73:1
**relating** [5] - 28:16, 29:6, 29:21, 30:6, 101:10
**relative** [2] - 131:9, 131:10
**relatively** [1] - 97:11
**relayed** [1] - 67:3
**relevant** [13] - 19:15, 47:15, 47:18, 47:19, 68:12, 68:17, 68:22, 68:24, 69:5, 69:10, 69:12, 81:10, 82:3
**relied** [8] - 70:24, 88:11, 88:14, 95:11, 95:20, 97:20, 98:21, 114:6
**rely** [12] - 88:9, 88:15, 98:18, 114:4, 114:6, 114:18, 115:1, 115:8, 115:15, 115:21, 117:1, 117:5
**relying** [14] - 29:11, 30:15, 30:18, 34:16, 34:21, 36:19, 38:3, 38:8, 45:4, 45:13, 72:16, 78:16, 79:14, 123:25
**remains** [1] - 104:7
**remember** [10] - 10:1, 11:20, 18:16, 22:10, 28:23, 34:1, 90:6,

95:10, 115:20, 123:18
**remember"** [1] - 12:10
**remembering** [1] - 100:7
**rep** [1] - 5:3
**repeated** [2] - 63:14, 75:18
**rephrase** [1] - 5:12
**replacing** [1] - 22:18
**Report** [1] - 39:14
**report** [35] - 11:1, 11:4, 27:18, 29:13, 34:1, 34:12, 34:20, 36:17, 39:18, 39:22, 39:23, 40:3, 40:8, 40:19, 40:23, 41:2, 41:4, 43:18, 46:17, 46:18, 46:20, 53:11, 53:12, 53:14, 55:1, 55:14, 105:12, 120:19, 121:9, 122:16, 122:18, 123:24, 124:15, 126:1, 131:6
**reported** [12] - 26:15, 36:8, 85:19, 88:4, 103:2, 105:7, 119:21, 127:12, 128:6, 128:8, 128:10
**Reporter** [3] - 1:15, 118:19, 131:6
**REPORTER** [3] - 7:3, 7:5, 7:22
**REPORTER'S** [1] - 131:1
**reporting** [1] - 105:2
**reports** [11] - 24:4, 27:14, 27:16, 27:20, 35:6, 41:14, 41:17, 41:18, 79:10, 79:11, 108:16
**represent** [2] - 71:7, 77:8
**Representative** [1] - 16:2
**representative** [10] - 1:12, 4:10, 4:23, 10:21, 16:12, 17:7, 17:13, 17:23, 42:4, 81:1
**representing** [1] - 4:7
**reputation** [1] - 63:13
**request** [9] - 98:19, 102:20, 112:22, 113:1, 114:18, 115:1, 115:8, 115:15, 115:21
**requested** [4] - 85:16, 109:19, 113:9, 131:7

**require** [3] - 116:16, 116:18, 116:21
**required** [2] - 32:19, 58:20
**requirements** [2] - 68:6, 97:18
**requires** [2] - 70:13, 70:21
**rescind** [1] - 26:11
**reservation** [4] - 31:18, 31:22, 36:23, 37:4
**respect** [7] - 4:25, 86:5, 101:19, 101:23, 122:5, 126:11, 126:18
**respected** [1] - 35:17
**response** [12] - 25:4, 25:10, 26:7, 31:10, 40:3, 40:5, 85:12, 88:2, 100:16, 101:13, 103:11, 127:23
**responses** [4] - 60:14, 82:19, 84:13, 85:9
**responsibilities** [8] - 33:7, 122:5, 122:15, 124:20, 124:22, 125:1, 125:2, 125:12
**responsibility** [8] - 38:1, 47:21, 47:24, 48:7, 48:8, 120:3, 120:10, 120:16
**responsible** [20] - 9:7, 14:15, 24:10, 43:8, 43:20, 44:1, 45:18, 47:9, 48:17, 49:3, 49:12, 50:3, 59:3, 59:7, 105:3, 121:2, 121:5, 121:17, 122:25, 125:13
**result** [14] - 10:18, 11:18, 70:6, 71:4, 71:13, 85:17, 105:18, 105:25, 106:1, 106:5, 106:16, 106:18, 122:9, 125:10
**resulted** [1] - 52:21
**resulting** [1] - 71:24
**results** [1] - 35:20
**resumes** [2] - 114:17, 114:18
**retain** [1] - 57:9
**retained** [6] - 10:24, 35:16, 53:22, 53:24, 54:25, 56:5, 57:17, 56:5, 87:15
**retrospect** [1] - 89:2
**retrospectively** [1] -

