## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RLI INSURANCE COMPANY,

     Plaintiff,

v.                              Case No: 8:20-cv-2395-CEH-AEP

OUTSIDEIN ARCHITECTURE, LLC,

     Defendant.

_____

### **ORDER**

This cause comes before the Court on the following motions: 1) Plaintiff RLI Insurance Company's ("RLI" or "Plaintiff") Motion for Final Summary Judgment (Doc. 60), Defendant OutsideIn Architecture, LLC's ("OIA" or "Defendant") response in opposition (Doc. 76), and Plaintiff's reply (Doc. 82); 2) Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 62), Plaintiff's response in opposition (Doc. 74), and Defendant's reply (Doc. 83); 3) Defendant's Motion to Exclude Expert Opinion, Report and Testimony of Benjamin L. Bedard (Doc. 61), Plaintiff's response in opposition (Doc. 67), and Defendant's reply (Doc. 84); 4) Plaintiff's Motion to Strike Affidavit of Darren Azdell (Doc. 68), and Defendant's response in opposition (Doc. 79); and 5) Defendant's Motion to Exclude Supplemental Expert Witness Report of Benjamin L. Bedard (Doc. 75), and Plaintiff's response in opposition (Doc. 81).

On due consideration of the motions and being fully advised in the premises, the Court will deny Defendant's motions to exclude and Plaintiff's motion to strike, grant-in-part and deny-in-part both motions for summary judgment. Defendant is entitled to summary judgment as to Counts I, II, and III of the Complaint, while Plaintiff is entitled to summary judgment as to Count IV and the Counterclaim. Plaintiff is entitled to a declaratory judgment that it has no duty to defend or indemnify Defendant in the underlying lawsuit.

## I.     FACTS AND BACKGROUND[1]

This insurance action arises from the death of Raul Garcia Marrero on June 10, 2019, during demolition at a construction site in Puerto Rico for a project known as Rise Village. Doc. 77 ¶¶ 2, 8. Defendant OIA was the architect for the Rise Village project. Docs. 62-8 at 2, 73-2 at 2. On July 15, 2020, Marrero's estate sued OIA and other entities affiliated with Rise Village that it alleges are liable for his death ("the underlying lawsuit"). Doc. 77 ¶ 14. OIA maintained a professional liability insurance policy with Plaintiff RLI that was active between March 2020 and March 2022. *Id.* ¶ 13. However, RLI alleges it has no duty to defend or indemnify OIA in the underlying lawsuit. Doc. 1.

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the Joint Statement of Undisputed Material Facts (Doc. 77), deposition transcripts and other evidence in the record.

A. **The Rise Village Project and Accident**

1. **Parties and Contracts**

OIA entered into a contract with a developer, Tower Acquisition Group, LLC ("Tower"), to provide architecture services for the Rise Village Project on June 25, 2018. Doc. 77 ¶ 2. The services OIA contracted to provide consisted of the following phases: schematic design, design development, construction documents, procurement, and construction. Doc. 62-8 at 8-13. OIA agreed to "contact governmental authorities required to approve the Construction Documents [and] respond to applicable design requirements imposed by [them]." *Id.* at 8. However, OIA would "not be responsible for the accuracy, completeness, and timeliness of services and information furnished by the Owner and the Owner's consultants." *Id.* at 8.

During the project's construction phase, OIA would "not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work," nor would it "be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents" or "acts or omissions of the Contractor or of any other persons or entities performing portions of the work." *Id.* at 11. During the construction phase, OIA was required only to "visit the site at intervals appropriate to the stage of construction…to become generally familiar with the progress and quality of the portion of the Work completed," but not "to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work." *Id.* Tower, on the other hand, was required to "furnish tests, inspections

and reports required by law…such as structural, mechanical, and chemical tests[.]" *Id.* at 17.  The contract between OIA and Tower did not refer to demolition.

The project's general contractor was Bird Group, LLC ("Bird"). *See* Doc. 62-1 ¶ 12; Doc. 62-18 at 2; Doc. 73-2 at 2.  Tower and Bird entered into a contract for the project's demolition work on February 20, 2019. Doc. 73-2.  OIA was listed as the architect on the demolition work contract, and its responsibilities were set forth in Article 4. *Id.* at 2, 10, 26-28.  As with the project's construction phase, OIA was required to "visit the site…to become generally familiar with the progress and quality of the portion of the Work completed," but not to "make exhaustive or continuous on-site inspections to check the quality or quantity of the work." *Id.* at 26.  OIA would "not have control over, charge of, or responsibility for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities[.]" *Id.*  Similarly, it would "not have control over or charge of and [would] not be responsible for acts or omissions of the Contractor, Subcontractors…or any other persons or entities performing portions of the Work." *Id.*

In contrast, Bird, as the Contractor, was required to "supervise and direct the Work," and would "be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work[.]" *Id.* at 22.  Bird would also "be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work." *Id.*  Bird was required to provide reasonable

4

protection against unsafe conditions. *Id.* at 35-36.  It was also responsible for making arrangements for all required tests, inspections and approvals of portions of the Work. *Id.* at 41.  However, OIA was permitted to instruct Bird to make arrangements for additional testing, inspection, or approval that it, Tower, or public authorities deemed necessary. *Id.*

OIA prepared a "demolition set of drawings" on which Bird's cost proposal was based. *Id.* at 59.  Aside from preparing the drawings for bid purposes, however, OIA's principal, Darren Azdell, states in his declaration that OIA was not involved in the project's demolition phase. Doc. 62-1 ¶ 16.  He explains that demolition was a separate phase of the Rise Village project that occurred prior to the construction phase. *Id.* ¶¶ 14-15.

Bird employed a subcontractor called Demex Environmental Group, LLC ("Demex") to perform the interior demolition work. *See* Doc. 62-18; Doc. 62-1 ¶ 13. An entity, EHA Engineering, PSC, listed itself as the demolition inspector on a June 2019 monthly report, naming Edgardo Hernandez-Alvarado as the senior inspector. Doc. 62-18.  EHA, through Hernandez-Alvarado, sent Tower a status report about the demolition permits on June 5, 2019. Doc. 62-5.  OIA was not mentioned in either EHA document, nor were Demex, EHA, or Hernandez-Alvardo mentioned in the contract between Tower and OIA.

OIA subcontracted with two relevant entities in connection with the Rise Village project.  First, OIA retained a structural engineering consultant named Jose Morla. *See* Doc. 62-8 at 6; Doc. 62-11.  Morla's proposal to OIA covered the following

professional services: "structural analysis and design, and preparing of construction drawings and technical specifications for the structural phase of the project"; 3-D structural model generation to determine the design's code compliance; and specified services "during the construction of the structural elements." Doc. 62-11 at 22. Neither the proposal nor the contract refers to demolition. Azdell states in his declaration that Morla also served as a structural engineering consultant directly for Tower regarding the existing building and all demolition work, in addition to his work for OIA. Doc. 62-1 ¶ 17. Morla conducted a visual inspection of the Rise Village site for Tower in 2017. Doc. 62-2.

OIA also retained the architecture and interior design services of IG Intergroup LLC ("IG"). Doc. 62-10. IG agreed to assist OIA with the development of the construction documents and related permits, and with site supervision during the construction phase. *Id.* at 21-27. Neither the proposal nor the contract refers to demolition.

## 2. Dispute Between OIA and IG

Mario Corsino, IG's president, notified Azdell on March 1 that the Rise Village project's demolition was about to begin, but that there was a problem with the permit. Doc. 60-4 at 3. This conversation illuminated a disagreement between Corsino and Azdell as to whether OIA had any responsibility during the demolition phase. *Id.* The disagreement escalated during another exchange on March 4. Docs. 60-5, 60-6. Corsino stated that the lack of a demolition permit would bring embarrassment to IG because OIA was neglecting a professional responsibility. Doc. 60-6 at 6. Azdell

responded that he "instructed the [general contractor] to not proceed with demolition" until they received the original permit. *Id.*

About a week later, Azdell wrote to Corsino to confirm that the demolition permit had been issued. Doc. 62-12 at 2.  He also told Corsino that on-site inspections would be conducted by other individuals so that IG's time could be spent on the construction documents. *Id.* at 2, 8.  On April 8, Azdell repeated even more emphatically that he had not authorized IG to provide inspection services, and that IG's failure to meet the construction documents deadline could be grounds for termination of the contract. *Id.* at 6-7.  He then sent IG a letter dated May 16, 2019, in which he stated he was terminating the OIA-IG contract for cause. Doc. 62-13 at 4.  Azdell alleged that IG's failure to timely complete the construction documents had placed OIA "in default under the prime agreement with the owner as a result of those missed deadlines." *Id.*; Doc. 60-8.  Corsino sent a letter dated May 20, 2019, stating that any termination would not be for cause, because "delays in the delivery of [construction documents] are a direct cause of OIA's constant changes to designs and information that OIA still owes to IG and other consultants to date, among other relevant matters that we have discussed." Doc. 62-14 at 2.

On June 10, 2019, attorney Alcides Reyes-Gilestra sent OIA a letter in which he accused OIA of breaching its contract with IG by terminating their relationship without cause and failing to pay the liquidated damages that such a termination required. Doc. 60-9.  Reyes-Gilestra alleged that OIA owed IG $455,861.12, but that it would accept a settlement payment of $350,000. *Id.*  He also informed OIA that its

7

lease agreement at IG's facilities was terminated and demanded that OIA cease and desist from using IG's name. *Id.*  The letter concluded,

> Failure to resolve this matter by the date and time indicated above, will force IG to file a judicial claim against OIA.  The litigation of this matter in court could uncover serious ethical violations by OIA… These violations could affect your license to practice architecture in Puerto Rico and Florida and could adversely affect the interests of the project owner.

*Id.* at 3.

OIA reported the letter to its insurance broker, Tammy Johnson, who advised him to "turn it in" to his insurance company, even though he "might not think this is a claim," because "if something blows up, and it turns into one…your claim could be denied on this insurance." Doc. 60-11.  Accordingly, Azdell notified his insurance company, New Hampshire Insurance Company (AIG), that he received a demand letter for payment of services that were not rendered. Doc. 60-12.  AIG informed him that the failure to pay a consultant was not covered by his professional liability policy, and asked him to confirm he would withdraw the claim. Doc. 60-15; Doc. 62-17. Azdell did so, explaining that he had not intended to file a claim, only to notify them about receiving a legal demand letter. *Id.*

OIA retained an attorney named Sergio Criado to respond to IG's demand letter. Doc. 60-13.  Criado sent a letter to Reyes-Gilestra on June 17, 2019 to inform him that he had been retained on the IG matter.  The two spoke on the phone on June 25 and followed up via email. Doc. 60-36.  On June 28, Criado responded to the same email chain to inform Reyes-Gilestra that a company affiliated with him had just sent

a certified letter to OIA, and cautioned Reyes-Gilestra that any communication with OIA must go through Criado. *Id.* Reyes-Gilestra responded, "It's the same letter…" but did not provide any details about the letter's subject or contents. *Id.* at 4 (ellipses in original).