89:22
**revenue** [3] - 116:10, 116:14, 116:24
**revenues** [1] - 116:2
**review** [26] - 18:11, 18:21, 20:6, 32:21, 33:17, 34:13, 41:18, 46:11, 46:13, 46:14, 47:12, 47:14, 48:20, 50:23, 61:15, 69:8, 73:16, 78:6, 89:9, 94:11, 103:13, 119:1, 119:2, 122:18, 124:16, 131:7
**reviewed** [57] - 18:3, 18:4, 18:6, 18:7, 18:8, 18:17, 20:10, 22:11, 32:15, 34:15, 39:23, 40:19, 40:22, 40:25, 41:1, 41:2, 41:3, 41:5, 41:6, 41:8, 41:9, 41:10, 41:13, 41:16, 41:19, 42:1, 45:21, 46:9, 46:12, 46:16, 46:19, 46:25, 47:1, 47:19, 49:6, 49:14, 51:11, 51:13, 51:25, 52:19, 52:23, 52:24, 55:13, 55:14, 56:10, 58:19, 73:6, 73:7, 73:9, 78:7, 88:10, 112:11, 115:17, 124:11, 127:17
**reviewing** [10] - 21:25, 22:7, 22:18, 23:14, 26:11, 44:15, 56:11, 110:8, 114:23, 118:24
**Rican** [3] - 48:2, 58:4, 63:8
**Rico** [11] - 46:1, 51:17, 52:20, 58:24, 59:2, 65:18, 75:15, 77:11, 77:18, 78:21, 126:24
**rights** [4] - 31:18, 31:22, 36:23, 37:4
**rise** [4] - 32:9, 33:21, 38:19, 38:24
**Rise** [1] - 78:20
**risk** [1] - 110:17
**RLI** [166] - 1:5, 4:11, 4:15, 6:17, 6:24, 8:7, 9:9, 10:23, 10:24, 11:6, 11:13, 11:16, 11:21, 12:6, 14:9, 14:17, 15:6, 16:3, 17:7, 17:23, 21:24, 22:6, 22:12, 23:13,

26:10, 27:24, 28:14, 29:8, 29:10, 30:10, 30:12, 30:14, 30:16, 31:8, 31:10, 32:5, 34:6, 34:16, 34:21, 36:5, 36:10, 36:19, 38:3, 38:7, 39:19, 39:20, 40:2, 40:7, 40:14, 41:8, 41:9, 42:4, 44:5, 44:10, 44:23, 45:4, 46:6, 47:1, 52:13, 56:25, 59:6, 59:21, 60:3, 60:21, 61:4, 62:7, 62:13, 63:5, 63:21, 64:13, 64:15, 64:18, 65:4, 66:5, 66:9, 67:1, 69:4, 69:17, 71:11, 71:12, 71:19, 72:16, 73:3, 74:13, 76:14, 76:19, 76:21, 76:25, 77:21, 77:23, 78:2, 78:10, 78:15, 79:13, 80:25, 82:13, 82:14, 82:23, 88:9, 88:11, 88:25, 89:2, 89:4, 89:12, 89:15, 89:23, 90:10, 90:18, 92:7, 92:8, 92:15, 93:1, 93:13, 93:19, 93:23, 93:25, 94:3, 95:4, 95:11, 95:16, 95:20, 95:22, 96:20, 97:12, 97:14, 97:21, 98:2, 98:3, 98:5, 98:10, 98:12, 98:18, 98:21, 99:9, 99:11, 101:7, 102:25, 103:1, 109:1, 109:14, 110:1, 110:7, 110:11, 111:3, 112:8, 113:2, 113:25, 114:8, 114:17, 115:1, 115:8, 115:15, 115:21, 116:15, 116:18, 117:11, 119:15, 124:1, 124:21, 126:18, 128:4, 128:6, 128:9, 132:3
**RLI's** [56] - 4:15, 4:22, 6:23, 18:18, 18:21, 21:1, 28:3, 28:12, 28:18, 28:19, 29:12, 30:21, 31:4, 32:3, 33:18, 34:8, 34:11, 34:12, 38:22, 39:18, 39:22, 39:23, 43:19, 43:22, 52:16, 59:23, 60:1, 60:13, 62:18,