### 3. The June 10, 2019 Accident

Tower authorized Bird to proceed with interior demolition for the Rise Village project on or about February 19, 2019. Doc. 62-7. EHA's Alvarado contacted Azdell and Morla on February 18, 2019, asking about structural testing of the roof. Morla and Alvarado noted there were cracks in the roof's southwest corner, and Azdell responded that he was "particularly concerned about cracks in the cantilever corners where the slab is less than 4" thick." Doc. 60-3. On April 11, Bird notified Tower that a fire had occurred during demolition on the 11th floor. Doc. 60-7. Nonetheless, in a June 5 status update, EHA reported that demolition was well underway and all demolition permits had been timely obtained. Doc. 62-5. EHA also noted that the construction documents had not yet been completed. *Id.*

On June 10, 2019, demolition was occurring on the building's 13th floor. Doc. 77 ¶ 8. While operating a bobcat machine, a Demex employee named Raul Garcia Marrero fell to his death when the floor underneath the bobcat collapsed. *Id.* Azdell learned of Marrero's death on the same day it occurred. Doc. 77 ¶ 9. Azdell and Morla exchanged emails about the accident on June 14. Morla opined that "it was negligent for Bird to use the bobcat without a detailed analysis from a structural engineer. I know that, with all the doubts we have, if they had asked us we will have say [sic] 'no

way, specially in the overhangs of the 13th floor and roof.'" Doc. 60-18 at 3.  Azdell responded that "they should remove all equipment from the 13th floor until all testing is complete," and that "[t]hey have a meeting with a structural forensic engineer." *Id.* at 2.  He did not explain who "they" referred to, but stated that he and "the owner" would not attend the meeting because "It'd [sic] should do their own evaluation, separate of ours if you agree." *Id.*  Morla agreed that "[w]e should not get involve [sic] in his evaluation." *Id.*  After reviewing a structural test report on July 12, Morla warned Azdell that he would "have to assume the worst possible conditions from the report are present throughout the whole system and determine if and where we need to reinforce the floor" by doing a "complete evaluation of the floor system." Doc. 60-23.

Demex hired an engineer to perform a forensic study of the accident on June 12. Doc. 62-20 at 3.  The engineer concluded that the section of the floor through which Marrero fell "appeared to be a correctly designed and built section," but "had hidden defects of design and/or construction." *Id.*  Specifically, the section lacked the support beams that were present elsewhere. *Id.* at 2.  Although Demex had been informed the floor could withstand up to 25,000 pounds, neither Demex nor Bird had performed a study of the structural plan or a visual inspection before commencing the work. *Id.*  Morla told the Puerto Rico Occupational Safety and Health Administration (PROSHA) that such an analysis or inspection would have revealed the defect. *Id.* at 2-3.  PROSHA cited and fined Demex. *Id.*  OIA was not mentioned in the PROSHA report.  Azdell states that OIA did not investigate the accident independently, and that

10

it was neither involved in nor interviewed for the PROSHA investigation. Doc. 62-1 ¶¶ 24-25; Doc. 62-3 at 37.

## B. <u>The Underlying Lawsuit</u>

Marrero's family retained Alcides Reyes-Gilestra, the same attorney who represented IG.  On June 21, 2019, Reyes-Gilestra drafted a "Legal Hold Notice" addressed to representatives of Tower, OIA, Demex, and Bird. Doc. 60-19.  The letter notified them that they were "all involved in a matter that may involve litigation regarding Rise Village" stemming from Garcia Marrero's death.   Reyes-Gilestra explained,

> I have been engaged as legal counsel by the Garcia family to seek redress in light of the negligence of one or more parties, Bird Group, LLC included, that may be liable for Mr. Garcia's death on June 10, 2019.  To that end we are advising you as a potential custodian of records pertaining to this potential matter.

*Id.* at 3.  The letter instructed the recipients in detail about document retention. *Id.* at 3-5.

In the header, the letter states, "By Certified Mail and Personal Delivery." *Id.* at 1.  However, Azdell denies receiving it.  Gilestra-Reyes stated in his deposition that it was his practice to serve such letters through certified mail and personal delivery through a courier, messenger, or process server. Doc. 60-20 at 30-31.  He did not have a certified mail receipt for service on OIA, but his "recollection" was that his firm received an invoice for "all services provided in this case and also in other cases too." *Id.* at 31, 33.  Gilestra-Reyes explained that he was "very keen—on this case in particular, because it's a contingency case, it's a damage claim, we were very keen—

11

and as a lawyer, I'm very keen on documenting correctly and appropriately expenses so we can in the future recover them[.]" *Id.* at 33.  Reyes-Gilestra also shared his recollection that OIA's registered agent told Gilestra-Reyes's other client, Corsino from IG, that the agent had received the letter. *Id.* 38-39.  However, he did not recall whether the agent said he gave the letter to Azdell. Doc. 62-16 at 105-108.

On June 28, 2019, Azdell sent his attorney, Criado, the following email:

> Busca Tu Abogado, llc just tried to serve me a certified letter.  No one was here. Accident attorney?  Maybe from the construction accident?
> I guess I will go pick it up.  This may be another reason not to let IG off the hook too soon.

Doc. 60-22 at 4.  Criado responded that the firm was owned by "IG's counsel," and he recommended notifying Reyes-Gilestra that he should not contact OIA directly.  *Id.* at 3-4.  Azdell asked "Should I pick up the letter or let it go back to them or find out what it says?" *Id.* at 3.  Criado initially responded "I don't think is [sic] worth it." *Id.* Criado subsequently emailed Reyes-Gilestra, as described in Section I(A)(2), *supra*, then told Azdell, "I just confirmed that it is the same letter that you already have. No need to pick it up." *Id.* at 2.

The Marrero family initiated a lawsuit on July 15, 2020, against OIA, Tower, Bird, Demex, and unnamed individuals and entities. Doc. 1-1.  They alleged that the co-defendants caused Marrero's death through "willful, intentional, reckless, quasi-criminal and grossly negligent" conduct. *Id.* ¶¶ 28-36.  The underlying complaint makes the following allegations regarding OIA:

¶ 10. [OIA, as] the chief architect and manager of the Rise Village construction project…was in charge of everything related to the design and management of the Rise Village construction project. … [It] failed to ensure compliance with the safety standards established by [OSHA] for construction and demolition sites and it continued with construction, despite being aware of reports made about OSHA and permitting process violations at the construction site. … [I]t failed to exercise its duty to oversee the demolition work done by Bird and Demex and it failed to ensure compliance with the laws and regulations applicable to construction and demolition sites, both of which were fundamental obligations under the service contract it signed with Tower Acquisition Group LLC.

¶ 16. Tower Acquisition Group, LLC hired OIA as the chief architect and manager of the construction project. In these roles, its essential duties were to design, supervise and manage the construction project, which includes supervising the work of contractors and subcontractors and serving as a compliance officer, to ensure compliance with all of the standards, laws and regulations applicable to construction projects, which also includes the government permit component. In order to perform these services, OIA subcontracted a team of consultants in a variety of disciplines related to construction, such as civil engineers, mechanical engineers, and structural engineers.

¶ 17. … OIA had to order that the work be halted for several days when one of the consultants alerted the head of OIA that the project lacked the required permits.  This consultant also warned the head of OIA about instances of noncompliance with OSHA standards at the site. …

Doc. 1-1.

As the litigation progressed, OIA successfully moved to disqualify Reyes-Gilestra as counsel for the Marrero family.  OIA argued it was a conflict of interest for Reyes-Gilestra to represent both IG and the Marrero family, because IG was OIA's subcontractor on the same project. Doc. 60-31.  OIA pointed out that Reyes-Gilestra made filings containing allegedly confidential documents he had obtained in the

course of representing IG.  In opposing disqualification, Reyes-Gilestra argued there was no connection between the underlying action and IG's isolated claim for breach of contract. Doc. 60-32 at 7.

**C. <u>The RLI Policy and Application</u>**

Azdell did not report Marrero's death to his insurer at the time, AIG.  AIG notified him in the beginning of 2020 that it would not renew OIA's insurance policy, which Azdell suspected was because "I signaled to them that I was looking at a potential legal issue which didn't come to be and they filed and then cancelled the claim," referring to the IG payment demand. Doc. 60-24.  Instead, OIA's broker, Johnson, submitted the AIG renewal application to other carriers. *See id.*; Doc. 60-25; Doc. 60-26 at 1.

The application[2] contained the following questions and answers:

<u>B. Short Form Eligibility</u>

8. After inquiry, is the applicant …. aware of any act, error or omission or circumstance which may result in a claim being made against them but which has not yet been reported to a  professional liability carrier?  (If yes, please attach a full statement.)
Answer: No
…

<u>I. Claims History</u>

1.   Please provide the total number of claims and the total aggregate amount incurred…for all claims over the last five (5) years…
Answer: None

---

[2] Several versions of the application were submitted to RLI, but the excerpted contents did not change.

> ...
> 3. After inquiry, is the Applicant...aware of any _____ act, error, omission or circumstance which may possibly result in a claim being made against them but which has not yet been reported to a professional liability carrier?
> Answer: No
>
> 4. Has the Applicant...ever reported a potential claim, circumstance to a professional liability carrier?
> Answer: No

Doc. 60-1 at 3, 10 (blank line in original).  The application also stated,

> Claim means any demand for money or services, including but not limited to the service of suit or the institution of arbitration proceedings against you.
> ...
> The application warrants and represents that the information that is set forth in this Application is true, accurate and complete.  The Applicant acknowledges and understands that this Application and all information that is provided by this Applicant or any representative of the Applicant to supplement this Application will, if a policy of insurance is issued, be incorporated in such policy and be made part of such policy by reference.

*Id.* at 1, 12.

OIA accepted a policy with RLI that was effective March 18, 2020. *See* Doc. 60-27; Doc. 77 ¶ 13.  The policy contained the following provision:

> 14. <u>Representations</u>
> The Insureds represent and acknowledge that the statements and information contained in the Application are true, accurate and are the basis of this Policy and are incorporated into and constitute a part of this Policy; and shall be deemed material to the acceptance of this risk or the hazard assumed by the Insurer under this Policy.

Doc. 1-2 at 19.[3]

**D. <u>Procedural History</u>**

OIA was served with the underlying complaint on or around September 10, 2020, Doc. 1-1 at 1, and promptly notified RLI that it was subject to a legal claim. Doc. 62-23.  RLI contacted AIG to "confirm" that it would be defending OIA in the lawsuit, as it "arises from" the June 17, 2019 notice that OIA provided to AIG. Doc. 62-24 at 8.  AIG disagreed, stating that it would not cover the lawsuit because it had "zero relationship" with the notice regarding a breach of contract demand for payment. *Id.* at 3.  Thereafter, RLI agreed to defend OIA under a reservation of rights because it maintained the lawsuit was not covered by its policy. Doc. 62-25.  Despite this agreement, RLI has not provided OIA's defense. *See* Doc. 62; Doc. 62-28 at 6.