64:1, 64:5, 64:6, 64:9, 65:7, 69:25, 70:8, 76:6, 84:8, 84:15, 85:9, 85:20, 88:1, 90:25, 92:3, 95:13, 95:14, 97:22, 98:8, 99:19, 102:25, 105:13, 108:19, 114:4, 126:11, 126:15
**Rog** [4] - 31:15, 34:10, 36:24, 39:19
**role** [5] - 4:13, 21:25, 22:6, 23:14, 26:11
**Ross** [6] - 24:2, 24:9, 24:11, 24:21, 26:14, 69:20
**ross** [1] - 24:3
**RPR** [2] - 130:18, 131:15
**rules** [1] - 5:4
**run** [1] - 89:6
**runs** [1] - 94:19
**rusty** [1] - 13:5

**S**

**safe** [2] - 61:20, 77:12
**safety** [7] - 48:18, 49:22, 49:23, 52:14, 52:20, 58:25, 59:7
**satisfy** [2] - 111:3, 111:5
**saw** [6] - 17:21, 23:1, 83:16, 114:24, 127:18
**Schedule** [1] - 16:14
**schedule** [1] - 16:15
**school** [4] - 12:19, 12:20, 13:17, 13:20
**science** [1] - 13:3
**scope** [11] - 55:23, 56:2, 56:4, 56:8, 56:12, 57:1, 58:1, 58:6, 58:9, 73:13, 73:19
**scratch** [1] - 9:15
**screen** [4] - 15:19, 16:1, 118:1, 118:3
**scroll** [15] - 16:23, 17:3, 17:18, 28:9, 30:23, 32:1, 34:8, 73:23, 83:10, 99:1, 109:8, 109:22, 112:18, 113:10
**scrolling** [1] - 124:14
**seal** [1] - 130:14
**second** [12] - 29:2, 29:3, 30:5, 42:21, 55:5, 60:25, 64:14,

82:2, 96:4, 107:11, 110:18, 118:15

**Section** [10] - 84:21, 84:23, 85:12, 86:20, 99:2, 100:13, 101:9, 102:7, 103:21, 107:24

**section** [5] - 16:24, 38:20, 42:8, 121:22, 122:10

**see** [57] - 38:15, 39:21, 40:20, 41:23, 42:8, 42:10, 42:18, 42:21, 43:7, 43:14, 46:18, 46:22, 54:4, 55:7, 55:8, 57:18, 60:23, 61:3, 61:10, 61:11, 64:17, 64:21, 73:24, 74:2, 77:5, 79:16, 82:5, 83:11, 83:13, 83:15, 83:17, 83:19, 84:24, 90:25, 91:23, 99:5, 99:6, 101:12, 102:8, 103:23, 104:1, 104:2, 105:20, 105:22, 105:24, 106:3, 106:12, 109:9, 117:17, 119:22, 122:10, 122:12, 122:13, 124:14, 125:21