RLI initiated the instant action on October 13, 2020, seeking a declaration that it has no duty to defend or indemnify OIA in the underlying lawsuit. Doc. 1.  RLI alleges there is no policy coverage for four reasons: the claim was first made before the policy period, under the "related claims" provision (Count I); the "prior knowledge" provision precludes coverage (Count II); the "prior notice" exclusion applies (Count III); and the policy is void under the rescission doctrine because of material misrepresentations in the application (Count IV). *Id.*  OIA filed a counterclaim for breach of contract. Doc. 12.

---

[3] Additional policy provisions that RLI alleges preclude or exclude coverage will be discussed in detail in Section III, *infra*.

Both parties have now moved for summary judgment in their favor as to all counts. Docs. 60, 62.  Defendant OIA has also moved to exclude both of Plaintiff's expert reports, and Plaintiff RLI has moved to strike the declaration of Darren Azdell. Docs. 61, 68, 75.  The motions will be addressed in turn.

## II.   MOTIONS TO STRIKE OR EXCLUDE

### A. Defendant's *Daubert* Motion

### 1. Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 is a codification of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  In *Daubert*, the Supreme Court described the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Id.* at 589; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*).

The Court extended its reasoning in *Daubert* to non-scientist experts in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

> In performing its gatekeeping function, a district court must consider whether:
>
> (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).   Thus, the three discrete inquiries to determine the admissibility of expert testimony are qualifications, reliability, and relevance. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1341 (11th Cir. 2003).  "The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004) (citation omitted).

The admission of expert testimony is a matter within the discretion of the district court, which is afforded considerable leeway in making its determination. *Frazier*, 387 F.3d at 1258.  However, the court's gatekeeper role is not intended to supplant the adversary system or the role of the factfinder: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

In a non-jury case, where the district court serves as both gatekeeper and factfinder, it has "substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for [itself] during the course of trial whether the evidence meets the requirements" of Rule 702. *Landivar v. Celebrity Cruises, Inc.*, 584 F. Supp. 3d 1150, 1158 (S.D. Fla. 2022) (quotation omitted).  The court is less likely than a jury "to be awestruck by the expert's mystique," *see Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999), thereby lessening the harm of admitting questionable testimony.  As the Eleventh Circuit has explained, "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

### 2. Discussion

Plaintiff's expert, Benjamin Bedard, has been a member of the Florida Bar and a practicing attorney in the field of insurance defense for approximately 27 years. Doc. 61-3 at 1.  He has represented and counseled clients in matters related to complex construction defects involving large scale commercial and residential projects, including wrongful death claims arising out of construction accidents. *Id.* at 1-2. Bedard opines that OIA knew or could have reasonably expected that Marrero's death could have given rise to a claim prior to the inception date of the policy or the application. *Id.* at 3.  His initial opinion was based on his review of the underlying complaint and some of RLI's exhibits in support of its motion for summary judgment. *Id.* at 3-7.  In a supplemental report, Bedard incorporated a discussion of deposition

testimony, the relevant contracts, and additional documents into his initial conclusions. Doc. 60-2.

Defendant challenges the admission of Bedard's testimony on all three *Daubert* grounds. Doc. 61.  Defendant argues he is unqualified because he is an attorney, not an architect, and therefore cannot opine on what a reasonable architect in OIA's shoes should have known. Doc. 61 at 17-20.  As to reliability, Defendant points out that Bedard failed to take into account the evidence demonstrating OIA had no contractual duties with respect to demolition, and failed to cite any authority demonstrating it had a different type of duty that could lead to liability, relying instead on the inaccurate allegations in the underlying complaint. *Id.* at 7-17.  Defendant also argues that Bedard's testimony is not helpful because it amounts to irrelevant speculation and does not concern a topic that requires expert testimony. *Id.* at 20-22.

In response, Plaintiff contends Bedard was correct to rely on the allegations in the underlying complaint, because those allegations are what determines the existence of a duty to defend; Plaintiff characterizes Defendant's arguments regarding liability as irrelevant to the question of whether OIA knew or reasonably should have known a claim was possible. Doc. 67 at 4-6.  Plaintiff also highlights the supplemental report in which Bedard analyzed the evidence on which Defendant relies. *Id.* at 5.  It argues that his testimony is relevant and helpful as to the reasonableness of OIA's conduct, and asserts that, as defense counsel for architects and design professionals against similar claims, he is qualified to give his opinions. *Id.* at 6-16.  In any event, Plaintiff contends that exclusion is unnecessary because the Court will be the factfinder at a

trial. *Id.* at 18-20.  Both parties also spend many pages reiterating the arguments that appear in their summary judgment briefing.

The Court agrees that exclusion of Bedard's testimony is unwarranted in light of the fact that any trial in this action will be a bench trial.  Many of Defendant's concerns regarding Bedard's qualifications and methodology—such as his reaction to the conflicting evidence OIA relies on and his understanding of an architect's duties and contract interpretation—could be addressed in a "vigorous cross-examination." *See Daubert*, 509 U.S. at 596; *Landivar*, 584 F.Supp.3d at 1159 (noting movant "remains free to cross-examine [expert] at [the bench] trial and may make the points it stresses in its Motion at that time.").  The Court observes that the *Daubert* prong of helpfulness is particularly dubious in this case; although Bedard cites generally to his "experience" when reaching his conclusions, it is unclear that he offers more than what Plaintiff's counsel can argue in their closing arguments (and have argued in their summary judgment motion). *See Frazier*, 387 F.3d at 1262-63; *Schultz v. Gov't Employees' Ins. Co.*, No. 1:15CV172-MW/GRJ, 2016 WL 8861701, *1 (N.D. Fla. Aug. 12, 2016) ("When the facade of improper opinion is stripped away, much of Mr. Fey's expert report is merely a summary of the facts in a light favorable to Plaintiff and argument about the significance of those facts.").  The Court is also troubled by his failure to acknowledge the contractual provisions that conflict with his conclusion.  However, Plaintiff is correct that the Court may choose what, if any, weight to give his testimony while acting as the factfinder at trial, without concern that its admission will improperly influence a jury. *See Brown*, 415 F.3d at 1270 (district court did not abuse its discretion

or err in bench trial when it admitted questionable expert testimony but chose to give it little weight). Therefore, the Court declines to exclude his testimony from the trial.

As to the cross-motions for summary judgment, Bedard's opinions neither create nor eliminate any genuine issues of material fact, rendering exclusion equally unnecessary. Accordingly, Defendant's *Daubert* motion is due to be denied.

## B. **Defendant's Motion to Exclude Supplemental Expert Report**

Defendant next moves to exclude Bedard's supplemental report as untimely. Doc. 75. The Court's Case Management and Scheduling Order set a deadline of December 3, 2021, for Plaintiff's disclosure of expert reports, Doc. 35 at 1, but Plaintiff did not serve the supplemental report until April 8, 2022, which was the same date as the dispositive and *Daubert* motion deadline. Doc. 75 at 4. Defendant argues the supplemental report is not a true "supplement," as governed by Federal Rule of Civil Procedure 26(e), because it did not complete or correct an error or omission in the initial report. *Id.* at 7-9. Further, it asserts that Plaintiff's delay was not substantially justified because it had access to most of the additional documents Bedard reviewed in his supplemental report before December 2021. *Id.* at 10-13. Defendant was prejudiced by the delay because it lost the opportunity to depose Bedard and retain a rebuttal expert after reviewing the supplemental report. *Id.* at 13-15.

Plaintiff first responds that the supplemental report is timely under Rule 26(e)(2) because it was provided before the pretrial disclosure deadline. Doc. 81 at 3-5. Even if it were untimely, the delay was substantially justified because the original report was incomplete due to OIA's delayed discovery disclosures. *Id.* at 6-11. At any rate,

Plaintiff argues Defendant has failed to show prejudice because Bedard's conclusions did not change. *Id.* at 12-13.

Rule 26(a) requires a party to timely disclose, *inter alia*, "a complete statement of all opinions [an expert] witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i).  The party must supplement this disclosure, as to both the expert report and any information given in a deposition, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect[.]" Fed. R. Civ. P. 26(e)(1)(A), 26(e)(2).  The failure to comply with Rule 26(a) and (e) may result in exclusion of the undisclosed information, unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).  If the proponent can show that its failure to abide by Rule 26(a) was substantially justified or harmless, the Court has broad discretion to decide whether it will admit the evidence. *Id.*; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1315 (11th Cir. 2014) ("District courts have broad discretion to exclude untimely disclosed expert-witness testimony.").

"In determining whether the failure to sufficiently disclose an expert witness is substantially justified or harmless, courts are guided by the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Goines v. Lee Memorial Health System*, 2:17-cv-656, 2019 WL 968397, *6 (M.D. Fla. Feb. 28, 2019) (citations omitted).

After comparing the original and supplemental Bedard reports, the Court concludes Defendant's motion is due to be denied, either because the supplemental report does not contain new opinions or because any failure to timely disclose was substantially justified and harmless.

Bedard's supplemental report adds a discussion of additional evidence, including the contracts, correspondence and documents related to the OSHA investigation, and the depositions of Darren Azdell, Alcides Reyes Gilestra, and Tammy Johnson.  Bedard incorporates the new evidence into his original analysis and conclusion, thereby bolstering it.  Just as with the evidence discussed in his original report, he explains his opinion that each new piece of evidence demonstrates OIA's prior knowledge that it might be subject to a claim.  But his conclusions, theories, and methodology do not change between the reports.  As a result, "[t]he Second Report builds upon the original, without significantly changing the core conclusions or opinions found therein." *Lanzi v. Yamaha Motor Copr.*, 8:17-cv-2020, 2019 WL 9553066, *9 (M.D. Fla. Sept. 26, 2019) (Honeywell, J.)*, citing In re Accutane Products Liability Litigation*, 8:04-md-2523, 2007 WL 201091, *1 (M.D. Fla. Jan. 24, 2007) (declining to exclude supplemental expert report absent "evidence of sweeping revisions or additions to [the] opinions on causation," where it bolstered its original conclusions with additional rationales but "the core opinions remain the same," especially absent prejudice to the other party.); s*ee also Ward v. Carnival Corp.*, No. 17-24628-cv-Scola/Torres, 2019 WL 1228063, *3 (S.D. Fla. March 14, 2019) ("The supplemental reports merely shed light on the basis supporting both experts'

24

opinions…but they do not contain *new* opinions that went undisclosed during the discovery process.") (emphasis in original).  Bedard's supplemental report therefore does not qualify as a new report that falls under Rule 26(a).