**seeing** [2] - 104:18, 119:3

**seek** [3] - 40:7, 78:24, 80:17

**seem** [1] - 77:14

**select** [1] - 113:5

**self** [5] - 90:23, 91:1, 91:8, 91:17, 91:25

**self-performing** [3] - 90:23, 91:1, 91:25

**semantics** [1] - 19:11

**send** [1] - 98:12

**sense** [1] - 96:17

**sent** [8] - 15:12, 15:14, 18:4, 59:12, 63:2, 122:21, 127:18

**sentence** [7] - 42:15, 43:7, 43:14, 43:21, 55:4, 55:5, 82:2

**sentences** [1] - 42:19

**separate** [4] - 83:18, 84:6, 115:3, 115:24

**separately** [1] - 31:21

**September** [1] - 39:18

**serious** [10] - 9:23, 61:8, 61:12, 65:16, 66:6, 73:1, 75:8, 75:11, 88:6, 92:14

**served** [2] - 77:25, 128:7

**services** [6] - 14:15, 56:15, 56:19, 57:13, 58:22, 74:6

**serving** [2] - 43:9, 45:19

**set** [11] - 8:5, 28:18, 29:12, 30:22, 33:24, 34:7, 36:20, 60:9, 73:4, 84:16, 84:19

**sets** [1] - 36:25

**seven** [1] - 67:11

**several** [1] - 14:4

**share** [1] - 34:1

**sheet** [1] - 117:24

**SHEET** [1] - 132:1

**short** [3] - 28:2, 84:25, 128:17

**shortly** [1] - 128:6

**show** [5] - 63:5, 63:16, 70:4, 83:6, 120:18

**showed** [1] - 39:5

**showing** [1] - 59:6

**shows** [1] - 45:18

**side** [4] - 37:2, 96:22

**side-by-side** [2] - 37:2, 96:22

**signature** [5] - 96:6, 96:8, 96:18, 111:23, 113:20

**signed** [17] - 45:8, 45:12, 86:7, 96:2, 96:9, 98:16, 110:18, 110:21, 110:24, 111:11, 111:13, 111:17, 111:20, 111:21, 112:9, 113:24

**signing** [2] - 107:20, 111:6

**similar** [8] - 34:10, 48:17, 59:13, 63:13, 65:24, 75:18, 86:25, 96:23

**simply** [2] - 32:12, 97:17

**SINA** [1] - 2:4

**Sina** [4] - 7:15, 25:18, 100:25, 129:2

**sina** [4] - 8:19, 15:20, 25:7, 25:12

**single** [2] - 26:13, 33:23

**sit** [4] - 72:3, 74:15, 123:22, 124:7

**site** [1] - 58:10

**situation** [1] - 66:2

**situations** [1] - 60:5

**slab** [12] - 38:11, 39:3,

39:10, 55:15, 57:4, 57:6, 63:11, 86:10, 87:5, 87:19, 121:10, 125:7

**slabs** [1] - 121:3

**slash** [2] - 98:12, 101:11

**slightly** [1] - 116:6

**solely** [4] - 50:14, 98:18, 114:4, 117:1

**someone** [8] - 12:7, 36:9, 78:8, 80:9, 93:9, 105:3, 105:10, 125:22

**sometimes** [2] - 49:22, 98:24

**sorry** [10] - 9:1, 9:13, 11:8, 23:12, 29:25, 51:8, 65:9, 83:6, 109:7, 111:4

**sort** [1] - 127:13

**sound** [2] - 38:12, 39:10

**sounds** [3] - 37:16, 47:7, 53:23

**Spanish** [3] - 13:2, 13:4, 13:6

**speaking** [9] - 7:22, 8:20, 21:3, 38:17, 49:19, 49:24, 90:16, 127:5, 127:9

**speaks** [1] - 32:22

**special** [4] - 67:17, 97:3, 97:8, 97:10

**specific** [18] - 25:13, 33:16, 48:20, 48:21, 58:9, 64:8, 66:4, 72:4, 73:17, 80:8, 90:21, 92:20, 92:21, 94:15, 97:6, 97:9, 106:3

**specifically** [24] - 5:18, 26:14, 26:24, 27:8, 51:22, 55:10, 61:6, 62:23, 66:15, 74:24, 76:16, 77:13, 78:3, 81:5, 81:18, 91:5, 100:21, 105:22, 118:22, 120:7, 121:12, 124:4, 124:8, 127:14