In the alternative, the delayed disclosure of the supplemental report is substantially justified and harmless.  Courts in this District have reached the same conclusion when evaluating similar supplemental expert reports.  In *WhereverTV, Inc. v. Comcast Cable Comms., LLC*, 2:18-cv-529, 2023 WL 2734332, *2-3 (M.D. Fla. March 31, 2023) (Jung, J.), the court held that the timing of a supplemental expert report disclosure was substantially justified and harmless where the expert's methods remained consistent, and the supplemental report simply updated his damages calculations based on new figures that became available.  The court similarly declined to exclude a second portion of the supplemental report that was based on information that had been publicly available, because the information had not been in the plaintiff's possession until recently and the new contents were "not new theories or opinions." *Id.* at *3-4.  The court emphasized that exclusion is a harsh remedy that "many courts are loathe to invoke" absent a finding of bad faith or gamesmanship. *Id.* at *4; *see also Bendik v. USAA Cas. Ins. Co.*, 6:19-cv-118, 2019 WL 9466018, *2 (M.D. Fla. Oct. 25, 2019) ("In general, excluding expert testimony is viewed as a 'drastic' sanction requiring careful consideration.") (citations omitted).  Similarly, the court in *Goines*, 2019 WL 968397 at *6 (M.D. Fla. Feb. 28, 2019), found there was no unfair prejudice or surprise where the supplemental opinion that was based on new records addressed the same matters and reached the same conclusion as the initial opinion. *Cf.*, *e.g.*,

*Brucker v. Lowe's Home Centers, Inc.*, 2:10-cv-405, 2012 WL 2225818, *1-2 (M.D. Fla. June 15, 2012) (revised expert reports that included a new theory were not supplements and were therefore untimely).

Here, too, there is little or no surprise to Defendant because Bedard's conclusions did not change between the two reports. Further, many—though not all—of the documents Bedard relies on in the supplemental report were not available to Plaintiff before the expert disclosure deadline. Plaintiff's explanation for the delay is largely adequate, and there is no evidence of gamesmanship or bad faith in the timing of its disclosure.

Most significantly, the Court does not find that Defendant has been prejudiced by any late disclosure. Although Defendant argues it did not have the opportunity to depose Bedard or retain a rebuttal expert, Defendant does not affirmatively state that it would have done so had the supplement been disclosed earlier, nor does it request the reopening of discovery for this purpose as an alternative remedy to exclusion. Further, there is little harm from the admission of the supplemental report because of the nature of Bedard's testimony. As noted in Section II(A), *supra*, much of his report, including the new sections, simply makes the same interpretations of evidence and arguments that appear in Plaintiff's summary judgment briefing. Both parties have adequately briefed and responded to the issues in their various motions and responses. The Court has already concluded Bedard's testimony neither creates nor eliminates any issue of material fact for the purpose of summary judgment. And Defendant would have the opportunity to cross-examine Bedard at trial. The five-factor test

therefore weighs in favor of a finding that, to the extent disclosure was untimely, any delay was substantially justified and harmless.   Accordingly, Defendant's motion to exclude it is due to be denied.

### C. Plaintiff's Motion to Strike Azdell Declaration

Plaintiff moves to strike the declaration of OIA principal Darren Azdell, which Defendant offered in support of its motion for summary judgment and *Daubert* motion. Doc. 68.  Plaintiff argues that the declaration, or at least most of its contents, must be stricken because it contains statements that are not based on personal knowledge, amount to inappropriate pseudo-expert conclusions, are unsupported by record evidence, contradict Azdell's deposition testimony, and/or are hearsay. *Id.*  Defendant opposes the motion to strike and contests Plaintiff's characterizations of the statements. Doc. 79.  Upon review, Plaintiff's arguments are meritless.

Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that a declaration used to support a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated.   As to admissibility, the statements in a declaration must be able to be "reduced to admissible form"; the "most obvious way" to do so is by calling the affiant as a witness at trial. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (collecting cases); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996).

The Azdell declaration complies with the requirements of Rule 56(c)(4).  First, it is certainly based on his personal knowledge.  Myriad documents submitted in support of the motions for summary judgment demonstrate that Azdell was not only OIA's corporate representative, but was also the leader of OIA's work on the Rise project who was intimately involved in the very communications and decisions on which Plaintiff relies when arguing it is entitled to summary judgment.  Plainly, Azdell has personal knowledge of OIA's actions, its contractual responsibilities, and other details of the project of which OIA was the architect of record. *Cf. Broughton v. School Bd. of Escambia Cnty., Fla.*, 540 F. App'x 907, 911 (11th Cir. 2013) (upholding decision to strike affidavit due to the affiant's lack of personal knowledge, where he stated he was aware of the events in question but did not work for the school board during the relevant time period).  Moreover, Plaintiff has placed Azdell's understanding and knowledge of the project directly at issue by its argument that he (as the applicant and primary insured) knew or reasonably should have known that a claim was possible. This is not a subject on which expert testimony is required. *See* Section II(A), *supra*. Azdell is fully qualified to make the statements in his declaration.

Next, Azdell's statements are not improper because they are unsupported or contradictory.  Defendant is correct that Plaintiff misstates the Rule 56 standard. There is no requirement that a declaration—as opposed to a motion, *see* Rule 56(c)(1)—cite to specific pieces of record evidence.  To the extent Defendant believes Azdell's statements are contradicted by evidence or have no basis in fact, it had or would have the opportunity to raise those arguments in its opposition to Plaintiff's

motion for summary judgment or during cross-examination at trial.   Moreover, Defendant's claim that Azdell's declaration must be stricken because it contradicts his deposition testimony is baseless.   Contrary to Defendant's assertion, Azdell extensively described in his deposition the reasons he believed he and OIA lacked actual or constructive knowledge that a claim would result from Marrero's death. *See* Doc. 62-3.  Plaintiff has not identified any statement in the declaration that contradicts a clear answer to an unambiguous question in the deposition. *See Van T. Junkins & Associates, Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

Finally, Plaintiff has not shown that any statements in the declaration cannot be reduced to admissible form.  It is well-settled that statements that are not offered for their truth are not hearsay, including statements that are offered only to show their effect on the listener. *See* Fed. R. Evid. 801(c); *see, e.g.*, *United States v. Harris*, 886 F.3d 1120, 1129-30 (11th Cir. 2018).  A primary question in this action is whether Azdell knew, or a reasonable architect in his shoes would have known, that a claim against OIA was possible after Marrero's death.  Statements that led Azdell to believe it was not possible are therefore relevant to show their effect on him.  They are not relevant for the truth of their contents: as Plaintiff has repeatedly asserted, whether OIA was *in fact* liable for the death—i.e., the truth of the statements Azdell recounts—is not the question.  The statements Plaintiff objects to are not hearsay or otherwise improper. Plaintiff's motion to strike is due to be denied.

### III.    CROSS MOTIONS FOR SUMMARY JUDGMENT

#### A. <u>Legal Standard</u>

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden is discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324.  Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323.  However, a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x. 852, 858

(11th Cir. 2006).  Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the undisputed facts. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.*  The Eleventh Circuit has explained that cross-motions for summary judgment will not, in themselves, warrant a grant of summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984), quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975).  Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## B. <u>Discussion</u>

Under Florida law,[4] insurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage. *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 877 (Fla. 2007). "If the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written." *Travelers Indemn. Co. v. PCR Inc.*, 889 So.2d 779, 785 (Fla. 2004). Policy language that is "susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage," will be considered ambiguous; but a provision or term will not be found ambiguous "merely because it is complex and requires analysis" or lacks a definition. *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165-166 (Fla. 2003). An insured bears the burden of proving that a claim against it is covered by the insurance policy, while the insurer bears the burden of proving that an exclusion to coverage applies. *Goldberg*, 143 F.Supp.3d at 1293. Any doubts about the duty to defend must be resolved in favor of the insured. *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So.2d 435, 443 (Fla. 2005).

Usually, "an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the true facts of the cause of action against the insured, the insured's version of the facts or the

---

[4] In a contract action, a federal court sitting in diversity jurisdiction applies the substantive law of the forum state. *See Zodiac Grp., Inc. v. Axis Surplus Ins. Co.*, 542 F. App'x 844, 848 (11th Cir. 2013).

insured's defenses." *State Farm Fire and Cas. Co.,* 393 F.3d 1226, 1230 (11th Cir. 2004),

citing *Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.,* 771 So.2d 579, 580–81 (Fla.

4th DCA 2000).  This rule is known as the "eight corners rule," referring to the four

corners of the underlying complaint and the four corners of the insurance policy. *See*

*Addison Ins. Co. v. 4000 Island Blvd. Condominium Ass'n, Inc.*, 721 F. App'x 847, 854 (11th

Cir. 2017).  "If the allegations in the complaint state facts that bring the injury within

the policy's coverage, the insurer must defend regardless of the merits of the lawsuit."

*Id.* (citations omitted).

In this case, however, both parties ask the Court to consider extrinsic evidence

outside of the eight corners of the policy and the underlying complaint.  The policy

provisions that Plaintiff argues exclude coverage—the Related Claims provision, the

Prior Notice exclusion, and the Prior Knowledge provision, each discussed *infra*—

necessarily call for the consideration of facts that would not be expected to appear in

the underlying complaint.  For example, the underlying complaint is unlikely to

address whether OIA made a previous claim to its insurer that was related to the

underlying claim.  Similarly, as the court in *Diamond State Ins. Co. v. Boys' Home Ass'n,*

*Inc.*, 172 F.Supp.3d 1326, 1340 (M.D. Fla. 2016), noted, "one would not necessarily

expect [the underlying complaint] to disclose facts relevant to whether [the underlying

defendant] had knowledge of its alleged wrongful conduct prior to its execution of the

insurance application."  For this reason, many courts have made an exception to the

eight corners rule to permit extrinsic evidence "where [the] pleading would not be

expected to disclose the facts necessary to determine the duty to defend." *Composite*

*Structures Inc. v. Continental Ins. Co.*, 903 F.Supp.2d 1284, 1285 (M.D. Fla. 2012), *aff'd* 560 F. App'x 861, 865-66 (11th Cir. 2014) ("We conclude this case presents an exception to the general rule that the duty to defend is determined solely from the allegations of the complaint."); *see also Diamond State*, 172 F.Supp.3d at 1340 (collecting cases).  The Court finds that such an exception is appropriate here as to Counts I, II, and III.[5]

The Court concludes that a strict reading of the policy language does not preclude coverage under the Related Claims provision, the Prior Notice exclusion, or the Prior Knowledge provision, with or without consideration of extrinsic evidence. However, it agrees with Plaintiff that OIA made material misrepresentations on the policy application that voided the policy under the rescission doctrine.  Accordingly, RLI has no duty to defend or indemnify OIA in the underlying lawsuit, and Plaintiff is entitled to summary judgment in its favor.