**specifics** [4] - 29:14, 56:24, 58:3, 94:9

**specify** [1] - 74:25

**speculating** [1] - 128:8

**spell** [2] - 22:13, 27:11

**spelling** [1] - 22:16

**spoken** [13] - 11:13, 11:16, 11:21, 12:6,

12:12, 22:20, 22:24, 24:11, 26:22, 27:7, 36:5, 36:10, 81:21

**stability** [3] - 35:7, 35:19, 35:20

**stamp** [2] - 77:9, 77:17

**standard** [6] - 50:1, 50:18, 50:23, 115:8, 116:22, 116:23

**standards** [5] - 43:11, 50:9, 59:7, 97:12, 97:16

**standby** [1] - 28:1

**stapled** [1] - 84:20

**start** [8] - 22:4, 36:15, 39:17, 48:4, 89:5, 104:12, 111:4, 112:2

**started** [1] - 39:3

**starting** [3] - 78:18, 85:11, 120:24

**starts** [3] - 16:15, 31:1, 120:22

**State** [1] - 1:16

**state** [5] - 4:8, 11:4, 11:5, 58:20, 94:3

**STATE** [2] - 130:5, 131:3

**statement** [11] - 6:24, 37:17, 37:21, 37:23, 37:25, 38:22, 52:10, 54:23, 66:10, 124:18, 125:15

**statements** [7] - 38:11, 39:4, 40:2, 81:20, 82:22, 88:9, 88:11

**STATES** [1] - 1:1

**states** [2] - 13:25, 123:4

**stating** [7] - 35:4, 35:23, 61:18, 72:5, 87:21, 117:12, 119:16

**statute** [1] - 102:20

**stems** [1] - 78:21

**stenographic** [1] - 131:8

**stenographically** [1] - 131:6

**step** [1] - 6:6

**still** [4] - 5:17, 26:3, 63:20, 110:7

**stop** [1] - 39:17

**stopping** [1] - 67:8

**strategic** [2] - 35:14, 87:14

**strategy** [1] - 87:12

**strength** [1] - 57:6

**stricken** [3] - 17:9,

17:15, 17:16

**strike** [1] - 36:14

**strong** [1] - 54:2

**structural** [16] - 35:7, 35:18, 37:13, 37:14, 39:2, 53:9, 53:11, 56:6, 56:14, 56:18, 56:20, 57:5, 63:10, 86:9, 87:5, 121:9

**structurally** [2] - 38:12, 39:10

**structure** [1] - 37:10

**stuff** [2] - 15:18, 15:25

**sub** [20] - 37:8, 37:12, 37:18, 38:9, 38:10, 39:7, 39:9, 45:22, 45:25, 48:1, 48:14, 48:23, 52:7, 57:13, 57:23, 59:9, 61:16, 87:6, 87:18

**subcategories** [1] - 90:14

**subcontract** [3] - 72:22, 73:13, 123:7

**subcontractor** [1] - 123:6

**subcontractors** [4] - 43:9, 45:19, 47:10, 116:9

**subject** [4] - 14:5, 60:6, 60:10, 132:22

**submit** [2] - 99:11, 102:24

**submitted** [11] - 77:23, 95:19, 95:21, 95:22, 95:24, 96:4, 97:24, 103:10, 110:21, 111:21, 112:9

**submitting** [1] - 78:10

**subsequently** [2] - 96:9, 98:3

**substance** [2] - 24:20, 132:23

**substantively** [1] - 23:8

**sued** [3] - 33:5, 81:10, 81:12

**sues** [1] - 81:9

**suggest** [1] - 117:6

**suggested** [1] - 117:8

**suggestion** [1] - 103:18

**suit** [1] - 54:2

**Suite** [2] - 2:5, 2:10

**summarize** [1] - 32:24

**summarizes** [1] - 36:22

**summary** [1] - 82:2

**supervising** [9] - 43:8,

44:1, 45:18, 47:10,
47:11, 47:22, 49:3,
49:12, 50:3
**supervision** [3] -
52:14, 79:10, 122:6
**supervisor** [3] - 27:7,
52:24, 93:9
**supplement** [2] - 40:7,
110:10
**support** [10] - 34:17,
34:24, 38:13, 38:22,
43:15, 64:15, 70:11,
70:18, 72:16, 86:15
**supported** [1] -
125:23
**supposed** [4] - 15:15,
99:12, 99:16, 102:22
**surveying** [1] - 121:6
**sworn** [3] - 4:2, 40:3,
130:12