### 1. Count I (Related Claims)

The RLI policy only covers claims that are first made against an insured during the policy period. Doc. 1-2 at 14.  Moreover, "Related Claims will be treated as a single Claim, regardless of when the earliest Claim was made against an Insured." *Id.* Therefore, the policy applies only if the earliest "related claim" was first made during the policy period. *Id.*  The term "Related Claims"

---

[5] In contrast, the rescission doctrine calls for a finding that the insurance policy itself is void and does not consider whether an underlying lawsuit triggers a duty to defend under the policy. *See* Section III(B)(4), *infra*.  As a result, the eight corners rule does not apply to Count IV.

> means all Claims for Wrongful Acts or Pollution Incidents that are
> logically or causally connected by common facts, situations,
> events, transactions, projects, decisions or advice, regardless of the
> number of contracts or the types of Professional Services rendered.

*Id.* at 10.  A "claim" is "a written demand for monetary, non-monetary or injunctive relief against any Insured." *Id.* at 7.

Plaintiff argues that the June 10, 2019 IG letter is a "related claim" to the underlying lawsuit, because the letter referred to OIA's alleged unethical practices of allowing demolition without a permit during the Rise Village project. Doc. 60 at 32-35. [6]  Plaintiff contends that OIA's motion to disqualify Gilestra-Reyes in the underlying litigation demonstrates the relationship between the two claims, and that Defendant should be judicially estopped from arguing otherwise now. *Id.*  Defendant, in turn, argues that the two claims are not related, because the IG letter was a payment demand that referred only to "'egregious breaches of contract' and unspecified ethical violations." Doc. 62 at 22-23.  Defendant relies on Gilestra-Reyes's position, as the author of both the letter and the underlying complaint, as well as AIG's opinion that there was no relationship between them. *Id.*; Doc. 76 at 27-31.

The IG letter, which demanded money from OIA, is undoubtedly a "claim" within the meaning of RLI's policy. *See* Doc. 1-2 at 7.  The question is whether it is "logically or causally connected by common facts, situations, events, transactions,

---

[6] RLI does not argue that the litigation hold notice is a related claim. *See id.*; *cf.* Doc. 62 at 20-22.

projects, decisions or advice" to the claim against OIA in the underlying lawsuit. *Id.* at 10.

For two claims to be "logically or causally connected," there "need not be exact factual overlap, or even identical legal causes of action." *Health First, Inc. v. Capitol Specialty Ins. Corp.*, 230 F.Supp.3d 1285, 1300 (M.D. Fla. 2017), *aff'd* 747 F. App'x 744 (11th Cir. 2018). They need only be "linked by a sufficient factual nexus." *Capital Growth Financial LLC v. Quanta Specialty Lines Ins. Co.*, No. 07-80908-CIV, 2008 WL 2949492, *4 (S.D. Fla. July 30, 2008). Factors that courts consider include "whether the parties are the same, whether the claims all arise from the same transactions, whether the 'wrongful acts' are contemporaneous, and whether there is a common scheme or plan underlying the acts." *Health First*, 230 F.Supp.3d at 1300, quoting *Quanta*, 2008 WL 2949492 at *4. In other words, courts consider "whether the acts in question are connected by time, place, opportunity, pattern, and perhaps most importantly, by method or modus operandi." *Id.*

Claims that are "nearly identical" to each other will be considered related, even if they are brought by different parties. *See, e.g.*, *Vozzcom, Inc. v. Great Am. Ins. Co. of N.Y.*, 374 F. App'x 906, 907-08 (11th Cir. 2010) ("nearly identical" allegations against the defendant by different plaintiffs were considered a single claim under the terms of the policy); *see also Westport Ins. Corp. v. Key West Ins., Inc.*, 259 F. App'x 298, 300 (11th Cir. 2007) (claims involving the same agent repeating the same misrepresentations to the same insured on two different occasions were both causally and logically related);

*Camico Mut. Ins. Co. v. Rogozinski*, 3:10-cv-762, 2012 WL 4052090, *6 (M.D. Fla. Sept. 13, 2012) (claims were related where they stemmed from the same error for three straight years by insured accounting firm during tax preparation on behalf of clients who ran a joint business together).

But claims need not be identical as long as they share a sufficient factual nexus. In *American Casualty Co. of Reading, Penn. v. Belcher*, 709 F. App'x 606, 609 (11th Cir. 2017), for example, the court upheld the district court's finding that claims were "related," under a similar definition to that of the RLI policy, where they all resulted from the same pharmacy's unsanitary method of repackaging medication that caused bacterial infections. Even though there were many different circumstances between the claims, such as different types of medication, different dates, and different bacterial strains, the court found that they were sufficiently connected because the medication syringes were all prepared in the same place (which had the same sanitary defects), by the same pharmacist and supervisor, using the same defective process. *Id.*

In contrast, the similarities between claims were not sufficient to create a factual nexus in *Westport Ins. Corp. v. Brodie*, No. 11-22755-CV, 2013 WL 12093155, *3 (S.D. Fla. April 16, 2013). Both claims involved allegations of legal malpractice in real estate transactions between the same parties. *Id.* However, the fact that they occurred during different, unconnected transactions and resulted in different types of damages to the defendant rendered them inadequately related. *Id.* Similarly, in *Medmarc Casualty Ins. Co. v. Martin*, No. 07-21467-CIV, 2008 WL 11333856, *6 (S.D. Fla. Dec. 11, 2008), the alleged acts were insufficiently connected even though they all "boiled down to"

the defendant's negligent supervision of the same attorney, and two out of the three even involved the same property. The court was persuaded that the factual scenario underlying each claim was unique, in that they arose "from separate transactions between different parties and lenders, and involve[d] unique predicate acts or omissions" by the defendant. *Id.* at *7.

Different types of claims that are part of the same course of conduct, where the defendant is alleged to be working toward the same goal, will be considered logically or causally related. In *Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1264 (11th Cir. 2000), the Eleventh Circuit found that a related claims provision applied where the defendant had committed a course of conduct involving different types of acts that "all were aimed at a single particular goal"—promoting investment in a company. Because the same course of conduct "serves as the basis for both" claims, the claims were related. *Id.*; *see also Zodiac Group, Inc. v. Axis Surplus Ins. Co.*, 542 F. App'x 844, 849 (11th Cir. 2013) (all of the alleged wrongful acts "related to Zodiac's alleged efforts to falsely imply that Georgian endorsed or was associated with its psychic services after" the parties' endorsement contract ended); *Stafford v. Stanton*, No CV 17-262, 2022 WL 4491073, *3 (W.D. La. Sept. 27, 2022) (applying Florida law, finding claims were related when the same course of conduct underlay them, because defendant allegedly engaged in the same series of actions intended to encourage investment in a single enterprise). Interpreting a much broader related claims provision that grouped claims "in any way involving the same or related facts...whether related logically, causally or in any other way," the *Health First* court found that all of the underlying

complaints described a continuing pattern of anticompetitive behavior by the same defendant, which allegedly "used its monopolistic power to coerce doctors to admit patients exclusively to [its] facilities." *Health First, Inc. v. Capitol Specialty Ins. Corp.*, 747 F. App'x 744, 751 (11th Cir. 2018).  In contrast, the court in *Medmarc Casualty Ins. Co. v. Louis Stinson, Jr., P.A.*, No. 21-61414-CIV, 2022 WL 18587637, *3 (S.D. Fla. May 17, 2022), rejected the insurer's argument that conduct both before and after the policy period involved a common scheme.  Although all alleged acts were committed by the same defendant against the same individual, the defendant's alleged conduct lacked temporal proximity, involved different corporate entities and numerous factual bases, and did not employ a single method, which suggested that he had numerous goals. *Id.* As a result, coverage was not barred. *Id.* at *4.

Here, the underlying lawsuit alleges that OIA acted negligently or recklessly in failing to supervise the Rise Village project's demolition, causing Marrero's death. Doc. 1-1.  The IG letter is a payment demand that accuses OIA of breaching their contract by terminating IG without cause and failing to pay the remaining costs and liquidated damages.  The purpose of the IG letter is to obtain payment of what IG believes it is owed.  Although it concludes with a vague threat to expose OIA's "serious ethical violations" if OIA does not meet its settlement offer, this message is far from the letter's crux.  Moreover, the alleged violations remain unnamed.  Although the author of the letter, Gilestra-Reyes, testified to his recollection that the reference was intended to indicate permit violations with respect to the demolition work, Doc. 60-2 at 18-23, he also characterized the letter as concerning "a purely contractual dispute."

*See* Doc. 60-32 at 8.  Although the evidence suggests Corsino believed OIA was acting negligently or recklessly in failing to supervise the demolition, *see* Docs. 60-5, 60-6, his letter is not, contrary to Plaintiff's characterization, a *claim* "over OIA's unethical practices allowing demolition without a permit." Doc. 60 at 33.  The letter itself is only a claim for breach of contract and a demand for payment.  Further, the breach of contract claim does not stem from Corsino's belief about OIA's conduct.  Rather, the letters they exchanged about the termination demonstrate that they were disputing who was at fault for the delays in completing the construction documents, which determined whether the contract termination was for cause or convenience.  Corsino asserted that IG was not terminated for cause because the delays were attributable to OIA, not IG. Doc. 62-14.  Azdell repeatedly stated that he was terminating the contract because of IG's failure to complete the construction documents, which had placed OIA in breach of its contract with Tower. *See* Doc. 62-12.  There is no evidence in the record that the contract dispute resulted from Corsino's allegations of or belief about OIA's negligence or recklessness in supervising demolition.[7]

---

[7] Nor does judicial estoppel prevent Defendant from arguing that the related claims provision does not preclude coverage.  OIA argued in the underlying lawsuit that Reyes-Gilestra should not simultaneously represent a wrongful death claimant at a construction project and a subcontractor who worked on the same project, because of the potential for a claim against IG. *See* Doc. 60-31 at 9 ("Intergroup performed certain work on the *Rise* project, which exposes it to being a party and defending itself in the same lawsuit in which its counsel represents Plaintiffs—either as a potential co-defendant or third-party defendant[.]").  This position is not inconsistent with its current argument that IG's payment demand letter is not a "related claim" to the underlying lawsuit.