## T

**Tab** [14] - 15:8, 15:21,
27:22, 29:16, 29:24,
30:19, 34:6, 39:11,
39:13, 60:14, 72:15,
76:4, 84:7, 108:18
**tab** [3] - 15:13, 39:12,
59:20
**tabs** [1] - 15:15
**talks** [2] - 65:15, 94:17
**Tammy** [10] - 100:16,
100:19, 101:6,
109:2, 112:15,
126:10, 126:13,
126:22, 127:15,
127:25
**TAMPA** [1] - 1:2
**tarnished** [2] - 35:5,
61:22
**tarnishing** [1] - 63:13
**team** [1] - 36:11
**technical** [1] - 28:1
**term** [8] - 6:24, 21:18,
104:6, 106:20,
106:21, 106:25,
107:1, 112:5
**terminated** [1] - 73:10
**terminating** [1] -
74:17
**termination** [5] -
72:22, 73:4, 74:16,
74:17, 74:21
**terminology** [1] -
104:16
**terms** [11] - 16:17,
21:14, 22:18, 73:17,
88:19, 89:11, 92:17,
109:19, 109:23,

110:13, 119:13
**Terry** [8] - 1:14, 25:9,
25:15, 25:19, 129:4,
130:18, 131:5,
131:15
**terry** [1] - 9:16
**test** [1] - 35:20
**testified** [1] - 4:3
**testify** [3] - 20:15,
21:17, 24:24
**testifying** [2] - 5:6, 5:7
**testimony** [5] - 4:15,
6:4, 37:17, 52:24,
81:20
**th** [2] - 74:5, 132:25
**THE** [29] - 1:1, 7:3,
7:5, 7:22, 9:13,
23:22, 29:25, 30:20,
39:12, 59:21, 59:24,
60:16, 76:5, 82:1,
82:13, 82:15, 82:17,
86:21, 100:22,
100:24, 101:1,
102:8, 108:22,
109:6, 109:22,
118:17, 118:21,
120:20, 128:15
**thick** [1] - 55:16
**thickness** [2] - 55:15,
57:4
**thinking** [2] - 20:10,
37:7
**thinks** [1] - 66:10
**third** [2] - 108:8, 108:9
**third-party** [1] - 108:8,
108:9
**thousand** [1] - 116:7
**threatened** [1] - 61:7
**threatens** [1] - 61:6
**three** [5] - 31:11, 97:5,
97:9, 105:23, 106:12
**throughout** [2] -
16:16, 17:1
**title** [3] - 14:11, 19:7,
19:11
**titled** [2] - 16:1, 16:24
**today** [13] - 4:14, 5:5,
5:6, 6:4, 15:10, 18:2,
67:12, 86:13, 87:3,
93:7, 114:24,
123:22, 124:7
**today's** [1] - 17:2
**toll** [1] - 102:20
**took** [2] - 39:13,
103:14
**top** [28] - 7:22, 10:1,
11:20, 22:9, 24:8,
28:23, 33:1, 33:3,
33:12, 33:23, 36:1,
46:3, 50:11, 55:22,