Having determined that IG's breach of contract claim does not involve or relate to any allegations about demolition supervision, the Court concludes it does not share a sufficient factual nexus with the underlying lawsuit to be considered a "related claim."  Both claims stem from the same source—OIA's participation in the Rise Village project—and a similar time period.  However, they involve different causes of action, legal duties allegedly breached, types of damages, and alleged victims. *See Brodie*, 2013 WL 12093155 at *3; *Martin*, 2008 WL 11333856 at *6.  Moreover, each involves an entirely different method or modus operandi, described as the "most important" of the factors, on the part of OIA. *See Quanta*, 2008 WL 2949492 at *4. There is no evidence that it acted with a singular or common purpose in allegedly breaching the IG contract and negligently failing to supervise the demolition at Rise Village. *Cf.*, *e.g.*, *Wendt*, 205 F.3d at 1264.  Although the standard for a "logical or causal connection" is broad, the caselaw demonstrates it is not so inclusive as to cover claims that share nothing more than a setting.  Weighing all of the relevant factors, no reasonable factfinder could conclude that the two claims are related.  Accordingly, the Related Claims provision does not preclude coverage.   Defendant is entitled to summary judgment as to Count I, with respect to Plaintiff's duty to defend only.[8]

### 2.  Count III (Prior Notice Exclusion)

In the Prior Notice Exclusion, the policy states that it does not apply to any Claim(s):

(q) based upon or arising out of:

---

[8] Plaintiff's duty to indemnify will be addressed in Section IV(B)(5), *infra*.

(i) any fact, situation, event, Wrongful Act…which was the subject of any notice given under any prior policy for Design Professional Liability…or other similar policy prior to the effective date of this Policy; or

(ii) any other Wrongful Act…, whenever occurring, which is logically or causally connected by common facts, situations or events, regardless of the number of contracts or the types of Professional Services rendered, to the Wrongful Act…specified in q. (i) immediately above.

Doc. 1-2 at 13-14.

OIA provided notice of the June 10, 2019 IG letter to its prior professional liability insurer, AIG. Plaintiff argues that the Prior Notice Exclusion bars coverage because OIA notified AIG of the IG claim, which alleged wrongdoing by OIA. Doc. 60 at 35. Plaintiff further asserts that the alleged "wrongful act" that OIA reported to AIG was IG's allegation of OIA's ethical violations involving demolition work, which is logically or causally connected to the allegations in the underlying lawsuit. *Id.* at 36.

As discussed in Section III(B)(1), *supra*, however, the wrongful act alleged in the IG letter was a breach of contract. The underlying lawsuit is not "based upon or arising out of" the payment demand IG conveyed in its letter. Similarly, as addressed *supra*, the underlying action is not logically or causally connected to the breach of contract allegation. Nor did OIA provide notice to AIG of anything other than a payment demand. Accordingly, for the same reasons as the Related Claims provision, neither section (i) or (ii) of the Prior Notice Exclusion applies.[9] Defendant is also

---

[9] With regard to section (ii), it is also unclear whether IG's breach of contract claim constitutes a Wrongful Act within the meaning of the RLI policy, which defines a Wrongful Act as "a

entitled to summary judgment as to Count III, with respect to Plaintiff's duty to defend only.

### 3. Count II (Prior Knowledge)

The RLI policy provides that it will pay expenses and damages as a result of a claim for a "Wrongful Act to which this insurance applies," but only if:

> (iii) none of the insured's directors, officers, principals, partners or insurance managers knew or could have reasonably expected that the Wrongful Act …might give rise to a claim, either prior to the inception date of this Policy[.]

Doc. 1-2 at 6.  A "wrongful act" is defined as "a negligent act, error, or omission in the performance of Professional Services for others by an Insured[.]" *Id.* at 11.

Plaintiff argues that this provision precludes coverage of the underlying lawsuit, because OIA knew or could have reasonably expected that Marrero's death might give rise to a claim before the policy began. Doc. 60 at 19-29.  It cites specific evidence allegedly demonstrating OIA's prior knowledge, including but not limited to the Bedard reports. *Id.* at 19-20.  Plaintiff argues that the evidence conclusively establishes OIA's actual knowledge (subjectively) and that a potential claim was reasonably foreseeable (objectively), either of which is sufficient to trigger the condition. *Id.* at 19-29.  Moreover, it asserts that because lack of prior knowledge is a condition precedent to coverage, Defendant bears the burden of proving a lack of prior knowledge in order to prove it is entitled to coverage. *Id.* at 29.

---

negligent act, error, or omission in the performance of Professional Services for others by an Insured[.]" Doc. 1-2 at 11.

Defendant argues that it is entitled to summary judgment as to Count II because it could not have reasonably expected that it would be subject to a claim from Marrero's death, as it had no contractual or legal duties related to the demolition work being performed and was never contacted regarding the accident. Doc. 62 at 24-25. Defendant asserts that RLI cannot rely on allegations in the underlying complaint that the evidence shows are untrue. *Id.* at 26-27. Defendant also argues that prior knowledge provisions are treated like exclusionary clauses, for which the insurer bears the burden of proof. Doc. 83 at 7.

Neither party acknowledges that the language of the RLI policy's prior knowledge provision is unusually narrow. Plaintiff's expert, Bedard, also fails to address the policy language when opining about prior knowledge. The RLI policy requires the insured's prior knowledge of a "wrongful act," which is defined as a "negligent act, error, or omission in the performance of professional services." Doc. 1-2 at 6, 11. Notably, neither provision includes the term "alleged." The significance of this omission is illustrated by other provisions of the RLI policy. Its definition of the term "circumstance" is particularly compelling: "an event or occurrence from which the Insured reasonably expects that a Claim(s) for an alleged Wrongful Act…will be made." *Id.* at 7. The insured is instructed to provide written notice if during the policy period it becomes aware of a "circumstance" for which the policy may apply. *Id.* at 16. Yet, in contrast, the prior knowledge provision does not exclude coverage if the insured knew or should have known about a "circumstance"—only if it knew about an actual "wrongful act." Likewise, the policy uses the term "alleged" in a number of

44

its exclusions, stating that it does not apply to claims that are based on or arise out of any "actual or alleged" excluded acts. *See id.* at 11-13. But, again, "alleged" is not used in the prior knowledge provision or in the definition of "wrongful act." Therefore, according to the "plain meaning" of the policy's words, *see Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528, 532 (Fla. 2005), the prior knowledge provision does not exclude claims that are based on events, occurrences, or allegations that the insured knew or should have known about before the policy began might give rise to a claim—only claims that are based on *actual* negligent acts, errors, or omissions that an insured knew or could have reasonably expected might give rise to a claim.[10]

The policy language of the cases on which Plaintiff relies is significantly broader. In *Berkley Assurance Co. v. Expert Group International Inc.*, 779 F. App'x 604, 607-07 (11th Cir. 2019), the prior knowledge provision required the insured to not have "any knowledge of any circumstance likely to result in or give rise to a claim." In *Feldman v. Imperium Ins. Co.*, the policy stated coverage did not apply if the insured knew or could have reasonably foreseen that the "wrongful act" might be expected to be the basis of a claim, defining "wrongful act" as "any actual *or alleged* act, error, omission, [etc.]." 8:14-cv-1637, 2015 WL 5854153, *6 (M.D. Fla. Oct. 5, 2015) (Moody, J.) (emphasis added); *see also Fidelity Nat. Title Ins. Co. v. Houston Cas. Co.*, 6:11-cv-1438, 2012 WL 4523666, *8 (M.D. Fla. Sept. 30, 2012) (same). Prior

---

[10] To the extent this policy language is ambiguous, and an interpretation that does not require knowledge of a wrongful act may also be reasonable, the Court must construe the language against the insurer and in favor of coverage. *See*, *e.g.*, *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 877 (Fla. 2007).

knowledge provisions' language in other cases is similarly broad. *See Nova Southeastern Univ., Inc. v. Continental Casualty Co.*, No. 18-CIV-61842, 2019 WL 7820594, *7 (S.D. Fla. Dec. 27, 2019) (insured must have known "of any *act*, error, omission, *or event* that could reasonably be expected to give rise to that claim") (emphasis added); *Houston Specialty Ins. Co. v. Titleworks of S.W. Fla., Inc.*, 2:15-cv-219, 2018 WL 11354007, *3 (M.D. Fla. March 16, 2018) (insured must have "had no knowledge of the actual or alleged Wrongful Act"); *David R. Farbstein, P.A. v. Wesport Ins. Corp.*, No. 16-cv-62361, 2017 WL 3425327, *3 (S.D. Fla. Aug. 9, 2017) (definition of "wrongful act" of which insured could not have prior knowledge included "circumstance" and "personal injury"); *Axis Ins. Co. v. Farah & Farah, P.A.*, 3:10-cv-393, 2011 WL 5510063, *4 (M.D. Fla. Nov. 10, 2011) (policy was conditioned on statement that "no fact, circumstance or situation indicating the probability of a claim or action…is now known"); *Lawyers Professional Liability Ins. Co. v. Dolan, Fertig & Curtis*, 524 So.2d 677, 678 (Fla. 4th DCA 1988) (policy did not apply to a claim "arising out of *any acts* or omissions" the insured could have reasonably foreseen "might be expected to be the basis of a claim") (emphasis added).

There is no question that OIA knew about the event of Marrero's death at the time the policy began.  The parties ardently dispute whether OIA reasonably should have known that Marrero's death might lead to a claim against it.  But the policy's prior knowledge provision asks a different, narrower question that neither party answers: whether OIA knew or could have reasonably expected that a "negligent act, error, or omission in the performance of professional services" might give rise to a

claim.   Answering this question in the affirmative requires OIA to know that it committed a negligent act, error, or omission.

The Court will turn first to the allegations of the underlying complaint. *See Farbstein, P.A.*, 2017 WL 3425327 at *7 (considering only the allegations of the underlying complaint when determining a prior knowledge exclusion applied).   The negligent act, error, or omission alleged is OIA's "failure to ensure compliance with safety standards…despite being aware of reports made about OSHA and permitting violations at the construction site." Doc. 1-1 ¶ 10.   OIA was also "warned…about instances of noncompliance with OSHA standards." *Id.* ¶ 17.   The allegations include three alternative theories of liability, including negligence and vicarious liability. *Id.* ¶ 10.   The complaint alleges OIA's awareness of reports of OSHA and permitting noncompliance.   However, it does not necessarily allege OIA's awareness of its own error, because the theories of negligence and vicarious liability do not require knowledge.   It is well-settled that an insurer must defend against an action whose complaint alleges facts showing two or more grounds for or theories of liability, one that is within coverage and one that is not. *See*, *e.g.*, *Jones Boat Yard, Inc. v. St. Paul Fire & Marine Ins. Co.*, 745 F. App'x 308, 312-23 (11th Cir. 2018); *Lime Tree Vill, Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir. 1993).   The allegations of the underlying complaint do not establish that the prior knowledge provision precludes coverage.