59:17, 73:17, 73:21,
74:14, 77:3, 77:4,
77:6, 77:15, 79:24,
84:25, 85:11, 88:4,
97:1, 114:14
**topic** [5] - 7:18, 7:20,
7:24, 8:1, 8:5, 23:20,
70:12, 70:21
**Topics** [1] - 16:25
**topics** [5] - 7:17, 17:6,
17:8, 17:12, 23:21
**total** [6] - 100:2,
101:21, 102:10,
107:15, 108:2,
108:15
**totally** [2] - 8:24, 21:13
**Tower** [2] - 47:6, 54:9
**TRANSCRIPT** [1] -
132:2
**transcript** [2] - 5:23,
117:23, 131:7, 131:7
**tried** [1] - 89:7
**trier** [1] - 48:9
**trouble** [3] - 61:21,
63:12, 66:17
**true** [7] - 44:5, 44:8,
44:19, 48:13, 54:23,
131:7, 132:22
**truth** [3] - 44:10,
44:12, 64:3
**try** [2] - 101:1, 118:6
**trying** [5] - 8:22,
100:8, 113:2, 118:2,
119:25
**turn** [3] - 62:10, 63:20,
81:23
**turned** [1] - 120:7
**two** [24] - 21:22,
21:23, 28:25, 29:8,
29:10, 29:15, 29:21,
30:5, 30:14, 30:18,
31:7, 34:16, 53:24,
60:21, 64:25, 86:15,
86:25, 95:25, 96:5,
96:11, 104:20,
104:23, 110:16,
122:14
**typ** [1] - 113:8
**type** [1] - 101:25
**types** [1] - 96:23
**typical** [1] - 89:18
**typically** [7] - 69:21,
102:17, 112:25,
113:9, 119:8,
119:18, 126:20

## U

**ultimate** [9] - 44:3,
47:24, 48:4, 48:6,

48:7, 52:23, 89:7,
94:23, 117:10
**ultimately** [5] - 62:10,
63:20, 109:15,
117:5, 125:18
**uncover** [2] - 61:8,
75:11
**uncovered** [1] - 65:16
**Under** [1] - 132:22
**under** [9] - 5:6, 81:24,
86:18, 87:10, 103:9,
122:22, 123:10,
123:19, 123:21
**underlying** [71] - 7:7,
8:11, 9:6, 9:24,
10:15, 23:16, 28:16,
29:6, 29:22, 30:7,
30:11, 32:8, 32:14,
32:17, 32:25, 42:14,
42:16, 42:19, 42:22,
43:1, 43:16, 44:6,
44:11, 45:5, 45:6,
46:4, 46:7, 47:25,
48:10, 48:16, 48:19,
49:8, 49:15, 49:18,
50:5, 51:5, 51:12,
52:2, 52:6, 57:21,
58:14, 59:13, 59:22,
60:4, 61:1, 62:9,
62:12, 62:21, 63:4,
63:14, 63:19, 64:16,
64:19, 65:2, 65:5,
65:15, 68:25, 75:18,
76:17, 76:24, 91:2,
91:3, 91:14, 120:6,
120:12, 120:14,
121:15, 121:19,
121:23, 122:23,
125:18
**undersigned** [1] -
130:10
**understood** [2] - 4:16,
25:5
**undertaking** [1] -
52:17
**underwrite** [2] - 88:19,
110:11
**underwriter** [12] -
22:11, 23:3, 93:6,
97:20, 98:23, 111:8,
112:17, 117:3,
117:4, 117:7, 117:9
**underwriting** [41] -
18:13, 19:1, 19:3,
19:9, 20:9, 20:11,
26:16, 26:18, 26:23,
27:5, 88:14, 88:15,
88:18, 88:23, 90:19,
92:1, 93:10, 93:22,
93:25, 94:7, 94:11,

94:12, 94:17, 95:23,
97:13, 97:14, 97:16,
97:17, 98:2, 110:2,
112:8, 112:16,
113:17, 114:4,
114:23, 116:11,
116:13, 117:3,
118:4, 118:25,
126:20
**unhappy** [1] - 73:11
**UNITED** [1] - 1:1
**University** [1] - 12:21,
13:17
**unless** [2] - 5:17, 95:6
**unprofessional** [1] -
67:25
**unprofessionally** [1] -
67:22
**unproven** [1] - 42:25
**unresolved** [1] -
106:11
**unsafe** [1] - 66:2
**unspecified** [1] - 61:8
**unusual** [2] - 90:7,
90:9
**up** [17] - 5:23, 8:5,
15:8, 17:3, 25:6,
26:7, 27:22, 32:11,
73:23, 99:1, 117:2,
117:4, 117:25,
118:3, 119:18,
119:20, 119:21
**update** [3] - 96:15,
96:17, 100:8
**updated** [2] - 17:20,
111:23
**upset** [1] - 73:18
**uses** [3] - 102:9,
112:21, 113:2
**usual** [1] - 90:9