Nor does extrinsic evidence demonstrate that OIA knew that it had committed a negligent act, error, or omission that could reasonably be expected to give rise to a

claim.  RLI does not point to any *admissions* by an OIA representative that it acted

negligently in connection with Marrero's death or the demolition.  On the contrary,

Azdell has maintained he had no responsibility over it.[11]  Again, the question is not

whether OIA knew it was *alleged* to have been negligent, but whether it actually knew

it *was* negligent.  For example, Corsino informed Azdell of his belief that OIA was not

fulfilling its duties, which establishes OIA's knowledge of Corsino's belief.  But OIA

has identified no evidence establishing that Azdell agreed with him, contrasted with

considerable evidence that he did not.  As a result, the threshold requirement for the

RLI policy's Prior Knowledge provision—the insured's awareness that it committed a

wrongful act—is not satisfied.  Because Plaintiff has not proven that the prior

knowledge provision applies, Defendant is entitled to summary judgment as to the

duty to defend in Count III.[12]

---

[11] Plaintiff and Bedard make much of Azdell's statement to Corsino that he was in breach of his primary contact with Tower. *See* Doc. 60 at 7 (calling the statement a "confess[ion]"), 20, 25, 28.  But the same correspondence states that the breach occurred "as a result of [the] missed deadlines" for the construction documents—not, as Plaintiff implies, for any negligence or misconduct with respect to demolition. Doc. 62-13 at 4.  No reasonable factfinder could infer Azdell's knowledge of demolition negligence from this statement.

[12] Plaintiff argues that Defendant bears the burden of proving that the provision does not preclude coverage, because the provision is a condition precedent to coverage rather than an exclusion. Doc. 60 at 26.  Plaintiff relies on a Fourth Circuit case holding that a similar provision is a condition precedent, while not addressing the burden of proof. *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 660 F.3d 827, 831 (4th Cir. 2011).  However, courts within this Circuit largely treat prior knowledge provisions interchangeably with exclusions.  The Eleventh Circuit itself has rejected the argument RLI makes, albeit in an unpublished, non-binding opinion. *Berkley Assurance Co. v. Expert Grp. Int'l Inc.*, 779 F. App'x 604, 608 n.1 (11th Cir. 2019) ("Berkley calls this condition a "limitation" rather than an "exclusion." To the extent there is any meaningful difference between the two terms, we treat the condition as an "exclusion" for purposes of this opinion.").  This Court finds that the *Berkley* position is more consistent with Florida law's presumption in favor of coverage, particularly in the event of an ambiguity or conflict.  In the absence of any binding authority to the contrary, this Court will

### 4.  Count IV (Rescission)

In Count IV, Plaintiff argues that OIA's insurance policy is void under the rescission doctrine, because of OIA's material misrepresentations in its application. Doc. 1 ¶¶ 43-50.  When applying for the RLI policy, OIA affirmed that the information in its application was "true, accurate, and complete."  Doc. 60-1 at 12.  The policy also contained a warranty condition that the information contained in the application is "true, accurate" and "material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy."  Doc. 1-2 at 19.

Plaintiff contends that OIA's answers to the following questions were inaccurate:

> 8. After inquiry, is the applicant…aware of any act, error or omission or circumstance which may result in a claim being made against them but which has not yet been reported to a professional liability carrier?  (If yes, please attach a full statement.)
> Answer: No
> …
> 3. After inquiry, is the Applicant…aware of any _____ act, error, omission or circumstance which may possibly result in a claim being made against them but which has not yet been reported to a professional liability carrier?
> Answer: No
>
> 4. Has the Applicant…ever reported a potential claim, circumstance to a professional liability carrier?
> Answer: No

---

follow *Berkley* and consider the prior knowledge provision to carry a similar burden of proof to an exclusion.

Doc. 60-1 at 3, 10.  A "claim" is defined as "any demand for money or services, including but not limited to the service of suit or the institution of arbitration proceedings against you." *Id.* at 1.

Plaintiff provided an affidavit from an RLI underwriter who explained that RLI detrimentally relied on OIA's "no" answers to those questions when deciding whether to issue the policy. Doc. 60-39 ¶¶ 6-11.  The underwriter also stated that RLI would not have issued the policy if it had known that OIA was accused of serious ethical violations on the same day a demolition worker died on its project, or it would have issued the policy with higher premiums and an endorsement excluding all coverage related to the project or the death. *Id.* ¶¶ 30-31.  Plaintiff therefore argues that OIA's material misrepresentations render the policy void, based on the policy's condition and Florida Statutes § 627.409. Doc. 60 at 30-32.

Defendant argues Plaintiff has failed to prove that the answers were inaccurate, because a reasonable person in OIA's situation could have truthfully answered "no" to the application questions. Doc. 76 at 25.  OIA had no reason to believe that Marrero's death would result in a claim against it because it had no contractual or other legal duties in connection with the demolition and it had not been a part of the investigation into Marrero's death. *Id.* at 26-27.  Moreover, RLI was required, but failed, to investigate the actual circumstances of the death before it could determine that OIA made a misrepresentation. *Id.* at 25-26.

In reply to its motion for summary judgment, Plaintiff argues that Defendant is erroneously conflating actual liability with reasonable foreseeability, and that

Defendant cannot contradict the allegations of the underlying complaint when arguing in favor of insurance coverage. Doc. 82 at 2-3, 5-6.  In its own reply, Defendant contends that the same facts that demonstrate OIA is not actually liable for the death also show that it had no reason to expect a claim would be made against it. Doc. 83 at 8.  It also asserts that the accuracy of its statements can only be judged based on the actual circumstances, not those alleged in the underlying lawsuit. *Id.* at 9.

Under Florida law, a misrepresentation in an insurance application may prevent recovery if it "is material to the acceptance of the risk or to the hazard assumed by the insurer," meaning that "the insurer in good faith would not have issued the policy," would not have issued it at the same premium rate, or would not have provided the same level of coverage, "[i]f the true facts had been known to the insurer[.]" Fla. Stat. § 627.409(1).  An insurer seeking to rescind its policy based on a misrepresentation under this statute "bears the burden to plead and prove the misrepresentation, its materiality, and the insurer's detrimental reliance." *Griffin v. Am. Gen. Life & Acc. Ins. Co.*, 752 So.2d 621, 623 (Fla. 2d DCA 1999).

An "essential prerequisite" to the rescission doctrine is that the insured must make an inaccurate statement in his application. *William Penn Life Ins. Co. of N.Y. v. Sands*, 912 F.2d 1359, 1362 (11th Cir. 1990).  Therefore, for the insurer to receive summary judgment on the issue of rescission, it must "demonstrate as a matter of law that there were underlying facts known to the insured which clearly contradicted her answers to the insurer." *Trisura Specialty Ins. Co. v. Kanpai, Inc.*, No. 20-62142-CIV, 2021 WL 4902508, *6 (S.D. Fla. Oct. 21, 2021) (citations and modifications omitted).

51

A misrepresentation need not be intentional to void an insurance policy. *Continental Assurance Co. v. Carroll*, 485 So.2d 406, 408 (Fla. 1986).  However, the subjectivity or objectivity of the application language is significant: representations made "to the best of [the applicant's] knowledge and belief" are evaluated differently than an unconditional warranty that the information is "true and accurate." The insurer's language choice can "shift[] the focus from a determination of the truth or falsity of an applicant's statement to an inquiry into whether the applicant believed the statements to be true," which requires assessment "in light of his actual knowledge or belief." *Hauser v. Life Gen. Sec. Ins. Co.*, 56 F.3d 1330, 1334 (11th Cir. 1995).  Summary judgment is "rarely proper in 'knowledge and belief' cases because the issue usually turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge." *Trisura*, 2021 WL 4902508 at *5 (quotation omitted).   Here, in contrast, the application language is objective, unconditionally asking the applicant to attest that his answers are "true, accurate, and complete." Doc. 60-1 at 12.

Plaintiff contends that OIA's answers to questions three, four, and eight are inaccurate as a matter of law.  Question four unequivocally is.  This question asked whether OIA "ever reported a potential claim…to a professional liability carrier," with a claim defined as "any demand for money or services." *Id.* at 1, 10.  It is undisputed that Azdell contacted OIA's former professional liability carrier, AIG, to notify it that OIA had received the June 10 IG letter.  The letter was a demand for payment, therefore constituting a "claim" as defined by the application.  Even crediting Azdell's

statement that he did not intend to *make* a claim, as he understood the term, to AIG by reporting the letter, it is clear that the purpose of notifying them was to "report a potential claim." Azdell informed AIG about the letter in response to his insurance broker's advice that he should, even though he "might not think this is a claim," because "if something blows up, and it turns into one…your claim could be denied on this insurance." Doc. 60-11. As a result, Azdell emailed AIG "to notify [it] that I received a demand letter…from a consultant…for payment of services which were not rendered. … Please advise if additional information or discussion is required." Doc. 60-12. Viewing this evidence in the light most favorable to Defendant, no reasonable factfinder could conclude the negative answer to question four was accurate.

With respect to questions three and eight, however, the accuracy of their answers is a closer question. OIA was asked whether it was "aware" of any "act, error, omission or circumstance which may possibly result in a claim being made against them." There is no dispute that Azdell was aware of Marrero's death, and that the death qualified as a "circumstance." Thus, the outstanding issue is whether Azdell was aware that the death "may possibly result in a claim being made against" OIA. In this regard, questions three and eight have an element of subjectivity. Although the entire application was not made upon knowledge and belief, questions three and eight specifically referred only to information that the applicant was aware of. Thus, for Azdell's answers to be inaccurate, Plaintiff must prove that Azdell or another OIA officer was actually aware that the death "may possibly result in a claim being made against" OIA.

The phrase "may possibly result" in a claim is a low bar: it does not call for a probability, but for any possibility that OIA would be named in a suit or other demand. To answer "no" therefore denies awareness of any possibility of that outcome. Interpreting similar policy application language, courts in this District have held that the proper inquiry is whether the insured "had an objective basis to believe that a reasonable claim could arise," not whether they subjectively believed that it would. *St. Paul Mercury Ins. Co. v. Spencer Int'l Advisors, Inc.*, No. 811CV00166, 2012 WL 13109896, *8 (M.D. Fla. Mar. 28, 2012); *see also Eddy v. Cont'l Cas. Co.*, 784 F. Supp. 2d 1331, 1342-43 (M.D. Fla. 2011) (disregarding insured firm's subjective beliefs where evidence showed one of firm's partners foresaw a malpractice claim and shared concern with others). Courts have emphasized that, "[ev]en if [the insured] believed any claims against it lacked merit, the insurance application still required that those claims or potential claims be disclosed." *Id.*

In *Metro. Life Ins. Co. v. Liebowitz*, No. 2:20-CV-276, 2022 WL 103566, at *5-6 (M.D. Fla. Jan. 11, 2022), for example, the court found that the insured's answer that he was not "aware of any fact that could change [his] occupational status or financial stability" was inaccurate where he knew he was subject to a pending investigation resulting from patient complaints, irrespective of his perception of the investigation's merits or likelihood of success. The Eleventh Circuit found that an insured made a similar misrepresentation in *Pericles v. MGA Ins. Co.*, 567 F. App'x 804, 808 (11th Cir. 2014), when he warranted that "there have been no accidents…that may result in claims against" the insurance policy, even though he was aware the insured vehicle

had been involved in a collision that injured a third party. The court rejected his argument that he had good reason to believe the accident would not lead to a claim because the responding police officer had declined to ticket the insured driver. *Id.* at 809. The court explained that "whether [the insured] subjectively believed that a claim could result from the…accident goes to whether he *intended* to misrepresent events, and [the insured's] subjective intent is irrelevant in our analysis." *Id.*; *see also Zurich Am. Ins. Co. v. Diamond Title of Sarasota, Inc.*, No. 8:10-CV-383, 2013 WL 6283684, *2–3 (M.D. Fla. Dec. 4, 2013) (rejecting insured's argument that she accurately answered that she did not "know of circumstances which could result in professional liability claims" because her admitted mortgage fraud was a criminal act, not a professional one; finding that she "was not relieved of her duty in the application to report acts that *could* result in a professional liability claim simply because the Policy may not have covered those acts.").