## V

**value** [2] - 89:8, 94:23
**variety** [1] - 102:21
**various** [11] - 18:3,
34:23, 34:24, 35:6,
58:21, 70:24, 79:11,
87:13, 90:13,
110:14, 113:4
**verbalize** [1] - 5:25
**verify** [1] - 25:7
**version** [1] - 95:15
**versions** [1] - 96:11
**via** [2] - 1:13, 130:12
**vice** [3] - 14:12, 14:13,
27:4
**Village** [1] - 78:20
**Vince** [18] - 19:4,
19:14, 19:18, 19:24,

20:4, 20:6, 20:15,
20:24, 21:8, 21:9,
21:16, 21:19, 26:19,
27:19, 27:20, 93:24,
94:3, 94:8
**Vince's** [1] - 19:7
**violated** [2] - 51:2,
52:4
**violating** [1] - 59:7
**violation** [7] - 9:23,
35:5, 62:5, 62:8,
62:14, 62:15, 64:4
**violations** [30] - 10:5,
35:11, 51:10, 51:18,
52:21, 58:25, 59:10,
59:12, 61:9, 61:12,
63:6, 63:17, 63:23,
65:16, 65:17, 66:6,
66:16, 72:9, 73:1,
74:25, 75:3, 75:9,
75:12, 75:14, 75:24,
87:20, 88:6, 89:17,
92:14, 94:24
**visits** [1] - 58:10
**VP** [1] - 14:18
**vs** [1] - 1:7

---

### W

**waiting** [1] - 96:1
**waived** [1] - 25:22
**waiver** [1] - 114:3
**waiving** [1] - 94:6
**website** [2] - 114:20,
115:18
**week** [3] - 19:21,
19:22, 19:23
**weekly** [2] - 41:4,
41:14
**weight** [1] - 37:11
**weird** [1] - 84:20
**whole** [6] - 9:10,
38:15, 59:3, 61:23,
119:21, 122:18
**Wisconsin** [2] - 13:12,
14:1
**withdraw** [3] - 103:16,
103:17, 110:13
**Witness** [2] - 3:2,
39:14
**WITNESS** [26] - 9:13,
23:22, 29:25, 30:20,
39:12, 59:21, 59:24,
60:16, 76:5, 82:1,
82:13, 82:15, 82:17,
86:21, 100:22,
100:24, 101:1,
102:8, 108:22,
109:6, 109:22,
118:17, 118:21,

120:20, 128:15,
130:14
**witness** [7] - 4:2, 4:24,
25:2, 25:8, 25:13,
123:16, 129:5
**witnessed** [1] - 58:21
**word** [14] - 16:20,
20:18, 20:20, 22:5,
78:14, 100:16,
100:19, 102:9,
102:11, 104:5,
104:12, 105:14,
105:22
**word-for-word** [1] -
78:14
**wording** [1] - 106:14
**words** [4] - 48:12,
48:21, 80:8, 107:5
**works** [2] - 11:15,
11:16
**worksheet** [5] -
117:16, 117:18,
118:9, 118:24,
118:25
**worksite** [1] - 78:22
**worried** [1] - 66:18
**write** [4] - 88:20,
99:12, 99:17, 119:11
**WRITE** [1] - 132:2
**writing** [4] - 37:18,
66:21, 90:11, 93:14
**written** [8] - 37:19,
37:23, 37:25, 38:22,
89:10, 95:6, 102:19
**wrongful** [13] - 9:25,
10:9, 23:16, 28:16,
32:8, 33:21, 38:24,
42:14, 44:18, 44:25,
47:17, 52:4, 60:6
**wrote** [5] - 66:25,
81:13, 81:17, 81:21,
100:19

---

### Y

**y'all** [1] - 7:22
**year** [4] - 14:3, 14:4,
23:12, 116:3
**years** [3] - 14:4,
117:14, 119:17
**yesterday** [2] - 18:5,
18:19
**yield** [1] - 68:1

---

### Z

**Zoom** [2] - 1:13,
130:12
**zoom** [3] - 16:7, 17:4