The instant case strongly resembles those in which courts found a misrepresentation occurred despite the insured's belief that a claim would not result. In so finding, however, the Court notes that it disagrees with Plaintiff about the significance of much of the evidence on which it relies, such as the existence of earlier problems with other aspects of the project that do not relate to the accident (cracks on the roof and a fire on another floor) and a delay in demolition permitting that was subsequently rectified. With respect to the litigation hold notice, the Court finds there

is a question of fact as to whether OIA actually received it.[13]  Further, Defendant is correct that its contracts expressly state that OIA would have no responsibility for the project's safety, including the safety of demolition.  Although OIA's actual liability is not at issue in this proceeding, it is less likely that someone would anticipate litigation when they are subject to a contract they believe precludes liability.  Similarly, the fact that the allegations in the underlying complaint about OIA's role and responsibilities are, arguably, refuted by the contracts, also makes it more reasonable that someone would not expect to be included in a lawsuit.   The fact that OIA was not named or involved in the PROSHA investigation lends further credence to that perspective.[14] *Cf. Metro. Life Ins.*, 2022 WL 103566 at *5-6 (insured knew he was under investigation).

Nonetheless, there is enough evidence in Plaintiff's favor that no reasonable factfinder could conclude Azdell's answers to questions three and eight were accurate. First, there is evidence that OIA was not completely removed from the demolition stage of the project.  Contrary to Azdell's claim that demolition was an entirely separate phase over which it had no responsibility, OIA was listed prominently as the architect on the demolition contract, which required OIA to "visit the site…to become generally familiar with the progress and quality of the portion of the Work

---

[13] Because Plaintiff cannot prove the letter was mailed, the mailbox presumption does not apply.  Moreover, a reasonable factfinder could interpret the emails between Azdell, Criado, and Reyes-Gilestra as reflecting Criado and Azdell's belief that the letter was another copy of the IG payment demand, rather than an acknowledgement of receipt of the litigation hold notice.

[14] Whether OIA conducted its own investigation into the accident is another disputed issue of fact, as both parties have presented evidence that supports an inference in their favor.

completed"—with "Work" referring to the demolition. Doc. 73-2 at 26. Some of Azdell's statements also suggest some responsibility over the demolition phase. Rather than denying Corsino's claims about OIA's responsibilities with respect to demolition, Azdell told Corsino he had "instructed [Bird] not to proceed with demolition" until the original permit was on site. Doc. 60-6 at 2. He also stated "We…have engineers there performing structural tests which will include destructive testing." *Id.* Likewise, after the accident, Azdell told Morla that "they should remove all equipment from the 13th floor until all testing is complete." Doc. 60-18 at 2. Regardless of OIA's contractual responsibilities or lack thereof, its involvement in the demolition phase could reasonably lead an observer to believe it shared liability—increasing the possibility of its inclusion in a lawsuit.

More importantly, there is affirmative evidence that Azdell was aware OIA might be accused of having responsibility for the death. It is undisputed that he knew Corsino believed OIA had responsibilities over the demolition that it was neglecting, leading to safety and ethical violations; it was not outside the realm of possibility that Corsino would have shared that belief with others, including Marrero's family, or that they would have developed the same belief on their own—whether mistaken or not. Azdell also knew that Marrero's death had resulted from professional negligence, making a lawsuit by his heirs more likely than if no one had been at fault. Finally, it is highly significant that Azdell's first reaction on learning there had been an attempt to serve a certified letter in June 2019 was to guess, "Accident attorney? Maybe from the construction accident?" Doc. 60-22 at 4.

In all, viewing the evidence in the light most favorable to Defendant, the Court finds OIA had an objective basis to believe there was a possibility it would be subject to a claim from Marrero's death, despite Azdell's personal belief that OIA could not be liable and that a lawsuit against it would not be successful. *See St. Paul Mercury*, 2012 WL 13109896 at *8; *Eddy v. Cont'l Cas. Co.*, 784 F. Supp. 2d at 1342-43 (insured's subjective belief that claim would be meritless was irrelevant).   Stated differently, it was inaccurate as a matter of law for him to say there was *no* possibility the accident could lead to a claim against OIA.   The evidence does not suggest the misrepresentation was intentional, and he may have had good reason, especially by the time of the RLI application, to think it was unlikely OIA would be sued.  As in *Pericles*, 567 F. App'x at 808, however, Azdell's subjective intent does not overcome the fact that there was an objective basis to believe there was a possibility of a claim against OIA.  Plaintiff has therefore demonstrated as a matter of law that the answers to questions three, four, and eight were inaccurate.[15]

Further, the affidavit of the RLI underwriter establishes that these misrepresentations were material and that RLI detrimentally relied on them. Defendant does not appear to dispute these elements of rescission, and it has submitted no evidence or arguments to refute the underwriter affidavit.  Accordingly, the Court

---

[15] The Court need not resolve Defendant's argument that RLI should have investigated the veracity of the underlying lawsuit before concluding the policy was void under the rescission doctrine.  Defendant has not identified authority that requires an insurer to do so.  Moreover, at this stage it is the Court that determines whether the answers were inaccurate.  The parties have had a full opportunity to present evidence supporting their position, which the Court reviewed and relied on in concluding that they were.

finds that the policy is void under Fla. Stat. § 627.409.  As a result, Plaintiff RLI does not have a duty to defend Defendant OIA in the underlying lawsuit.  Plaintiff is entitled to judgment as a matter of law.

### 5. Count V (Reimbursement)

In Count V, Plaintiff seeks to enforce a policy condition in which OIA agreed to "promptly reimburse the Insurer for all Claim Expenses paid or incurred by the Insurer on account of a Claim upon a final judgment or adjudication that the Insurer owes no duty to defend." Doc. 1 ¶¶ 47-48.  The Court has found that RLI owes no duty to defend OIA.  However, Defendant contends that RLI has not defended it, despite its initial agreement to do so under a reservation of rights.  As a result, it is not clear whether RLI has incurred any "fees and costs…on behalf of OIA." *Id.* ¶ 48; *see* Doc. 62-28 (stating it has not incurred any defense expenses to date).  Defendant argues that it is entitled to summary judgment as to Count V. Doc. 62 at 33-34. Plaintiff did not respond to this point.

Defendant's motion for summary judgment as to Count V is denied without prejudice.  To the extent Plaintiff seeks reimbursement under the policy provision it invoked in Count V, Plaintiff must file a separate motion to that effect on or before October 2, 2023.  Plaintiff's motion should address whether a reimbursement obligation in the policy survives the Court's finding that the policy is void as a result of rescission.

## 6. Duty to Indemnify

Defendant asks the Court to stay Plaintiff's request for a declaration that it has no duty to indemnify OIA in the underlying lawsuit, arguing that the duty to indemnify is premature until the underlying lawsuit is resolved. Doc. 62 at 34.  While that is true under some circumstances, in this case the Court has already determined there is no duty to defend.  It is well-settled in Florida that if an insurer has no duty to defend an insured, it also has no duty to indemnify. *See, e.g.*, *Trailer Bridge, Inc. v. Ill. Nat. Ins. Co.*, 657 F.3d 1135, 1146 (11th Cir. 2011), citing *Fun Spree Vacations, Inc. v. Orion Ins. Co.*, 659 So.2d 419, 422 (Fla. 3d DCA 1995).  Accordingly, Plaintiff is entitled to a declaration that it has no duty to indemnify OIA in the underlying lawsuit. Plaintiff's motion for summary judgment as to its duty to indemnify is therefore due to be granted.

## 7. Counterclaim

Defendant's counterclaim asserts that Plaintiff has breached the insurance contract between RLI and OIA in wrongfully refusing to defend and indemnify OIA in the underlying action. Doc. 12 at 16-18.  For the reasons explained in this Order, Defendant's motion for summary judgment as to its counterclaim must be denied. Doc. 62 at 35.

Plaintiff has not moved for summary judgment as to Defendant's counterclaim. However, this Court's ruling that Plaintiff is entitled to summary judgment that RLI has no duty to defend or indemnify OIA in the underlying action necessarily resolves Defendant's counterclaim.  Moreover, through its motion for summary judgment and

its opposition to Plaintiff's motion for summary judgment, Defendant has had a full and fair opportunity to present its arguments and evidence relating to the duty to defend and indemnify. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999) ("A district court possesses the power to enter summary judgment *sua sponte* provided the losing party '[is] on notice that she had to come forward with all of her evidence.'"), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).  Accordingly, pursuant to Rule 56(f)(1) of the Federal Rules of Civil Procedure, the Court will *sua sponte* grant summary judgment to Plaintiff as to Defendant's counterclaim.

Accordingly, it is **ORDERED**:

1. Defendant's Motion to Exclude Expert Opinion, Report and Testimony of Benjamin L. Bedard (Doc. 61) is **DENIED**.

2. Plaintiff's Motion to Strike Affidavit of Darren Azdell (Doc. 68) is **DENIED**.

3. Defendant's Motion to Exclude Supplemental Expert Witness Report of Benjamin L. Bedard (Doc. 75) is **DENIED**.

4. Plaintiff RLI's Motion for Final Summary Judgment (Doc. 60) is **GRANTED-IN-PART and DENIED-IN-PART**.  The motion is granted as to Count IV, and otherwise denied.

5. Defendant OIA's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 62) is **GRANTED-IN-PART and DENIED-**

**IN-PART**.  The motion is granted as to Counts I, II, and III, and otherwise denied.  The motion is denied without prejudice as to Count V.

6.   Plaintiff RLI is entitled to summary judgment in its favor on Count IV of the Complaint as to its duty to defend and indemnify Defendant OIA. A final declaratory judgment in favor of Plaintiff RLI will be entered by separate order.

7.   Counter-Defendant RLI is entitled to summary judgment in its favor on the Counterclaim of Counter-Plaintiff OIA. A final judgment will be entered by separate order.

**DONE** and **ORDERED** in Tampa, Florida on September 11, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties